UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
GAIL HINTERBERGER, BEVERLY WEISBECKER,
CYNTHIA WILLIAMS and MARCIA CARROLL,
on behalf of themselves and all other employees similarly situated,

                                        Plaintiffs,

                    v.

CATHOLIC HEALTH SYSTEMS, INC., CATHOLIC HEALTH
EAST, JOSEPH MCDONALD, MICHAEL MOLEY,
CHESTNUT RIDGE MEDICAL SUPPLIES INC., CATHOLIC
HEALTH SYSTEM PROGRAM OF ALL INCLUSIVE CARE
FOR THE ELDERLY, INC., CATHOLIC HEALTH SYSTEM
CONTINUING CARE FOUNDATION, KENMORE MERCY
HOSPITAL, MCAULEY-SETON HOME CARE
CORPORATION, MERCY HOSPITAL OF BUFFALO,             **Civil Action No.**
NAZARETH HOME OF THE FRANCISCAN SISTERS OF THE     **08-CV-00380-WMS**
IMMACULATE CONCEPTION, NIAGARA HOMEMAKER
SERVICES, INC., SISTERS OF CHARITY HOSPITAL OF
BUFFALO, NEW YORK, ST. ELIZABETH'S HOME OF
LANCASTER, NEW YORK, ST. FRANCIS GERIATRIC AND
HEALTHCARE SERVICES, INC., ST. FRANCIS HOME OF
WILLIAMSVILLE, NEW YORK, ST. JOSEPH HOSPITAL OF
CHEEKTOWAGA, NEW YORK, ST. JOSEPH'S MANOR OF
OLEAN, N.Y., ST. VINCENT'S HOME FOR THE AGED, ST.
CLARE MANOR OF LOCKPORT, N.Y., ST. LUKE MANOR
OF BATAVIA, N.Y., OUR LADY OF VICTORY
RENAISSANCE CORPORATION, CHESTNUT RIDGE
FAMILY PRACTICE, PLLC and ST. MARY'S MANOR,

                                        Defendants.
_____


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR COLLECTIVE ACTION NOTIFICATION**



                         **NIXON PEABODY LLP**
                         *Attorneys for the Catholic Health System Defendants*
                         40 Fountain Plaza, Suite 500
                         Buffalo, New York 14202
                         (716) 853-8100

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

RELEVANT FACTUAL BACKGROUND ............................................................4

    A.    The Catholic Health System ...................................................................4

        1.    Workforce of Defendants .......................................................5

        2.    Operations/Organizational Structure of Defendants ...........5

        3.    Alleged Policy at Issue..........................................................6

ARGUMENT ...........................................................................................................7

I.    PLAINTIFFS' MOTION FOR COLLECTIVE ACTION NOTIFICATION
    SHOULD BE DENIED ...................................................................................7

    A.    THE LEGAL STANDARD .....................................................................7

    B.    PLAINTIFFS FAIL TO MEET THEIR ARGUABLY MINIMAL
        EVIDENTIARY BURDEN UNDER FLSA SECTION 216(b) ............10

        1.    The Consent Forms Filed by Plaintiffs Provide No Useful Evidence ..........11

        2.    The Affirmations Filed by Plaintiffs are Vague and Conclusory .................12

        3.    Two of the Affiants Have No FLSA Claims .................................................15

    C.    PLAINTIFFS' CLAIMS ARE NOT SUITABLE FOR COLLECTIVE ACTION
        TREATMENT BECAUSE THEY REQUIRE HIGHLY INDIVIDUALIZED
        INQUIRY ...............................................................................................16

        1.    Plaintiffs Have Failed to Demonstrate the Existence of an Unlawful
            Policy or Practice.........................................................................................17

        2.    Plaintiffs Are Not Similarly Situated By Virtue of Some Employees'
            Union Memberships .....................................................................................20

        3.    The Case Law Cited by Plaintiffs Does Not Support Ordering Notice .......22

        4.    Adjudication of Plaintiffs' Claims Necessarily Requires Individualized
            Inquiries That Are Inappropriate for Collective Action Treatment............23

a.   Plaintiffs' Meal Period Claims Require Individualized Inquiry as to Whether Each Meal Period was Spent Predominantly for the Benefit of the Employer .................................................................................25

b.   Plaintiffs' Meal Period Claims Require Individualized Inquiry as to Whether Each Manager Knew that Each Proposed Class Member Performed Compensable Work During Any Given Meal Period .......................................................................................29

II.   **THE PUTATIVE COLLECTIVE ACTION TO WHICH PLAINTIFFS SEEK TO SEND NOTICE IS OVERBROAD, AND, THEREFORE, IF NOTICE IS NOT DENIED, IT MUST BE DISTRIBUTED ON A LIMITED BASIS** ..............................32

III.   **THE CONTENT AND FORM OF THE PROPOSED NOTICE IS INAPPROPRIATE** ..........................................................................................35

    A.   U.S. MAIL IS APPROPRIATE AS THE SOLE FORM OF NOTICE ..................35

    B.   PLAINTIFFS HAVE NO RIGHT TO EMPLOYEES' PERSONAL INFORMATION ..................................................................................37

    C.   THE TIME PERIOD FOR OPTING IN TO THE COLLECTIVE ACTION SHOULD BE LIMITED TO 45 DAYS ..................................................38

IV.   **BECAUSE OF PLAINTIFFS' IMPROPER PRE-NOTICE MASS SOLICITATIONS, THIS COURT SHOULD NOT AUTHORIZE ADDITIONAL NOTICE** ...........................................................................................39

**CONCLUSION** ........................................................................................40

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

Abrams v. Gen. Elec. Co., 95-CV-1734, 1996 U.S. Dist. LEXIS 16869
(N.D.N.Y. 1996) ................................................................................................29

Anderson v. Cagle's, Inc., 488 F.3d 945 (11th Cir. 2007).............................................22

Anglada v. Linens n Things, Inc., 06 Civ 12901, 2007 U.S. Dist. LEXIS 39105 *33
(S.D.N.Y. 2007)................................................................................................38

Barrus v. Dick's Sporting Goods, Inc., 465 F. Supp. 2d 224 (W.D.N.Y. 2006) ...........23

Basco v. Wal-Mart, 00-3184, 2004 U.S. Dist. LEXIS 12441 (E.D. La. 2004) ........................9, 17

Baum v. Shoney's Inc., 98-423-CV, 1998 U.S. Dist. LEXIS 21484 (M.D. Fla. 1998) ...............10

Beasley v. Hillcrest Med. Ctr., 78 Fed. Appx. 67, 70 (10th Cir. 2003)........................................25

Berger v. Cleveland Clinic Found., 1:05cv1508, 2007 U.S. Dist. LEXIS 76593
(N.D. Ohio 2007) ...........................................................................................23, 30

Bernard v. Household Int'l, Inc., 231 F. Supp. 2d 433 (E.D. Va. 2002) ................................10, 34

Bowens v. Atlantic Maint. Corp., 546 F. Supp. 2d 55 (E.D.N.Y. 2008) .......................................38

Camper v. Home Quality Mgmt. Inc., 200 F.R.D. 516 (D. Md. 2000) ....................................7, 34

Carmody v. Florida Center for Recovery, Inc., 05-14295, 2006 U.S. Dist. LEXIS 81640
(S.D. Fla. 2006)................................................................................................23

Cintron v. Hershey Puerto Rico, Inc., 363 F. Supp. 2d 1017 (D.P.R. 2005)................................39

D'Anna v. M/A-Com, Inc., 903 F. Supp. 889 (D. Md. 1995) ........................................................9

Diaz v. Elecs. Boutique of Am., 04-CV-0840E, 2005 U.S. Dist. LEXIS 30382
(W.D.N.Y. 2005) ...........................................................................................20, 24

Dudley v. Texas Waste Sys., Inc., 05-CA-0078, 2005 U.S. Dist. LEXIS 9168
(W.D. Tex. 2005)................................................................................24, 25, 31

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

Edwards v. City of Long Beach, 467 F. Supp. 2d 986 (C.D. Cal. 2006).........................................7

England v. New Century Fin. Corp, 370 F. Supp. 2d 504 (M.D. La. 2005)............................20, 24

Enright v. CGH Medical Center, No. 96 C 50224, 1999 U.S. Dist. LEXIS 370 *16
     (N.D.Ill. 1999)..................................................................................................................18

Fasanelli v. Heartland Brewery, Inc., 516 F. Supp. 2d 317 (S.D.N.Y. 2007) ..............................38

Flores v. Lifeway Foods, Inc., 289 F. Supp. 2d 1042 (N.D. Ill. 2003)..........................................40

Francis v. A&E Stores, Inc., 06 Civ 1638, 2008 U.S. Dist. LEXIS 49971 *8-9
     (S.D.N.Y. June 26, 2008).............................................................................................38, 39

Freeman v. Wal-Mart, 256 F. Supp. 2d 941 (W.D. Ark. 2003)................................................9, 19

Gerlach v. Wells Fargo & Co., No. C 05-0585, 2006 U.S. Dist. LEXIS 24823
     (N.D. Cal. 2006).................................................................................................................16

Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d 101 (S.D.N.Y. 2003)..............11, 38

Gulf Oil Co. v. Bernard, 452 U.S. 89 (1981)................................................................................40

H&R Block v. Housden, 186 F.R.D. 399 (E.D. Tex. 1999) ............................................................8

Hall v. Burk, 3:01-cv-2487, 2002 U.S. Dist. LEXIS 4163 (N.D. Tex. Mar. 12, 2002)..................7

Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358 (M.D. Ala. 1999) ...............................................34

Heagney v. European Am. Bank, 122 F.R.D. 125 (E.D.N.Y. 1988) ............................................29

Hens v. ClientLogic Operating Corp., 05-CV-3815, 2006 U.S. Dist. LEXIS 69021
     (W.D.N.Y. 2006)  ...................................................................................................... passim

Hinojos v. The Home Depot, Inc., 2:06-CV-00108, 2006 U.S. Dist. LEXIS 95434
     (D. Nev. 2006) ...................................................................................................................24

Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165 (1989)............................................... passim

Hoffmann v. Sbarro, Inc., 982 F. Supp. 249 (S.D.N.Y. 1997) ......................................................8

# TABLE OF AUTHORITIES

## FEDERAL CASES

<u>Page</u>

Holzapfel v. Town of Newburgh, 145 F.3d 516 (2d Cir. 1998) ....................................30

Horne v. United Servs. Auto. Ass'n, 279 F. Supp. 2d 1231 (M.D. Ala. 2003) ..................8, 17, 34

Humphries v. Stream Int'l, Inc., 3:03-cv-1682, 2004 U.S. Dist. LEXIS 20465
    (N.D. Tex. 2004) ....................................................................37

In re College Bound Con. Litig., 93-cv-2348, 1994 U.S. Dist. LEXIS 7074
    (S.D.N.Y. 1994) ......................................................................4

Iriarte v. Redwood Deli and Catering, Inc., CV-07-5062, 2008 U.S. Dist. LEXIS 50072
    (E.D.N.Y. June 30, 2008) .............................................................38

Jackson v. New York Tel. Co., 163 F.R.D. 429 (S.D.N.Y. 1995)................................29

Karvaly v. Ebay, Inc., 245 F.R.D. 71 (E.D.N.Y. 2007)........................................36

King v. Unique Rigging Corp., 2005 WL. 2290585 (E.D.N.Y. 2005)..........................21

Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706 (2d Cir. 2001).....................29

Lawrence v. City of Philadelphia, No. 03-CV-4009, 2004 U.S. Dist. LEXIS 8445
    (E.D. Pa. 2004)........................................................................24

Ledbetter v. Pruitt Corp., 5:05-CV-329, 2007 U.S. Dist. LEXIS 10243
    (M.D. Ga. 2007)......................................................................18, 28

Lee v. ABC Carpet & Home, 00 Civ 0984, 2008 U.S. Dist. LEXIS 38725 *9
    (S.D.N.Y. May 9, 2008)...............................................................38

Maddock v. KB Homes, Inc., 248 F.R.D. 229 (C.D. Cal. 2007)...................................4

Masson v. Ecolab, Inc., 04 Civ 4488, 2005 U.S. Dist. LEXIS 18022 *48
    (S.D.N.Y. 2005)......................................................................38

Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216 (D. Conn. 2003)....................................8, 9

Mowdy v. Beneto Bulk Transp., 06-05682, 2008 U.S. Dist. LEXIS 26233
    (N.D. Cal. Mar. 31, 2008).............................................................37

Pabst v. Okla. Gas. & Elec. Co., 228 F.3d 1128 (10th Cir. 2000)...............................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

Parks v. Eastwood Ins. Servs., Inc., 235 F. Supp. 2d 1082 (9th Cir. 2002).....................................4

Reab v. Electronic Arts, Inc., 214 F.R.D. 623 (D. Colo. 2002).....................................................35

Reich v. S. New England Telecom. Corp., 121 F.3d 58 (2d Cir. 1997) ........................................25

Scholtisek v. Eldre Corp., 229 F.R.D. 381 (W.D.N.Y. 2005) ......................................................17

Seever v. Carrols Corp., 528 F. Supp. 2d 159 (W.D.N.Y. 2007) ..................................................30

Sheffield v. Orius Corp., 211 F.R.D. 411 (D. Or. 2002) ..............................................................24

Sherrill v. Sutherland Global Servs., Inc., 487 F. Supp. 2d 344 (W.D.N.Y. 2007)................33, 34

Sperling v. Hoffman-LaRoche, Inc., 118 F.R.D. 392 (D.N.J. 1988)............................................10

West v. Border Foods, Inc., 05-2525, 2006 U.S. Dist. LEXIS 96963
    (D. Minn. 2006) ....................................................................................................................7, 24

White v. Osmose, Inc., 204 F. Supp. 2d 1309 (M.D. Ala. 2002) .................................................34

White v. Washington Gas, 2003-3618, 2005 U.S. Dist. LEXIS 3461
    (D. Md. Mar. 4, 2005)..............................................................................................................30

Wood v. Mid-America Mgmt. Corp., 192 Fed. Appx. 378, 381 (6th Cir. 2006) .........................30

## FEDERAL STATUTES

29 C.F.R. § 778.201 .....................................................................................................................22

29 C.F.R. § 785.11 .......................................................................................................................29

29 U.S.C. §216(b) .......................................................................................................................1, 7

29 U.S.C. §§ 251...........................................................................................................................1, 14

# TABLE OF AUTHORITIES

## FEDERAL STATUTES

**Page**

Fed. R. Civ. P. 23(c)(2)....................................................................................................35

## MISCELLANEOUS

United Operations, Inc., 338 N.L.R.B. No.18 (2002)....................................................21

U.S. DOL Opinion Letter FLSA 2008-7NA (May 15, 2008)..................................16, 22

U.S. DOL Opinion Letter FLSA 2007-INA (May 24, 2007) ........................................18

U.S. Dept. of Labor, Factsheet No. 53 ........................................................................18

<u>PRELIMINARY STATEMENT</u>

This Memorandum of Law is submitted on behalf of the Catholic Health System Defendants (collectively referred to as Catholic Health System or "CHS") in opposition to Plaintiffs' Motion for Collective Action Notification ("Motion") pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA").

Plaintiffs' Motion, at its core, is a quintessential "fishing expedition" intended to stir up litigation and burden CHS with costly system-wide discovery with the hopes of leveraging a high settlement from Defendants.  In the context of this case, Plaintiffs' Motion contravenes the express legislative intent of Congress when it amended the FLSA to require that plaintiffs demonstrate that they are "similarly situated" to putative class members prior to certification of a collective action and the issuance of notice.  29 U.S.C. §216(b) (also requiring that plaintiffs affirmatively "opt in" to a collective action).  Congress enacted the "similarly situated" standard as a procedural safeguard to prevent what Plaintiffs threaten to exact here, namely the "financial ruin of many employers" and the unnecessary burdening of judicial resources with "excessive and needless litigation."  Portal to Portal Act of 1947 § 1(a)(1), (7), codified at 29 U.S.C. §§ 251(a)(1), (7).

In this case, Plaintiffs seek certification of a collective action consisting of *all nonexempt* CHS employees who were subject to an automatic meal period pay deduction across CHS's highly decentralized operations.  CHS's operations include over 6,800 non-exempt employees with over 350 unique job titles, working in over 180 departments across more than 30 facilities throughout the greater Buffalo area.  (<u>See</u> Plaintiffs' Memorandum of Law in Support of Motion for Expedited Notice to Affected Employees ("Plaintiffs' Memo"), p. 1; <u>see also</u> the Declaration of Debra Sciandra, Director of Human Resources, Home Care, hereinafter "Sciandra Decl." ¶¶ 4-

5).  Approximately 50% of CHS's 6,800 employees are subject to one of ten different collective

bargaining agreements, each of which contains provisions regarding meal periods.  (Sciandra

Decl. ¶ 6).  Plaintiffs ask that notice of the pending action be sent to this massive and highly

diverse employee population.

Plaintiffs make the instant Motion despite the fact that an automatic meal period pay

deduction policy or practice is entirely lawful and cannot legitimately form the basis for

certification of a collective action.  Moreover, the very nature of the alleged meal period claims

renders them particularly ill-suited for collective action treatment because of the highly

individualized analysis necessary to adjudicate such claims.  Indeed, in order to assess whether

work performed during a meal period was not properly compensated, an individualized inquiry

would need to be conducted into, *inter alia*, (i) the frequency, duration, and nature of any such

work on an employee-by-employee and day-by-day basis; (ii) the existence of localized

timekeeping policies at each of CHS's facilities and within each of the departments and units of

those facilities; (iii) the extent to which any such policies were implemented and enforced at the

facility, departmental, and unit level; and (iv) whether CHS management suffered or permitted

any compensable work to be performed without proper compensation.

Plaintiffs' Motion is fatally flawed because it fails to demonstrate that they are similarly

situated to the putative collective action they purport to represent.  Although, arguably,

Plaintiffs' burden is minimal at this stage, the only evidence proffered in support of the instant

motion, the *four* vague affirmations from the named Plaintiffs, is woefully deficient and does not

pass even minimal judicial scrutiny.[1]  Plaintiffs only proffered affirmations from four employees

who worked strictly in a patient-care environment and establish no nexus whatsoever to the

---

[1] As noted on p. 12, Defendants argue the more stringent second-stage certification standard
should apply.

many other CHS employees who worked under very different circumstances and pursuant to different timekeeping policies and practices – for which no evidence of meal period violations is even presented.

Plaintiffs have not offered anything more than vague and conclusory declarations of wholly unsubstantiated and unconnected claims of uncompensated meal period work to support their Motion.  To the extent Plaintiffs rely on the number of consent forms obtained as part of their massive and scattershot solicitation efforts, such consent forms are worthless in light of the fact that they do not even identify the particular type of claim for which each "consenting" person is seeking relief (i.e. preliminary work, postliminary work, training time, or meal period work).  Significantly, of the 368 consent forms obtained, CHS records show the following:

- 110 of the 368 consent forms (or 30%) are for individuals who have no record of employment at all with CHS;
- of the remaining 257 consent forms:
  - twenty-nine of those employees (8% of all consents filed) were treated as salaried exempt and therefore were never even subject to a meal period pay deduction practice;
  - 119 (or 32% of all consents filed) are former employees that either left CHS or were terminated three years prior to the filing of their consent forms and, thus, fall outside the FLSA statute of limitations period,
  - 1 is deceased (and was at the time the consent was executed); and
  - 1 is a Home Health employee who is not on the KRONOS system.

(Declaration of Susan Chojnowksi, hereinafter "Chojnowski Decl." ¶ 3).

By contrast, in this Opposition to Plaintiffs' Motion, CHS submits declarations from 27 members of the putative class[2] from eight different facilities and 22 different departments/units.

---

[2] Employees were interviewed in an ethical manner that complied with all applicable disciplinary rules and ensured that no interview was conducted unless it was completely voluntary on the part of the employee and that there was no improper communications with represented parties.  See Shinaman Decl. at ¶¶ 3-7; Parks v. Eastwood Ins. Servs., Inc., 235 F. Supp. 2d

*(Footnote continued on next page)*

(See the Declarations attached to Todd Shinaman's Declaration as Exhibits C and E).  In these declarations, the employees state that they either never worked at all during their meal periods, or, otherwise, were aware of CHS's policy requiring the reporting of any missed or interrupted meal periods so that the "auto deduct" could be overridden in the timekeeping system, and followed such policies.  In addition, CHS submits declarations from 16 managers from 16 departments/units across 9 facilities who attest to the decentralized nature of CHS's timekeeping practices, the diverse types of work being performed across the putative class (resulting in different types of meal break practices), and the enforcement of CHS's policies to compensate employees for any work performed during meal periods.

Given the highly individualized nature of the claims at issue, compounded by CHS's decentralized operations and the heterogeneity of its workforce, as well as Plaintiffs' abject failure to demonstrate that they are "similarly situated" to the vast and highly disparate putative collective action, the instant Motion should be denied.

RELEVANT FACTUAL BACKGROUND

A.      The Catholic Health System

      1.      Operations/Organizational History of Defendants

The Catholic Health System ("CHS") was formed in 1998 under four religious sponsors as an affiliation of existing healthcare entities.  (Declaration of Joseph McDonald, hereinafter "McDonald Decl.," ¶ 4).  The facilities affiliated with CHS include four hospitals, fourteen primary care centers, various diagnostic and treatment centers, a freestanding surgery center, six long-term care facilities, two adult homes, three home care agencies and several other

---

*(Footnote continued from previous page)*
1082, 1083-84 (9th Cir. 2002); Maddock v. KB Homes, Inc., 248 F.R.D. 229, 236-237 (C.D. Cal. 2007); In re College Bound Con. Litig.,1994 U.S. Dist. LEXIS 7074 *18 (S.D.N.Y. 1994).

community ministries, which are spread across the greater Buffalo area.  (Id.).  CHS has its own

Board of Directors.  (Id. at ¶ 7).  Each of the four hospitals has its own President and Chief

Executive Officer.  (Id. at ¶ 9).  Each hospital is also a separately-licensed acute care facility

under New York Health Law Article 28, and is separately accredited.  (Id. at ¶¶ 11-12).  The

nature of the care provided by these facilities varies widely, and includes acute emergency care,

outpatient services and behavioral health and addiction services.  Id. at ¶¶ 13-26.

   2. <u>Workforce</u>

CHS employs approximately 6,800 non-exempt employees who work in over 350 distinct

job titles spread across more than 180 departments at the various facilities noted above.

(Sciandra Decl. at ¶¶ 4-5).  These positions range from Housekeeper to Billing Clerk to various

types of Registered Nurses ("RN"), among many others.  (Id. at ¶ 5 and the Job Descriptions

attached thereto as Exhibits C-F).  Even two employees working as RNs may have vastly

different duties, work demands and work environments.  (Id.).  In addition, many non-exempt

employees do not perform patient care, including, but not limited to, billers, secretaries,

maintenance workers and couriers.  (Id.).  Approximately 50% of these employees are governed

by one of ten different collective bargaining agreements, each of which contains different

provisions relating to meal periods.  (Id. at ¶ 6).  The various facilities pay overtime at different

thresholds, in many cases pursuant to collective bargaining agreements.  (Id. at ¶ 7).

   3. <u>Policy at Issue</u>

Throughout the Complaint and instant Motion, Plaintiffs make numerous references to

CHS's "Break Deduction Policy."  (See, e.g., Complaint ¶ 73; Plaintiffs' Memo at p. 2).  In fact,

no such policy exists as described by Plaintiffs.

Beginning in September 2005, CHS began implementing the KRONOS computer software system at various facilities to record employee hours worked.  (Declaration of Lorraine Herniak, Senior HRIS Analyst, hereinafter "Herniak Decl.," ¶¶ 3-4).  Employees enter the start and end of their workday into KRONOS, typically through the use of a phone system.  (Id. at ¶ 4).  Pursuant to CHS policy, all employees who work a shift greater than six hours are given a half-hour unpaid meal break, which is automatically deducted by KRONOS.[3]  (Id. at ¶ 5). Managers and supervisors typically serve as the timekeepers for the employees that they oversee. (Id.).  Timekeeping procedures are explained to employees at the department level.  (Sciandra Decl. at ¶ 3 and acknowledgment signed by Plaintiff Carroll attached thereto as Exhibit B). Timekeepers review and approve employees' time as reported in KRONOS, and they maintain various procedures whereby employees can report when they have not received a full meal period.  (Herniak Decl. at ¶ 5; Sciandra Decl. at ¶ 3; see also Declarations of Adele Battaglia at ¶ 6, Carolyn Breitwieser at ¶ 6, Lorraine Esene at ¶ 7, Janet Mazgaj at ¶ 6, Brian Przybysz at ¶ 6, John Sperrazza at ¶ 6, Mary Hojnacki at ¶ 6, Kathleen Kubrick-McAlpine at ¶ 6, Renee Holly-Eberhard at ¶ 6, Jon Carlson at ¶ 6, Mary Gampp at ¶ 6, Sandy Pidanick at ¶ 6, Denise Fumerelle at ¶ 6, Patricia Licata at ¶ 6, Bruce Johnson at ¶ 6 and Linda Logan at ¶ 6).  Timekeepers then cancel the automatic meal deduction in KRONOS, a process known as a "cancel deduct."   (See Herniak Decl. at ¶ 5 and the training materials attached thereto as Exhibit A).  The "cancel deduct" is used on a regular basis, as over 77,000 meal periods have been paid since KRONOS was implemented.  (Id. at ¶ 6).

---

[3]  Certain employees, such as those who perform home health care field work, are not subject to the deduction.  (Herniak Decl. at ¶ 4).  In addition, some engineers at various facilities are paid for their meal periods pursuant to a collective bargaining agreement.  (See, e.g., Declaration of Bruce Johnson, Director of Facilities and Engineers at Sisters of Charity Hospital, hereinafter "B. Johnson Decl.," ¶ 5).

<u>ARGUMENT</u>

I.      <u>PLAINTIFFS' MOTION FOR COLLECTIVE ACTION NOTIFICATION SHOULD BE DENIED</u>

A.      <u>The Legal Standard</u>

Before a district court can exercise its discretion to conditionally certify an FLSA

collective action and authorize the issuance of notice, the plaintiffs must demonstrate that they

are "similarly situated" to the putative collective action members.  29 U.S.C. § 216(b) (stating

that "an action [for relief under the FLSA] may be maintained … by any one or more employees

for and on behalf of … other employees similarly situated"); <u>see</u> <u>also</u> <u>Hens v. ClientLogic</u>

<u>Operating Corp.</u>, 2006 U.S. Dist. LEXIS 69021 *10 (W.D.N.Y. 2006) (Skretny, J.) (the court

must determine whether "the named plaintiff has demonstrated that the proposed class members

are 'similarly situated' to him or her") (citations omitted).

To satisfy this evidentiary requirement, plaintiffs cannot rely on "unsupported assertions

of widespread violations." <u>Edwards v. City of Long Beach</u>, 467 F. Supp.2d 986, 990 (C.D. Cal.

2006).  Rather, "before subjecting an employer to the burdens of a collective action, the plaintiffs

must establish a colorable basis for their claim that a [ ] class of 'similarly situated' plaintiffs

exist." <u>West v. Border Foods, Inc.</u>, 2006 U.S. Dist. LEXIS 96963 at *28 (D. Minn. 2006); <u>Hall</u>

<u>v. Burk</u>, 2002 U.S. Dist. LEXIS 4163 *5 (N.D. Tex. 2002) (noting that authorization of

collective action notice is "**by no means mandatory**") (emphasis added); <u>Camper v. Home</u>

<u>Quality Mgmt. Inc.</u>, 200 F.R.D. 516, 519 (D. Md. 2000) ("The relevant inquiry then is not

whether the Court has discretion to facilitate notice, but whether this is an appropriate case in

which to exercise discretion").

There is no decision from the Second Circuit Court of Appeals outlining the procedure to

determine whether appropriate circumstances exist to allow plaintiffs to proceed as a collective

action.  However, this Court has previously employed a two-step process that has also been

adopted by a majority of courts.  <u>ClientLogic</u>, 2006 U.S. Dist. LEXIS 69021 at *9-11.  The first

step requires the Court to "determine based on the pleadings, affidavits and declarations, if the

named plaintiff has demonstrated that the proposed class members are 'similarly situated' to him

or her."  <u>Id.</u>  In order to satisfy this initial burden, a plaintiff must show "that he or she and the

proposed class members together were victims of a common policy or plan that violated the

law."  <u>Id.</u> (citations omitted).  To succeed, a plaintiff must do more than simply assert

"conclusory allegations" of a widespread policy or practice.  <u>H&R Block v. Housden</u>, 186 F.R.D.

399, 400 (E.D. Tex. 1999).  If the Court is satisfied that the plaintiff meets the "similarly

situated" requirement, a court may certify the collective action and authorize notification of

potential members to permit them to "opt-in" to the collective action.  <u>ClientLogic</u>, 2006 U.S.

Dist. LEXIS 69021 at *9-11.

 Even under this standard, Plaintiffs' Motion is hardly the *fait accompli* that their papers

suggest.  The Plaintiffs must "demonstrate that they and potential plaintiffs together were victims

of a common policy or plan that violated the law," and the Court must be satisfied "that there is a

basis to conclude that questions common to a potential group of plaintiffs would predominate a

determination of the merits in this case."  <u>Mike v. Safeco Ins. Co. of Am.</u>, 274 F. Supp. 2d 216,

220 (D. Conn. 2003) (citing <u>Hoffmann v. Sbarro, Inc.</u>, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)

(citing cases)).  Plaintiffs must make at least "some rudimentary showing of commonality

between the basis for [their] claims and that of the potential claims of the proposed class, beyond

the mere facts of job duties and pay provisions, because without such a requirement, it is

doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly

present a ready opportunity for abuse."  <u>Horne v. United Servs. Auto. Ass'n</u>, 279 F. Supp. 2d

1231 (M.D. Ala. 2003).  Courts still require a preliminary *evidentiary* showing that a similarly situated group of potential plaintiffs exists before authorizing notice.  This requirement is premised on the principles of "sound case management … to avoid the 'stirring up' of litigation through unwarranted solicitation,' [and because] an employer should not be unduly burdened [and prejudiced] by a frivolous fishing expedition conducted by plaintiff at the employer's expense."  D'Anna v. M/A-Com, Inc., 903 F. Supp. 889, 893-894 (D. Md. 1995).  Indeed, it "would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated."  Freeman v. Wal-Mart, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003).

At the second step, "the court should render a final decision regarding the propriety of proceeding as a collective action with the benefit of all evidence gathered in discovery including any additional plaintiffs."  Mike, 274 F. Supp. 2d at 219.  Courts often employ this stricter second step standard, or collapse the steps, where, as here, there has been substantial opportunity for the plaintiffs to compile an evidentiary record in support of their motion for collective action certification.  Basco v. Wal-Mart, 2004 U.S. Dist. LEXIS 12441 *23, fn. 8 (E.D. La. 2004).

Although this standard is typically employed where discovery has already begun, the Court should employ this more stringent standard here given the undeniable opportunity for plaintiffs to compile an evidentiary record over the course of several months of purported "investigation" into CHS's timekeeping and pay practices.  By their own solicitations and pleadings, Plaintiffs concede that they have engaged in extensive fact-finding, investigation and mass-mailings over the past several months.  Plaintiffs obtained their first consent forms in January 2008 (Docket No. 2-5), sent out solicitation letters in January and March 2008, and

engaged in further solicitation by establishing an internet website.  (See Declaration of Todd

Shinaman, hereinafter "Shinaman Decl.," Exhibits A and B).  The magnitude of this

"investigation" could hardly be disputed by Plaintiffs' counsel in light of the fact that their

investigation continued for several months after obtaining their first consent form and before

filing the consent forms with the Court, all while the statute of limitations continued to run.

Plaintiffs have had ample opportunity to gather information in support of their motion and,

therefore, the stricter second stage standard should be applied.

Nonetheless, even if the Court were to employ the more lenient standard to the instant

Motion, Plaintiffs have failed to establish that they are similarly situated to the putative class

because the evidence they proffer in support of their Motion is woefully deficient.

B.      Plaintiffs Fail to Meet their Evidentiary Burden Under FLSA Section 216(b)

It is well-settled that plaintiffs seeking to authorize notice of a purported collective action

are required to provide *evidence*, not simply allegations, to establish that they are "similarly

situated" to members of the putative class.  See Bernard v. Household International, Inc., 231 F.

Supp. 2d 433, 435 (E.D. Va. 2002) ("factual evidence" that others are similarly situated "is

necessary" to support the issuance of notice); Baum v. Shoney's Inc.,1998 U.S. Dist. LEXIS

21484 *5 (M.D. Fla. 1998) ("Plaintiffs must provide evidence to support their allegations");

Sperling v. Hoffman-LaRoche, Inc., 118 F.R.D. 392, 406-407 (D.N.J. 1988) (holding that

evidence of "similarly situated" plaintiffs must be "sufficiently developed" to allow court

facilitated notice).

In this case, Plaintiffs have failed to provide such evidence, as both the affirmations and

consent forms filed by Plaintiffs in support of their motion are too vague to demonstrate the

existence of the requisite "factual nexus" between Plaintiffs and other similarly situated

individuals.  <u>Gjurovich v. Emmanuel's Marketplace, Inc.</u>, 282 F. Supp. 2d 101, 104 (S.D.N.Y. 2003).

        1.        <u>The Consent Forms Filed by Plaintiffs Provide No Useful Evidence</u>

        In support of their Motion, Plaintiffs rely on consent forms executed by putative class members to allege the existence of a system-wide policy to deprive employees of wages earned for work performed during meal periods.  Such reliance is misplaced.  The consent forms, on their face, are so utterly vague and ambiguous that they lack any probative value on the issue of whether other employees at CHS are similarly situated to Plaintiffs.  The consent forms merely state that the individual is an employee or former employee of CHS and that they consent to participate in an FLSA suit.  <u>See</u> Docket Nos. 2-5.  Significantly, the consent forms do not state what type of claim these individuals are asserting against CHS.  This total lack of specificity is particularly relevant for the purposes of the instant Motion, as Plaintiffs' Complaint alleges at least four different types of wage-hour claims – pay for work during meal periods, preliminary work, postliminary work, and training time – yet Plaintiffs only seek collective action certification on the alleged meal period claims.  <u>See</u> Plaintiffs' Memo, p. 1; <u>see also</u> Docket No. 99, Transcript of Proceedings held before Honorable William M. Skretny on June 24, 2008 at p. 18, hereinafter "Transcript."

        The generalized and ambiguous nature of the consent forms provides the Court with no probative evidence as to whether these individuals have claims that would be included in the collective action that Plaintiffs seek to certify.  The claims could just as easily be for unpaid preliminary or postliminary work or training time.  In fact, such a scenario is likely, given that payroll records indicate that many of those current employees who have signed consent forms have reported and been paid for meal periods, and thus are likely <u>not</u> asserting a meal break

claim.  (See Herniak Decl. at ¶ 6 and KRONOS Report attached thereto as Exhibit B: "Of the 61 currently active employees in the KRONOS system who submitted opt-in forms…37 have been paid for meal periods…Several of these employees have been paid for over 100 meal periods"). The opt-ins, and the number thereof, is therefore no indication that a class of similarly situated employees exists with regard to the alleged meal period claims.

The value of these consent forms is further undermined by the fact that there is no record of employment for 110 of the individuals who signed them.  (Chojnowski Decl. at ¶ 3).  Of the remaining 257 consents:

- twenty-nine were executed by individuals who were treated as salaried exempt employees during the relevant time period and, thus, would have no uncompensated meal period claims.
- 119 were executed by non-exempt former employees who either left employment or were terminated three years prior to the filing of their consent forms and thus fall outside the FLSA statute of limitations period;
- 1 was apparently executed on behalf of a deceased former employee; and
- 1 was executed by an individual who works in Home Health Care and is not on the KRONOS system.  (Id.).

These facts call into serious question the method and manner in which the consent forms were obtained and demonstrate that they have almost no probative value.

2.     The Affirmations Filed by Plaintiffs are Vague and Conclusory

In addition to the worthless consent forms discussed above, Plaintiffs also proffer four incredibly vague affirmations from the named Plaintiffs.[4]  As a preliminary matter, the affirmations do not even create a factual nexus between Plaintiffs and those who have signed consent forms.  The affirmations contain allegations relating only to alleged meal period claims while the consent forms are unclear as to which claims, if any, they relate to.  More importantly,

---

[4] In fact, the affirmations do not even allege that the affiants were not paid for the meal periods that they missed.

the affirmations utterly fail to create a factual nexus between Plaintiffs and other putative

members of the proposed collective action.  The affiants merely allege that they performed

compensable work during their meal periods **solely** as a result of patient care needs.

(Hinterberger Aff. at ¶¶ 5, 8, 9; Weisbecker Aff. at ¶¶ 5, 8, 9; Williams Aff. at ¶¶ 5, 8, 9; Carroll

Aff. at ¶¶ 5, 8, 9).  However, many members of the proposed collective action – all employees

subject to automatic meal period deductions – do not perform any patient care services and thus

share no commonality with the four affiants.  (Sciandra Decl. at ¶ 5).  The very basis of the claim

that Plaintiffs are required to work through meal periods is therefore inapplicable to much of the

putative class.

  The substance of Plaintiffs' affirmations is also deficient.  Plaintiffs misrepresent the

contents of their affirmations by stating that they support claims that CHS did not pay Plaintiffs,

or any other specific individual, for missed or interrupted meal periods.  Plaintiffs cite paragraph

5 of their affirmations in connection with these allegations, but paragraph 5 does not say that

"defendant's policy was not to compensate employees when their meal breaks were interrupted,"

as asserted.  Plaintiffs' Memo, p. 12.  Rather, the identical affirmations say:

> Even though the Hospital's pay roll program automatically deducted 30 minutes
> each shift, it was common that I would not be receiving a 30 minute uninterrupted
> meal period during my shift.  The reason – as the Hospital knew and expected –
> was that it was of paramount importance that the employees take care of the
> patients' needs.  Having uninterrupted meal breaks was understandably a
> secondary concern.

*Not one* plaintiff testified in her affirmation that it was CHS's policy not to compensate

employees when their meal breaks were interrupted or that they, as individuals, were not paid for

missed or interrupted meal breaks.

  Plaintiffs also failed to show that any other employees were not paid for such time.

While each affiant states that "I observed that other employees, like myself, rarely were able to

take a full uninterrupted 30 minute meal period," the Court should not simply accept the fact that Plaintiffs somehow have actual knowledge of the payroll practices of other managers in other departments, or in other facilities located at other geographic locations.  For instance, it strains credulity that a RN working in the Medical Rehab Unit at Mercy Hospital in Buffalo, has "observed" whether a Biller in the Billing Department at the Appletree facility in Cheektowaga (5 miles away) or a Patient Care Assistant at St. Francis Home of Dunkirk (43 miles away) performed work during a meal period and whether those employees were compensated for such work by their managers.

The authorization of notice based on such a paltry factual showing would directly contravene the legislative purpose of the FLSA's "similarly situated" standard and opt-in mechanism.  As stated above, the purpose of the notice and certification requirements of Section 216(b) was to prevent the "financial ruin of many employers" and inundating the courts "with excessive and needless litigation."  29 U.S.C. § 251.  Plaintiffs have submitted nothing more than conclusory allegations in the affidavits of only four employees from three facilities, and who describe interruptions during meal periods that were purportedly caused solely by a specific work environment that is inapplicable to many in the proposed class.  Plaintiffs contend almost glibly that the Court should authorize the issuance of notice "even if plaintiffs' claims turn out to be meritless."  Plaintiffs' Memo, p. 9 (citations omitted).  However, in enacting the procedural safeguards of the FLSA, Congress has instructed courts to carefully weigh the proffered evidence against the incredible financial burden that will be placed upon employers when certifying collective actions and the issuance of notice.

       3.    <u>Two of the Four Affiants Have No FLSA Claims</u>

Plaintiffs have failed to demonstrate that the proposed class members are similarly situated because the class is subject to varying overtime thresholds.  For example, pursuant to a collective bargaining agreement, employees at Mercy Hospital, where plaintiffs Hinterberger and Williams worked, are paid overtime at one and a half times their regular rate for all hours worked over their scheduled shift, or over 37.5 hours in one week,.  (Sciandra Decl. at ¶ 7).  Employees at St. Elizabeth's Home, where plaintiff Weisbecker worked, are paid one and a half times their regular rate for all hours worked over forty hours in one week.  (Id.).  At Kenmore Mercy Hospital, where plaintiff Carroll worked, employees are paid one and a half times their regular rate for all hours worked over 38 hours in one week.  (Id.).  Employees' regularly scheduled hours also vary.  (Id.).

Two of the named Plaintiffs, based on their own affirmations, do not even have a basis to allege FLSA claims.  Ms. Williams and Ms. Hinterberger were RNs at Mercy Hospital and were subject to a collective bargaining agreement which provided that they were to be paid at 1.5 times their regular rate "for all hours worked in excess of: a.) an employee's regularly scheduled shift; or b.) in excess of 37.5 hours per week."  Collective Bargaining Agreement between Mercy Hospital of Buffalo and Communications Workers of America, Local 1133, Registered Nurse, Article 25 "Overtime," Section 7, attached as Exhibit A to the Declaration of Mark Molloy, filed in support of Defendants' Motion to Dismiss (Docket No. 86).  Hinterberger was budgeted to work 37.5 hours per week, while Williams was budgeted to work 36 hours per week.  (Sciandra Decl. at ¶ 7).  In their affidavits, Williams and Hinterberger state that they were not paid for work performed during meal periods, but make no mention of any other work that they performed for which they were not paid.  However, the Plaintiffs only seek certification of a collective action on the issue of automatic meal deductions under the FLSA.  Based on the

- 15 -

evidence presented in Plaintiffs' own affirmations, even assuming that they worked five days per week and worked through their meal period each of those days (a total of 2.5 hours), **Plaintiffs would not even have an FLSA claim for overtime**, because they could not have worked more than 40 hours per week.[5]   Therefore, it is clear that these Plaintiffs are not similarly situated to putative class members subject to different overtime thresholds.

C.      Plaintiffs' Claims Are Not Suitable for Collective Action Treatment Because They Require Individualized Inquiry

Although Plaintiffs concede that they must establish a sufficient "factual nexus" between themselves and putative members of the collective action, they have utterly failed to do so.  Even accepting Plaintiffs' four affirmations as true, their allegations could arguably establish FLSA violations only as to *those* employees.  The allegations regarding meal time work relate only to the personal circumstances of these four named plaintiffs.  Nonetheless, they ask the Court to make a highly suspect leap of faith that, because they may have worked uncompensated periods of time within their departments or units, then the same policies or practices must be applicable at more than 30 other facilities and over 180 departments/units as well.  This type of speculation and conjecture does not satisfy Plaintiffs' burden for collective action certification, particularly when viewed against the overwhelming evidentiary record submitted by CHS in its opposition to the Motion.

In order to obtain conditional certification of a collective action under the FLSA, plaintiffs must demonstrate that "the putative class members were together the victims of a **single decision, policy, or plan**." Gerlach v. Wells Fargo & Co., 2006 U.S. Dist. LEXIS 24823

---

[5] They would already have been paid at 1.5 times their regular rate for any time worked on the clock beyond their scheduled shifts and over 37.5 hours per week pursuant to the collective bargaining agreement.  Such premium compensation may be credited toward any overtime compensation payments.  See U.S. DOL Opinion Letter FLSA 2008-7NA (May 15, 2008).

*6 (N.D. Cal. 2006) (emphasis added); <u>Scholtisek v. Eldre Corp.</u>, 229 F.R.D. 381, 387

(W.D.N.Y. 2005) (same); <u>Basco v. Wal-Mart</u>, 2004 U.S. Dist. LEXIS 12441 *15 (E.D. La. 2004)

(a court can foreclose a plaintiff's right to proceed collectively if "the action relates to specific

circumstances personal to the plaintiff rather than any generally applicable policy or practice")

(citations omitted).  Since Plaintiffs bear the burden of establishing a putative collective action of

similarly situated employees, and given that they are seeking certification of a massive and

sprawling collective action consisting of thousands of current and former non-exempt employees

across over 30 facilities and over 180 departments/units, the submission of only four highly

vague and conclusory affirmations from employees at only three facilities (two of whom have no

FLSA claim at all) cannot suffice as a matter of law.  See, *e.g.*, <u>Horne</u>, 279 F. Supp. 1231, 1235

(M.D. Ala. 2003) (finding that "a plaintiff must demonstrate that employees outside of the work

location for which the plaintiff has provided evidence were similarly affected by alleged work

policies in order for the court to certify a collective action which extends beyond the plaintiff's

own work location").

 In this case, as set forth more fully below, Plaintiffs have fallen woefully short of meeting

their burden to demonstrate a common policy or practice to violate the FLSA which creates a

factual nexus between their claims and those of other putative collective action members.

 1. <u>Plaintiffs Have Failed to Demonstrate an Unlawful Policy or Practice</u>

 Plaintiffs have failed to demonstrate the existence of an unlawful policy or practice which

violates the FLSA.  Plaintiffs contend that "employees were subject to a common policy which

automatically deducted time for meal breaks even when such employees should have been paid

for their compensable work."  Plaintiffs' Memo, p. 12; <u>see also</u> Transcript at p. 18.  Such a

contention, however, wrongly presumes that the automatic deduction for meal periods is itself

unlawful.  It also ignores the fact that there were various lawful policies and procedures in place to ensure that employees who missed or were interrupted during their meal periods were compensated properly.  The fact that Plaintiffs allege that these lawful policies and procedures were improperly applied to them necessarily involves an individualized inquiry.  It does not demonstrate the existence of an illegal system-wide policy with regard to missed or interrupted meals because such policies are implemented and enforced at the supervisor, department or unit level.

It must also be noted here that "[a] policy of automatic meal deductions does not *per se* violate the FLSA."  Ledbetter v. Pruitt Corp., 2007 U.S. Dist. LEXIS 10243 *13 (M.D. Ga. 2007); see also Enright v. CGH Med. Center, 1999 U.S. Dist. LEXIS 370 *16 (N.D. Ill. 1999). Moreover, the Department of Labor ("DOL") has held that such a policy is lawful and in compliance with the FLSA.  See Wage and Hour Division, U.S. Dept. of Labor, Factsheet No. 53, The Health Care Industry and Hours Worked (2008) (bona fide meal periods of 30 minutes are not work time, employers may choose to automatically deduct the 30 minutes); see also U.S. DOL Opinion Letter FLSA 2007-INA (May 24, 2007) (proposed new practice of automatic 30 minute deduction for meal breaks acceptable and in accordance with FLSA).

A lawful policy cannot legitimately be the basis for collective action treatment.  CHS has promulgated numerous policies and procedures to ensure that employees either do not miss or are not interrupted during meal periods, or that employees are paid for missed or interrupted meals.  Employees are informed by managers and by their collective bargaining agreements that they are expected to take a half-hour unpaid meal break and, if they do not, they must report it and will be paid for it.  The differences in the application of this policy are evident when comparing the declarations submitted by CHS from 16 different managers from 9 facilities and

16 departments/units and from twenty-seven putative class members from eight different

facilities and twenty-two different departments/units across CHS.  For instance, the juxtaposition

of the Declaration of Mary Hojnacki, Nurse Manager of the Post-Operative Surgical Unit at

Kenmore Mercy Hospital ("Hojnacki Decl.") (and the attached Sample Overtime Logs attached

thereto as Exhibit A), with the Declaration of Bruce Johnson, Director of Facilities and

Engineers at Sisters of Charity Hospital ("B. Johnson Decl.") is telling:

- "I regularly instruct employees that if they are unable to take a meal break due to patient care needs or some other work-related reason, they are required to inform me of this occurrence by recording it in an Overtime Log. . . .  Likewise, I instruct employees that if they are interrupted during their meal period, that they are required to report it as a missed meal on the Overtime Log."  See Hojnacki Decl. at ¶ 5 and attached Exhibit A attached thereto.

- "The employees are trained to tell me if they need an adjustment to their time or, for example, if they missed a lunch. . . .  However, I am not aware of anyone missing a meal period.  Sometimes, an employee will be called to fix something and the job extends into his/her regular meal time.  If that happens, it is well-established that the employee simply takes lunch at a later time."  B. Johnson Decl. at ¶¶ 6-7.

Any claim for unpaid work during a meal period is necessarily related to the often unique

application of these policies by various department supervisors.  It is not based on a system-wide

policy or practice, and Plaintiffs have utterly failed to demonstrate otherwise.

It is well-established that in proving that similarly situated employees were subject to a

common policy or plan, "unsupported assertions of widespread violations are not sufficient."

Freeman, 256 F. Supp. 2d at 945.  This principle is particularly important where, as here, each

plaintiff's claims are tied to that employee's interactions with his or her own supervisor.  (See,

e.g., Declaration of Mary Gampp, Director of Food Service, St. Francis-Buffalo, hereinafter

"Gampp Decl.," ¶¶ 6-7: "I instruct employees that if they are unable to take a meal break due to a

work-related reason, they are required to inform me of this occurrence either verbally or in

writing…If a missed meal break is reported to me, I enter a 'cancel deduct' in the KRONOS

system, and the employee is paid for the meal period"; Declaration of Linda Logan, Coordinator

of Administrative Services and Human Resources, St. Vincent's Home of Dunkirk, hereinafter

"Logan Decl." ¶ 6: "I have told the employees to inform me if they work through their meal

period.  If an employee informs me of this occurrence, I enter a 'cancel deduct' in the KRONOS

timekeeping system, and the employee is paid for the meal period").

Courts have not hesitated to deny collective action treatment where, as here, manager-

specific practices will dominate the litigation.  See <u>Diaz v. Elecs. Boutique of Am.</u>, 2005 U.S.

Dist. LEXIS 30382 *16-17 (W.D.N.Y. 2005) (Elfvin, J.) (allegations regarding one manager's

practices were insufficient to demonstrate that all other assistant managers were subject to a

policy of not being compensated for overtime work); <u>England v. New Century Fin. Corp</u>, 370 F.

Supp. 2d 504, 511 (M.D. La. 2005) (refusing to certify collective action where plaintiffs' claims

were "based on local policies of various managers located at different sites").  Here, members of

the putative collective action, including the named Plaintiffs, have signed a form entitled

"Associate Verification of Time & Attendance Policy" that explicitly acknowledges the

manager-specific nature of CHS's timekeeping practices: "I understand that if I transfer or float

to another department or site, the department supervisor will instruct me as to rules and

procedures for clocking in and out for that location."  (<u>See</u> Sciandra Decl. at ¶ 3 and Exhibit B).

No common unlawful policy or practice has been established.

> 2.    <u>Plaintiffs Are Not Similarly Situated Because Many Fall Within Separate
> Bargaining Units Controlled By Separate Collective Bargaining Agreements</u>

Approximately 50% of the 6,800 non-exempt employees working for separate

organizations under the CHS umbrella belong to one of several different labor unions.  These

employees are spread out over 12 separate bargaining units and are covered by 10 separate and

distinct collective bargaining agreements based on their "community of interest."  The

"community of interest" analysis involves a detailed review of the employees' similarity of pay and method of computing pay; the similarity of employee benefits; similarity of hours of work; similarity of work performed; similarity of qualifications, skills, and training; the physical proximity and frequency of contact and transfers; the functional integration of the CHS; and CHS's supervisory structure. See United Operations, Inc., 338 NLRB No.18 (2002) (summarizing aspects of "community of interest"); King v. Unique Rigging Corp., 2005 WL 2290585 at *3 (E.D.N.Y. 2005) (citing "community of interest" factors such as "bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange").

Here, there are 12 different bargaining units and 10 separate collective bargaining agreements, each with varying provisions governing wages, hours worked, meal times, break times and overtime thresholds.[6]  (Sciandra Decl. ¶ 6).  By the very nature of bargaining units, employees in one bargaining unit are not similarly situated to employees in a separate bargaining unit.  Likewise, employees who are represented by a particular union at a particular hospital and work under a particular collective bargaining agreement are not similarly situated to another employee represented by another union at another hospital who works under another collective bargaining agreement.  The differences in the application of meal period policies are evident when comparing different provisions of various collective bargaining agreements:[7]

- "Meal and rest period will be scheduled as follows: a.) employees working at least six (6) or more consecutive hours in a normal work day shall be entitled to a thirty (30) minute unpaid meal period.  The meal period shall not be counted as time worked, and if necessary, the Employer/Hospital shall provide for relief work duties during such time…e.) should an employee be required, by virtue of workload, to work through a normal meal period, the meal

---

[6] The differences between unionized class members can be further highlighted by a comparison of the meal period provisions cited above in Part I(C)(1).

[7] An additional collective bargaining agreement between St. Francis Home of Williamsville and The McAuley Residence and 1199 SEIU has been attached to Sciandra Decl. as Exhibit G.

period shall be treated as work time; and f.) employees who are required to carry a beeper and respond to pages during their meal period shall be paid for their meal period as time worked."  (Docket No. 86, Exhibit A, <u>Collective Bargaining Agreement between Mercy Hospital of Buffalo and Communications Workers of America, Local 1133</u>, Register Nurse, Article 21 "Hours of Work," Section 16).

- "An employee may have one-half (1/2) hour meal period without work responsibility and without pay at a reasonable time each shift, as the Hospital may assign or approve.  An employee who, due to patient care requirements, is assigned by his supervisor to work through the meal period shall be governed by the overtime provisions of this Agreement, if such employee completes the regular shift."  (Exhibit B, <u>Collective Bargaining Agreement between St. Joseph Hospital and 1199 SEIU United Healthcare Workers East</u>, Article 6 "Hours of Work," Section 12).

The "similarly situated" standard cannot be met when some putative collective action members carry a pager and are compensated for the entire meal period whenever it goes off during a meal period, while thousands of others do not.

Those employees that are not members of any union likewise are not similarly situated to union employees.  See <u>Anderson v. Cagle's, Inc.</u>, 488 F.3d 945, 954 (11th Cir. 2007) (upholding the district court's decertification of the collective action and emphasizing the importance of the evidence that, unlike all of the named plaintiffs, many of the opt-in plaintiffs are non-union).

To the extent the potential collective action members are subject to a collective bargaining agreement, different bargaining units bargained for different types of premium pay for varying hours thresholds.  Significantly, the FLSA allows for an offset for premium pay that is not otherwise due an employee – *e.g.* time and one-half for working over 8 hours in a day.  <u>See</u> 29 C.F.R. § 778.201; <u>see also</u> U.S. DOL Opinion Letter FLSA 2008-7NA (May 15, 2008) (extra compensation from premium rates need not be included in regular rate and such extra compensation may be credited toward overtime payments).  Thus, in adjudicating CHS's defense that an offset should be applied against any claim for overtime, the Court would have to conduct an individualized analysis of each employee and their applicable collective bargaining agreement

to determine offsets and/or whether the employee is entitled to backpay at all.  Such claims are
not appropriate for collective action and thus, Plaintiffs' Motion must be dismissed.

      3.      <u>The Case Law Cited by Plaintiffs Does Not Support Ordering Notice</u>

Plaintiffs claim that "[c]ourts routinely order notice to employees who are subject to an
automatic break deduction policy like the one at issue in this case."  Plaintiffs' Memo, pp. 10-11.
However, each of the cases that Plaintiffs cite for this proposition is distinguishable.

In <u>Barrus v. Dick's Sporting Goods, Inc.</u>, 465 F. Supp. 2d 224 (W.D.N.Y. 2006), the
Court ordered notice to be issued to a very narrow collective action consisting of non-exempt
retail employees who performed essentially the same duties in the same type of work
environment, regardless of which location they worked at.  By contrast, the proposed collective
action here consists of thousands of employees who perform vastly different duties in highly
disparate work environments across CHS's facilities and departments/units.

Likewise, in <u>Berger v. Cleveland Clinic Found.</u>, 2007 U.S. Dist. LEXIS 76593 (N.D.
Ohio 2007), the court conditionally granted certification to a much smaller (and more obviously
similarly situated) collective action – all respiratory technicians and therapists employed by one
hospital – as all members "worked in the same department within the same building, had the
same supervisor, and their job duties overlapped significantly."  <u>Id.</u> at *64.

Finally, Plaintiffs' reliance on <u>Carmody v. Florida Center for Recovery, Inc.</u>, 2006 U.S.
Dist. LEXIS 81640 (S.D. Fla. 2006) is inapposite since that case involved a single-site employer
that provided just one service – detox treatment for substance abusers.  Although the court
certified a collective action of all hourly employees, the defendant employed only <u>forty-five</u>
hourly employees, a far cry from the thousands of employees performing various services and
duties that Plaintiffs contend are similarly situated in this case.

4.    Adjudication of Plaintiffs' Claims Necessarily Requires Individualized Inquiries That Are Inappropriate for Collective Action Treatment

A veritable legion of courts has denied conditional certification where, as here, plaintiffs claim that they performed off-the-clock work on the grounds that resolution of such claims necessarily requires individualized inquiry and analysis:

- Diaz v. Elecs. Boutique of Am., 2005 U.S. Dist. LEXIS 30382 *16 (W.D.N.Y. 2005) (Elfvin, J.) (denying certification as allegations of off-the-clock work "are too individualized to warrant collective action treatment");

- Dudley v. Texas Waste Sys., Inc., 2005 U.S. Dist. LEXIS 9168 *6-7 (W.D. Tex. 2005) (denying certification of meal period auto deduct claims as "[a]ny analysis of lunch breaks will result in…hearing individual testimony regarding whether [employees] regularly took lunch breaks…the dates each [employee] actually worked through lunch…[and] whether any [employee] advised management that they worked through their break and required compensation");

- West v. Border Foods, Inc., 2006 U.S. Dist. LEXIS 96963 *27 (D. Minn. 2006) (denying certification of off-the-clock claims where plaintiffs "were employed at different store locations, where different individual restaurant managers allegedly used varying means to deprive the Plaintiffs of proper compensation for his or her overtime hours…the nature of the asserted violation differs among the Plaintiffs…[and] the alleged violations are contrary to the Defendants' official written policy");

- Hinojos v. The Home Depot, Inc., 2006 U.S. Dist. LEXIS 95434 *8 (D. Nev. 2006) (denying certification of off-the-clock claims as it was "clear that resolution of plaintiffs' claims depends on the specific employment conditions in each store and department in which each class member worked and would likely require testimony from individual supervisors and other employees about the circumstances allegedly giving rise to the claimed violations");

- England v. New Century Fin. Corp., 370 F. Supp. 2d 504, 511 (M.D. La. 2005) (denying certification of off-the-clock claims as it was "clear that individual inquiries must predominate in this case because of the different locations, managers, and factual situations involved at each location");

- Lawrence v. City of Philadelphia, 2004 U.S. Dist. LEXIS 8445 *7 (E.D. Pa. 2004) (denying certification of off-the-clock claims as "the circumstances of those individual claims potentially vary too widely");

- Sheffield v. Orius Corp., 211 F.R.D. 411, 417 (D. Or. 2002) (denying certification of off-the-clock and failure to pay overtime where "plaintiffs are employed by numerous defendants…they held a variety of job classifications, and did not work at the same job site").

In this case, analysis of Plaintiffs' claims will necessarily require an individualized inquiry into two crucial substantive issues: (a) whether each meal period was legally compensable, *i.e.*, spent predominantly for the benefit of the employer; and (b) whether each supervisor had knowledge that this work was being performed.

    a.    <u>Plaintiffs' Meal Time Claims Require Individualized Inquiry as to Whether Each Meal Period was Spent Predominantly for the Benefit of the Employer</u>

Plaintiffs' Memorandum of Law in Support of Motion for Expedited Notice and their supporting, cookie-cutter affidavits repeatedly refer to the inability of Plaintiffs to take a "30 minute uninterrupted meal period."  Plaintiffs' Memo, p. 3; Hinterberger Aff. at ¶¶ 5-7; Weisbecker Aff. at ¶¶ 5-7; Williams Aff. at ¶¶ 5-7; Carroll Aff. at ¶¶ 5-7.  Receipt of a 30 minute uninterrupted meal period is not, however, the standard employed by the Second Circuit in order to determine the compensability of an unpaid meal period under the FLSA.  Rather, the Second Circuit has held that a meal break is compensable only where "a worker performs activities predominantly for the benefit of the employer."  <u>Reich v. S. New England Telecom. Corp.</u>, 121 F.3d 58, 64 (2d Cir. 1997).  The determination of "whether an employee's time is spent 'predominantly for the benefit of the employer' is 'highly individualized and fact-specific.'" <u>Beasley v. Hillcrest Med. Ctr.</u>, 78 Fed. Appx. 67, 70 (10th Cir. 2003) (<u>citing</u> <u>Pabst v. Okla. Gas. & Elec. Co.</u>, 228 F.3d 1128, 1132 (10th Cir. 2000)).

The <u>Dudley</u> case is highly instructive.  In <u>Dudley</u>, the plaintiffs alleged that their employer unlawfully deducted half-hour or one hour meal periods from their pay, regardless of whether they performed work during this time.  The defendants submitted managers' affidavits stating that plaintiffs were advised that if they worked through their meal period, they were to

inform management so that they could be compensated for that time.  The court denied

certification, noting that:

> "[a]ny analysis of lunch breaks will result in…hearing individual testimony regarding whether [employees] regularly took lunch breaks…the dates each [employee] actually worked through lunch…[and] whether any [employee] advised management that they worked through their break and required compensation."  Id. at *6-7.

The only claims upon which Plaintiffs seek certification in this motion – that certain of their

meal periods should be compensable – likewise require individualized inquiry because they

involve employees who work in over 350 different job titles, who may or may not be subject to

one of ten different collective bargaining agreements, who perform vastly different types of

work, work in different facilities, work in different departments within those facilities, report to

different supervisors (who may or may not observe all of their employees during meal periods),

and who report missed or interrupted meals in different ways depending on their department

and/or supervisor.

The fundamental unmanageability of Plaintiffs' proposed collective action – all

employees subject to the Break Deduction Policy – and the highly individualized issues raised, is

evident when comparing potential members:

- Senior Carpenter, Sisters of Charity Hospital – A Senior Carpenter works in the Facilities and Engineers Department at Sisters of Charity Hospital, where he is responsible for the maintenance and upkeep of the hospital and grounds.  (B. Johnson Decl. at ¶¶ 2, 4).  He works 8 hour shifts and is subject to an automatic 30 minute deduction for his unpaid meal break.  (Id. at ¶ 3).  Meal times for the Department are scheduled on a staggered basis so that there are always employees on duty to handle emergency repairs and thus eliminating the possibility of interruptions.  (Id. at ¶¶ 5, 10).  The Senior Carpenter and all employees in the Department are instructed by their supervisor to inform him if they miss a meal period.  (Id. at ¶ 6).  However, missed meals simply do not occur in this Department, because it is well-established that if an employee's work interferes with his regularly scheduled meal period, he or she is to take a full meal period later in the shift.  (Id. at ¶¶ 7, 10).

- Biller, Appletree Facility – Billers work in the Billing Department in an office setting at the CHS's Appletree Facility, where they are responsible for billing insurance companies, following up on accounts, and reconciling accounts.  (Declaration of Janet Mazgaj,

Supervisor of Billing, hereinafter "Mazgaj Aff." ¶ 4).  Billers are permitted to work flexible hours, including eight hour day shifts five days per week, or 10 hour day shifts three days per week and a 9.5 hour shift one day per week.  (Id. at ¶ 3).  The Billing Department is open from 6:00am to 9:00pm, five days per week.  (Id.).  Meal times for Billers are scheduled on a staggered basis, and Billers are able to choose when to take their meal break.  (Id. at ¶ 5).  The supervisor of the department instructs Billers to inform her if they are required to work through a meal period.  (Id. at ¶ 6).  Calls are not put through to Billers when they are on meal breaks.  (Id.).  Moreover, supervisors constantly circulate throughout the department to observe Billers, and know if they missed or were interrupted during meal periods.  (Id. at ¶ 9).

- Certified Nursing Assistant, St. Francis of Buffalo – Certified Nursing Assistants ("CNAs") work at St. Francis of Buffalo, a skilled nursing facility, where they are responsible for caring for the needs of residents, providing long term medical care, and dispensing medications. Declaration of Sandy Pidanick, Director of Nursing, St. Francis of Buffalo, hereinafter "Pidanick Aff." ¶ 4.  CNAs are covered by a collective bargaining agreement, which governs wages, hours worked, meal times, break times, and overtime.  (Id. at ¶ 2).  CNAs work eight hour shifts, and the facility is open 24 hours per day, 7 days per week.  (Id. at ¶ 3).  Meal times on all shifts are scheduled on a staggered basis so that there is always coverage on the unit.  (Id. at ¶ 5).  Employees receive assignment sheets each day which indicate when they are to take their meal period.  (Id. at ¶ 5 & Exhibit A).  Employees are instructed by their supervisor that if they are unable to take a meal break due to patient care needs or some other work-related reason, they are required to inform a supervisor on duty of this occurrence either verbally or in writing.  (Id. at ¶ 6).  Employees are not permitted to eat on the unit, but instead eat meals in a break room on a different floor of the facility or outside at picnic tables.  (Id. at ¶ 9).  Interruptions during meal periods do not occur.  (Id. at ¶ 10).

The analysis of whether these various employees performed work during a meal period that was predominantly for the benefit of the employer will be as unique as the nature and demands of the work they perform.  For example, the nature of meal period practices and activities could not be more dissimilar among the highly disparate job functions contained in the putative collective action.  The affidavits submitted by Plaintiffs in support of their motion all claim interruptions solely as a result of patient care.  (See Hinterberger Aff. at ¶¶ 5, 8, 9; Weisbecker Aff. at ¶¶ 5, 8, 9; Williams Aff. at ¶¶ 5, 8, 9; Carroll Aff. at ¶¶ 5, 8, 9).  However, Plaintiffs seek to represent a collective action consisting of all employees subject to the automatic meal deduction, a group which includes many employees who have never provided patient-care services and would not be subject to interruptions during meal periods of the same

type, frequency, length or duration, if at all.  (Sciandra Decl. at ¶ 5).  These employees include

positions ranging from Housekeeper to Billing Clerk to various RNs, who all have vastly

different job duties and work environments.  (Id. at ¶ 5 and Job Descriptions attached thereto as

Exhibits C-F).

The immense variety of the positions and duties performed across the system is also

obvious when comparing the 16 manager declarations and twenty-seven declarations from

putative class members submitted by CHS.  Differences abound even among those who perform

patient care services, as completely different types of services are provided at the different

facilities.  For example, drug rehabilitation services – where emergency situations are highly

unlikely – are provided at Sisters of Charity Hospital, but not at the other acute-care hospitals.

(McDonald Dec. at ¶ 22; see also ¶¶ 16-21).  These varying patient-care services require

different job duties and demands which result in differences in the length, frequency, and nature

of potential interruptions.  The existence of employees with "different job responsibilities, who

work in different facilities, in different locations, and, most likely, in different working

conditions" is fatal to an attempt to fulfill the similarly situated requirement in the context of

uncompensated meal claims "because each claim will need to be established with an

individualized analysis of the specific minimum wage and overtime compensation violations that

may have occurred against the individual employee [and] [s]uch an individualized analysis runs

directly counter to 'the economy of scale' envisioned by collective treatment of similarly situated

employees under § 216(b) of the FLSA."  Ledbetter, 2007 U.S. Dist. LEXIS 10243 *16.

Plaintiffs erroneously cite to several cases for the proposition that the similarly situated

standard "is not defeated simply because, as here, the plaintiffs performed a variety of jobs in a

number of departments in different locations."  Plaintiffs' Memo, p. 10 (citations omitted).

Plaintiffs fail to mention that all of the cases they relied upon involved discrimination claims under the Age Discrimination in Employment Act ("ADEA") where the putative collective action members were subject to an alleged uniform discriminatory policy or decision.  For instance, in <u>Heagney v. European  Am. Bank</u>, 122 F.R.D. 125, 127 (E.D.N.Y. 1988), the policy at issue was a system-wide voluntary retirement program that allegedly coerced older workers to retire.  The fact that this program applied at different locations to different types of employees was irrelevant to the similarly situated analysis in that case, as all putative collective action members had received the same incentives to retire under the program.  See also, <u>Abrams v. Gen. Elec. Co.</u>, 1996 U.S. Dist. LEXIS 16869 *7 (N.D.N.Y. 1996) (retention procedures had discriminatory impact on employees over 40); <u>Jackson v. New York Tel. Co.</u>, 163 F.R.D. 429, 432 (S.D.N.Y. 1995) (same).  By contrast, claims for missed or interrupted meal periods are entirely dependent on the specific job duties and working conditions of employees that cause interruptions of different types, lengths and frequencies, if at all.  The affirmations submitted by Plaintiffs implicitly acknowledge this, as they all state that their meal periods were interrupted in order to provide patient-care services, a duty that, as noted, many members of the proposed class do not provide.

      b.    <u>Plaintiffs' Meal Time Claims Require Individualized Inquiry as to Whether Each Manager Knew That Each Proposed Class Member Performed Compensable Work During Any Given Meal Period</u>

A determination as to whether Defendants "suffered or permitted" employees to work "off the clock" will necessarily require an individualized analysis.  This analysis will depend, in part, on whether "the employer 'knows or has reason to believe that the employee is continuing to work.'"  <u>Kosakow v. New Rochelle Radiology Assocs., P.C.</u>, 274 F.3d 706, 718 (2d Cir. 2001) (<u>quoting</u> 29 C.F.R. § 785.11).  "[A]n employer cannot suffer or permit an employee to

perform services about which the employer knows nothing."  Holzapfel v. Town of Newburgh, 145 F.3d 516, 524 (2d Cir. 1998).

Courts have not hesitated to dismiss FLSA claims where a plaintiff has failed to record time for which he knows he could have been compensated.  Berger v. Cleveland Clinic Foundation, 2007 U.S. Dist. LEXIS 76593  (N.D. Ohio 2007) is instructive.  In Berger, the plaintiff claimed that he was not compensated for working through meal periods which were unpaid due to an automatic deduction.  The court granted the defendant-hospital's motion for summary judgment, finding that it was "undisputed that Defendant maintained a logbook in which employees were told to mark when they missed," and the failure to pay was "due to Plaintiff's own failure to mark them in the logbook."  Berger, 2007 U.S. Dist. LEXIS 76593 *37-38.  See also Seever v. Carrols Corp., 528 F. Supp. 2d 159, 170 (W.D.N.Y. 2007) (dismissing employees' off-the-clock claims based in part upon the "undisputed fact that plaintiffs never reported this work on their timesheets"); Wood v. Mid-America Mgmt. Corp., 192 Fed. Appx. 378, 381 (6th Cir. 2006); White v. Washington Gas, 2003-3618, 2005 U.S. Dist. LEXIS 3461 *13-14 (D. Md. 2005) (dismissing plaintiff's claims for time worked during unpaid meal breaks where employee "never reported those hours on his timesheets, nor did he ever asked to be paid for those hours until this lawsuit").

Plaintiffs contend in their Memorandum of Law and supporting affirmations that "Defendants and their management knew and expected that the employees continued to work through some or all of their meal breaks to take care of patients" and that "Defendants saw the work being done and employees' meal breaks being interrupted."  Plaintiffs' Memo, p. 4; Hinterberger Aff. at ¶ 9; Weisbecker Aff. at ¶ 9; Williams Aff. at ¶ 9; Carroll Aff. at ¶ 9. Plaintiffs attempt in vain to impute this knowledge to CHS in an incredibly vague fashion in the

hopes of satisfying the "similarly situated" requirement.  Plaintiffs ignore the fact that whether

Defendants had knowledge of violations depends on an individualized inquiry into whether each

employee's manager knew that a particular employee performed work on a particular day during

their meal period and whether such work was predominantly for the benefit of the employer to

render it compensable.[8]

As discussed above, and demonstrated through the declarations of managers and

employees of numerous departments and facilities throughout CHS's operations, employees

were informed by their supervisors that they were to report missed or interrupted meal periods in

order to be paid for such work:

- Declaration of Mary Hojnacki, Nurse Manager of the Post-Operative Surgical Unit at
  Kenmore Mercy Hospital ¶ 7 ("I regularly instruct employees that if they are unable to take a
  meal break due to patient care needs or some other work-related reason, they are required to
  inform me of this occurrence by recording it in an Overtime Log…Likewise, I instruct
  employees that if they are interrupted during their meal period, that they are required to
  report it as a missed meal on the Overtime Log");

- Declaration of Jon Carlson, Site Manager for Respiratory Therapy at Mercy Hospital ¶ 6, 10
  ("I instruct employees that if they are unable to take a meal break due to patient care needs or
  some other work-related reason, they are required to record this occurrence on an exception
  log… I have instructed employees that if interruptions occur during their meal period, it is up
  to the employee to report these interruptions as a missed meal period on the exception log");

- Declaration of Katherine Johnson, CNA in Skilled Nursing Facility III at St. Catherine's
  Laboure ¶ 3 ("I understand that these [timekeeping] policies and/or procedures require that if
  I worked through my meal period or I have been interrupted for more than a minute or two
  and did not get a full meal break, I must record an entry on the department's Time Exception
  Slip, and that I will be paid for this time if I do so");

- Declaration of Susan P. Link, Activities Leader at Father Baker Manor ¶ 3 ("I understand
  that these [timekeeping] policies and/or procedures require that if I worked through my meal

---

[8] To the extent that Plaintiffs claim that they were not paid for missed or interrupted meal periods
despite reporting them to their supervisor, that they were told by their supervisor not to record
such occurrences, or that they did not report such occurrences because they did not receive pre-
approval from their supervisor, this does not demonstrate a system-wide policy or practice.
Rather, such claims necessarily require an individualized inquiry into the specific interactions of
an employee with his or her manager.  See Dudley, 2005 U.S. Dist. LEXIS 9168 *6-7.

period or I have been interrupted for more than a minute or two and did not get a full meal break, I would notify my supervisor, and would get a full half hour meal break at some time in the day").

In addition, all unionized employees – approximately 50% of the proposed class – were subject to one of ten different collective bargaining agreements, each of which contains varying provisions requiring pay for work performed during meal periods.  (See Exhibits A-I to Declaration of Mark Molloy, filed with the Court in support of Defendants' Motion to Dismiss; see also Sciandra Decl., Exhibit G).  Employees were well-aware of the fact that they could be compensated for this time and were informed of supervisor- and/or department-specific procedures to report such occurrences.

System-wide KRONOS reports show that meal periods were regularly compensated at facilities and departments/units throughout the system, demonstrating the absence of any widespread pattern or practice of failure to pay compensable meal period work.  (Herniak Decl. at ¶ 6).  KRONOS records also reveal 549,087 overtime hours were recorded and paid at 1.5 times the employee's regular rate in 2007, clearly showing no systemic pattern or practice of denying employees overtime pay. (Id. at ¶ 7).

For all of the reasons set forth above, Plaintiffs' Motion should be denied in its entirety.

II.     THE PUTATIVE COLLECTIVE ACTION TO WHICH PLAINTIFFS SEEK TO SEND NOTICE IS OVERBROAD AND, THEREFORE, IF NOTICE IS NOT DENIED, IT MUST BE DISTRIBUTED ON A LIMITED BASIS

As set forth above, Plaintiffs have failed to make a sufficient evidentiary showing of any uniformity among the purported collective action; the Plaintiffs have also failed to establish that any unlawful policy, plan or practice exists.  Under these circumstances, notice is simply inappropriate.  If, however, the Court determines that some notice should be sent, the Court

should limit such notice to what is reasonable and appropriate under the circumstances in this case.

Courts have routinely denied the broad notice often requested by plaintiffs in favor of more limited notice.  In <u>ClientLogic</u>, this Court found the plaintiffs' request to conditionally certify and send notice to a proposed collective action of "all hourly telephone customer service employees who worked in ClientLogic's call center facilities" to be "overly broad." <u>ClientLogic</u>, 2006 U.S. Dist. LEXIS 69021 at *15.  The Court, instead, certified a collective action that was limited to "those ClientLogic facilities where Plaintiffs have made some showing that potential violations of the FLSA have occurred."  <u>Id.</u>  Significantly, the Court found that Plaintiffs had made this "showing" only at facilities where the plaintiffs provided affidavits.

Here, Plaintiffs seek to send notice on a grand (and imprecise) scale to all persons who were employees at any of the Defendants' locations and who were subject to the automatic meal deduction, without limitation as to job title or department, a collective action even broader than that requested and denied in <u>ClientLogic</u>.  Plaintiffs have even failed to provide the Court with sufficient and relevant information concerning the employment of the named Plaintiffs (much less the opt-in Plaintiffs or the putative plaintiffs subject to the automatic meal deduction) or with any relevant evidence as to how those individuals are similarly situated.  This Court rejected such a collective action in <u>Sherrill v. Sutherland Global Servs., Inc.</u>, 487 F. Supp. 2d 344 (W.D.N.Y. 2007), where the plaintiffs proposed a collective action of all hourly employees at all of the defendant's locations.  The Court limited the collective action to telemarketing agents, as the plaintiffs only submitted affidavits from employees who held that job title.  The Court also held:

> "Plaintiffs summarily assert that Sutherland utilized the KRONOS system for all hourly
> employees.  They have not, however, submitted any evidence to suggest that any other

employees performed work before their scheduled work day or during their lunch period. Without such evidence, there is no basis to conclude that any factual nexus exists between the call center employees and other employees of Sutherland."

Id. at *14.

Similarly, the Plaintiffs in this case have presented no evidence to suggest that employees other than the affiants performed work during their meal periods, as the consent forms do not specify what type of claim the opt-in Plaintiffs are even pursuing.

Many courts have limited notice to employees working for the same employer, in the same facility, who share the same position.  See, *e.g.*, Bernard, 231 F. Supp. 2d at 436 (limiting notice to two facilities where plaintiffs provided affidavits detailing practices of managers and where affidavits failed to provide "any specific allegations regarding practices in other offices – no names of employees or supervisors, and no indication that the problems alleged through first-hand knowledge in the two Virginia offices exist elsewhere"); Horne, 279 F. Supp. at 1235 (denying notice; holding that a plaintiff "must demonstrate that employees outside of the work location for which the plaintiff has provided evidence were similarly affected by alleged work policies in order for the court to certify a collective action which extends beyond the plaintiff's own work location"); White v. Osmose, Inc., 204 F. Supp. 2d 1309, 1318 (M.D. Ala. 2002); Camper, 200 F.R.D. at 520-521; Harper v. Lovett's Buffet, Inc., 185 F.R.D. 358, 363 (M.D. Ala. 1999).

The Court should likewise limit notice here, if it finds that any notice is warranted. Plaintiffs' affirmations only present evidence from three job titles – RN, LPN and Respiratory Therapist – out of the over 350 different types of hourly positions at Defendants' various sites. Each of these affiants only presents evidence of the practices employed by the managers in their particular department within three of Defendants' facilities – the Medical Rehabilitation Unit and

Emergency Room at Mercy Hospital of Buffalo, the Pink Unit at St. Elizabeth's Home, and the Respiratory Therapy Department at Kenmore Mercy Hospital.  (Sciandra Decl. at ¶ 4).  Plaintiffs have clearly failed to demonstrate a factual nexus between themselves and other individuals in different positions and different departments.

For the reasons stated above, if the Court decides finds that Plaintiffs have satisfied their evidentiary burden under Section 216(b), collective action notice should be limited to employees in the same job title and department as the affiants.

III.    THE CONTENT AND FORM OF THE PROPOSED NOTICE IS INAPPROPRIATE[9]

A.    U.S. Mail is Appropriate as the Sole Form of Notice

Plaintiffs seek an order requiring Defendants to e-mail collective action notices and opt-in forms to employees.  This request is excessive and goes far beyond the well-established requirements for providing potential members with "the best notice practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2).  In fact, it is well-established that first-class mail is an adequate means and, indeed, the preferred method of providing potential class members with "accurate and timely notice concerning the pendency of the collective action."  Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989).

In Reab v. Electronic Arts, Inc., 214 F.R.D. 623 (D. Colo. 2002), the court addressed the plaintiffs' request to notify potential class members by electronic mail and by a posting on a website, in addition to distribution by first-class mail.  The court held that the electronic means of notification were unnecessary and potentially problematic:

"Where it is important to ensure that the most accurate notice possible is provided to the proper audience, notification by first class mail is the preferred method in the unique

---

[9] CHS disputes the form of Plaintiffs' proposed notice, and submits proposed changes, attached as Exhibit D to the Declaration of Todd Shinaman.

> circumstances of class certification notification. Such a mailing process ensures the integrity of a judicially controlled communication directed to the intended audience. In contrast, electronic communication inherently has the potential to be copied and forwarded to other people via the internet with commentary that could distort the notice approved by the Court. Electronic mail heightens the risk that the communication will be reproduced to large numbers of people who could compromise the integrity of the notice process. In addition, email messages could be forwarded to non-class members and posted to internet sites with great ease. First class mail ensures, at the outset, that the appropriately targeted audience receives the intended notification and maximizes the integrity of the notice process."

Id. at 630–31.

The Eastern District of New York rejected a proposed settlement agreement under Rule 23 because the agreement's proposed notice provision did not provide the "best notice practicable." Karvaly v. Ebay, Inc., 245 F.R.D. 71, 91 (E.D.N.Y. 2007). The parties had agreed to provide electronic notice to all class members, but the court concluded that electronic notice, although less expensive than notice by mail, was not an appropriate substitute because it "creates risks of distortion or misleading notification that are substantially reduced when first-class mail is used." *Id.*

Plaintiffs' request to have class notices and opt-in forms distributed by email is unnecessary, redundant and creates the potential for mis-information to be distributed to potential class members. Plaintiffs have not presented any reasoning why first-class mail — the well-accepted standard for providing the "best" notice to class members — is insufficient in this case. Accordingly, Defendants should only be required to distribute class notices and opt-in forms by mail.

Plaintiffs' request that Defendants be required to publicize the notice in employer communications to employees and to post the notices in a conspicuous place is similarly redundant and unnecessary. Again, it is well-established that first-class mail, alone, is sufficient to provide class members with the best notice practicable of the lawsuit. Additional means of

notification are superfluous.  See <u>Mowdy v. Beneto Bulk Transp.</u>, 2008 U.S. Dist. LEXIS 26233

*31 (N.D. Cal. 2008) (posting of notices not necessary to effect "best notice practicable").

B.      <u>Plaintiffs Have No Right to Employees' Personal Information</u>

        Plaintiffs have requested significant personal and highly sensitive information about

Defendant's employees without providing any justification whatsoever as to why such

information is needed.  Specifically, Plaintiffs have requested "the employee's name, current of

[sic] last known address, phone number, social security number, location of employment, dates

of employment, date of birth and e-mail address."  This information goes well beyond the well-

established obligation of a defendant to provide plaintiffs with <u>names</u> and <u>last known addresses</u>

only.

        In <u>Hoffman-La Roche</u>, the Supreme Court affirmed the district court's order to produce

the <u>names and addresses</u> of similarly situated employees.  <u>Hoffmann-La Roche, Inc. v. Sperling</u>,

493 U.S. 165, 169–70 (1989) (emphasis supplied).  Since then, the courts in this Circuit and

others have routinely denied requests by counsel for named plaintiffs for personal information

such as social security numbers and telephone numbers, citing privacy concerns of the individual

potential class members.  For example, in <u>Humphries v. Stream Int'l, Inc.</u>, 2004 U.S. Dist.

LEXIS 20465 (N.D. Tex. 2004), the court rejected plaintiffs' counsel's argument that telephone

numbers, dates of birth and social security numbers of potential class members were required,

holding:

        Any need for the compelled disclosure of such data is outweighed by the
        privacy interests of these current and former workers. Inadvertent disclosure of
        such information could lead to such unintended consequences as identity theft.
        And there is no apparent reason to conclude that sending a letter to the person's
        last known address will be inadequate.

Id. at *12; see also Francis v. A&E Stores, Inc., 2008 U.S. Dist. LEXIS 49971 *8–9 (S.D.N.Y. 2008) (denying request for social security numbers, telephone numbers, and dates and location of employment); Lee v. ABC Carpet & Home, 2008 U.S. Dist. LEXIS 38725 *9 (S.D.N.Y. 2008) (denying request for social security numbers); Fasanelli v. Heartland Brewery, Inc., 516 F. Supp. 2d 317, 324 (S.D.N.Y. 2007) (same).

Given that Plaintiffs have not put forth any reason whatsoever for needing this sensitive information about CHS's employees, and in light of the CHS's obligations to protect the privacy concerns of potential class members, CHS should be required to produce only the names and last known addresses of its employees.

C.      The Time Period for Opting into the Collective Action Should be Limited to 45 Days

Plaintiffs' proposed notice does not contemplate any finite opt-in period but, instead, leaves potential collective action members with an open-ended opportunity to opt in to the collective action. This is patently unreasonable. In Bowens v. Atlantic Maint. Corp., 546 F. Supp. 2d 55 (E.D.N.Y. 2008), the court held that, in the absence of a finite opt-in period in the plaintiff's proposed collective action notice, a period of 60 days was appropriate. Id. at 85. Courts in this Circuit routinely approve 60 day opt-in periods. See, e.g., Iriarte v. Redwood Deli and Catering, Inc., 2008 U.S. Dist. LEXIS 50072 *17 (E.D.N.Y. 2008); Francis v. A&E Stores, Inc., 2008 U.S. Dist LEXIS 49971 *16 (S.D.N.Y. 2008); Anglada v. Linens 'n Things, Inc., 2007 U.S. Dist. LEXIS 39105 *33 (S.D.N.Y. 2007); Masson v. Ecolab, Inc., 2005 U.S. Dist. LEXIS 18022 *48 (S.D.N.Y. 2005); Gjurovich v. Emmanual's Marketplace, Inc., 282 F. Supp. 2d 101, 107 (S.D.N.Y. 2003).

Here, not only have Plaintiffs failed to articulate a reason why an extended opt-in period would be necessary, they have not even addressed, or cited any case law, to support their request

for an open-ended opt-in period.  There are no extenuating circumstances necessitating a

lengthened or indefinite opt-in period.  Given that Plaintiffs' counsel has been conducting a

purported "investigation" since at least January 2008 and sent solicitations to thousands of

employees, a 45 day opt-in period is perfectly reasonable.

IV.     BECAUSE OF PLAINTIFFS' IMPROPER PRE–NOTICE MASS SOLICITATIONS,
        THIS COURT SHOULD NOT AUTHORIZE ADDITIONAL NOTICE

        Notwithstanding Plaintiffs' request for court-authorized notice, Plaintiffs have been

engaging in improper self-help mass solicitations to potential plaintiffs since at least January

2008 – six months prior to filing the instant action.  Plaintiffs' counsel has posted a website

(www.hospitalovertime.com) devoted to soliciting plaintiffs.  (Shinaman Decl. at ¶ 2).  The

website contains a link to a "frequently asked questions" page and provides a "sample" opt-in

consent form which has not been approved, reviewed or submitted to this Court, as contemplated

by Section 216(b) of the FLSA.  (See id.).  In addition to the website, Plaintiffs' counsel has sent

mass mailings to CHS employees, at their home addresses, requesting that those employees

"[t]ake [a]ction,[10]" and directing them to their website and consent forms.  (See id.). Those mass

solicitations are at odds with Plaintiffs' Motion for Court Authorized Notice and are nothing but

an attempt to circumvent the established procedure for court-supervised notice under Section

216(b).  See Hoffman-La Roche, Inc., 493 U.S. at 169-72 (court is to monitor preparation and

distribution of notice); Cintron v. Hershey Puerto Rico, Inc., 363 F. Supp. 2d 1017 (D.P.R. 2005)

("[T]he trial court must first authorize whether the alleged class should be provided with

notice").  In Hoffman-La Roche, the Supreme Court warned of the inherent dangers in

promulgating notice without the court's approval and the potential consequences for doing so:

---

[10]   The action Plaintiffs' counsel "want" employees to take is to execute the consent form
contained in the website.

By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative.  Both the parties and the court benefit from settling disputes about the content, of the notice before it is distributed. This procedure may avoid the need to cancel consents obtained in an improper manner.

493 U.S. at 172.  Plaintiffs' solicitations on a mass scale, which appear to have been directed to all health care workers in Western New York regardless of their specific job or employer, is the type of abuse the Supreme Court sought to prevent.[11]  This Court has both the duty and the broad authority to exercise control over a class action given the potential for abuse in such cases.  Gulf Oil Co. v. Bernard, 452 U.S. 89 (1981).  The Plaintiffs' pre-certification notice of the pendency of this litigation on a mass scale has already prejudiced Defendants through the scattershot solicitation of and communications with its employees with imbalanced and inaccurate information.

Because Plaintiffs have engaged in such self-help prior to the court involvement and approval of notice, they should be precluded from taking advantage of the Court's processes to facilitate further notice.  In addition, any further notice would confuse employees through the distribution of multiple and contradictory notices.[12]

CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied in its entirety.

---

[11]   In fact, Plaintiffs website, www.hospitalovertime.com, directs all hospital workers to contact "Hospital Overtime Class Action Lawsuits and Investigations" for further information and instructions.  The consent forms distributed by Plaintiffs are directed at employees of several different companies, including CHS, Kaleida Health, Erie County Medical Center and "[other] health care institutions."

[12]  Plaintiffs will not be prejudiced by this Court's refusal to authorize further notice as Plaintiffs mass solicitations have already resulted in a significant number of consents, without even identifying the employee's particular claim.  See Flores v. Lifeway Foods, Inc., 289 F. Supp. 2d 1042, 1047 (N.D. Ill. 2003) (failure to authorize court approved notice in no way hampers Plaintiffs representation of opt-in plaintiffs).

- 40 -

NIXON PEABODY LLP

/s/ Mark A. Molloy

By: _____
       Mark Molloy, Esq.
       Todd Shinaman, Esq.
       Joseph Carello, Esq.
*Attorneys for Catholic Health System Defendants*
40 Fountain Plaza, Suite 500
Buffalo, New York 14202
Tel:  (716) 853-8100
Email:  mmolloy@nixonpeabody.com
         tshinaman@nixonpeabody.com
         jcarello@nixonpeabody.com