UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GAIL HINTERBERGER, *et al.,*                          **DECISION**
                                                            **and**
                              Plaintiffs,                   **ORDER**[1]
            v.
                                                      **08-CV-380S(F)**
CATHOLIC HEALTH SYSTEM, INC., *et al.,*

                              Defendants.
_____

APPEARANCES:          THOMAS & SOLOMON, LLP
                      Attorneys for Plaintiffs
                      MICHAEL J. LINGLE,
                      SARAH E. CRESSMAN, of Counsel
                      693 East Avenue
                      Rochester, New York   14607

                      NIXON PEABODY, LLP
                      Attorneys for Defendants
                      MARK A. MOLLOY,
                      TODD R. SHINAMAN,
                      JOSEPH A. CARELLO, of Counsel
                      40 Fountain Plaza, Suite 500
                      Buffalo, New York   14202


## JURISDICTION

By order of Hon. William M. Skretny, dated January 6, 2010 (Doc. No. 243), this

matter was referred to the undersigned for all non-dispositive pretrial matters pursuant

28 U.S.C. § 636(b)(1)(A).  The matter is presently before the court on Defendants'

Motion To Disqualify Consulting Expert filed October 2, 2012 (Doc. No. 351)

_____

[1] A motion to disqualify an expert is non-dispositive. *See Nikkal Industries, LTD. v. Salton*, 689 F.Supp. 187, 189 (S.D.N.Y. 1988) (motion to disqualify considered within non-dispositive referral authority pursuant to 28 U.S.C. § 636(b)(1)(B)).  *But see United States ex rel. Grimm Constr. Co., Inc. v. SAE Civil Constr., Inc.*, 1996 WL 148521, *1 (D.Neb. Jan. 29, 1996) (applying *de novo* review where magistrate judge's order denying disqualification of attorney was without findings or a discussion of applicable law).

("Defendants' motion").

## BACKGROUND

This action, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 218, and New York State Wage and Hour Laws, N.Y. Labor Law § § 190, 650 (McKinney's 2002) ("Plaintiffs' state claims"), filed May 22, 2008 seeks unpaid regular wages and overtime pay for work during Plaintiffs' meal breaks, shift preparation time and required training.  Defendant Catholic Health System, Inc. is a major regional hospital system and provider of related health care services.  Plaintiffs are a group of Defendants' hourly employees, primarily nurses and other health care professionals, clerical, and maintenance workers.  Conditional certification of Plaintiffs' collective action under Plaintiffs' FLSA claim pursuant to 28 U.S.C. § 218(b), limited to Plaintiffs who provide direct patient care, was granted on October 21, 2009 (Doc. No. 221).  On October 5, 2012, Plaintiffs filed,  pursuant to Fed.R.Civ.P. 23, a motion for class certification of Plaintiffs' state claims (Doc. No. 356).  Discovery has been stayed as of January 28, 2013, pending disposition of Defendants' motions to decertify Plaintiffs' FLSA collective action (Doc. No. 397) and for summary judgment on Plaintiffs' state law claims (Doc. No. 437).

Defendants' motion was filed together with Attorney Declaration In Support Of Motion To Disqualify Consulting Expert (Doc. No. 351-1) ("Molloy Declaration") attaching Exhibit A (Doc. No. 351-2) ("Molloy Declaration Exh. A") and a Memorandum of Law In Support Of Motion To Disqualify Plaintiffs' Expert Consultant (Doc. No. 351-3) ("Defendants' Memorandum").  In opposition, Plaintiffs filed, on October 19, 2012, a

Memorandum of Law In Opposition To Defendants' Motion To Disqualify Consulting Expert (Doc. No. 373) ("Plaintiffs' Memorandum"), the Affirmation Of Sarah E. Cressman In Opposition To Defendants' Motion To Disqualify Consulting Expert (Doc. No. 374) ("Cressman Affirmation") attaching exhibits A - F (Doc. No. 374-1) ("Cressman Affirmation Exh.(s) __"), and the Affirmation of Amir Karahasanovic (Doc. No. 375) ("Karahasanovic Affirmation").  On October 26, 2012, Defendants filed a Reply Memorandum of Law In Further Support of Motion To Disqualify Plaintiffs' ESI Expert Consultant (Doc. No. 381) ("Defendants' Reply Memorandum") together with a Reply Attorney Declaration In Further Support of Motion To Disqualify Consulting Expert (Doc. No. 381-2) ("Shinaman Reply Declaration").[2]  Oral argument was deemed unnecessary. Based on the following, Defendants' motion should be DENIED.

## FACTS[3]

D4, located in Rochester, New York, provides litigation support services to law firms and corporations including E-Discovery[4] services such as computer forensics,

---

[2]  Defendants also contend that based on Plaintiffs' counsel's contact with Amir Karahasanovic ("Karahasanovic'"), employed by D4, LLC ("D4"), a litigation support firm that had provided document scanning and coding services for Defendants, to assist Plaintiffs in opposing Defendants' motion, Plaintiffs' counsel should be disqualified.  Defendants' Reply Memorandum at 5, 7; Shinaman Reply Declaration ¶ 9.  Because this request first appeared in Defendants' reply papers, the court's briefing schedule for Defendants' motion did not direct Plaintiffs file a sur-reply; however, Plaintiffs have not requested leave to do so.  The court therefore considers Defendants' motion to also request disqualification of Plaintiffs' counsel as well as disqualification of Plaintiffs' experts or consultants employed by D4.

[3]  Taken from the pleadings and papers filed in connection with Defendants' motion.

[4]  E-Discovery is the "process of identifying, preserving, collecting, preparing, and producing electronically stored information ("ESI") in the context of the legal process."  The Sedona Conference Glossary E-Discovery & Digital Information Management (Third Edition) ("Sedona Conference Glossary") at 18.  *See also* Maura R. Grossman and Gordon V. Cormack, *The Grossman-Cormack Glossary of Technology-Assisted Review*, Vol. 7 FEDERAL COURTS LAW REVIEW 1, 15 (2013) (E-Discovery is the

consulting, paper document scanning,[5] coding[6] and storage or hosting[7] of documents in digital form on web-based platforms allowing computerized access to a database and the processing of electronically stored information ("ESI"). Karahasanovic Affirmation ¶¶ 3-4. On February 12, 2010, D4 and Nixon Peabody, LLP ("Nixon"), Defendants' attorneys, entered into a Master Services Agreement ("Master Service Agreement" or "the Agreement") under which D4 was to perform services to Nixon in connection with the instant case. Molloy Declaration ¶ 3 (D4 "e-discovery services" to be provided); Molloy Declaration Exh. A;[8] Karahasanovic Affirmation ¶ 4 (D4 provides "litigation support services"). As relevant, the Agreement required D4 to hold in confidence "all matters relating to Client's [Nixon's] business and those of [Nixon's] client's business," and information designated as confidential by Nixon. Molloy Declaration ¶ 4; Molloy Declaration Exh. A Section 3 of the Agreement ("Section 3").

---

"process of identifying, preserving, collecting, processing, searching, reviewing, and producing Electronically Stored Information that may be relevant to a civil, criminal, or regulatory matter.") ("The Grossman-Cormack Glossary"). ESI includes electronic mail, or e-mail messages, word processing files, web pages, and databases created and stored on computers, magnetic disks (such as computer hard drives, optical disks (such as DVDs and CDs, and flash memory (such as "thumb" or "flash" drives) and "cloud" based services hosted by third parties via the internet)). MANAGING DISCOVERY OF ELECTRONIC INFORMATION : A POCKET GUIDE FOR JUDGES, Second Edition, Federal Judicial Center (2012) at 2.

[5] Scanning is a process by which, using an optical character reader (OCR), the contents of paper documents are converted into digital images in standard formats to facilitate the viewing and coding of the resulting images using a computer. Sedona Conference Glossary at 46 (defining software for scanning); Lexbe Scanning Services Definition http://www.lexbe.com/hp/define-scanning-services-software.htm, at 2 of 2 ("Lexbe") (defining scanning services as "[s]ervices that create an electronic image or electronic document version of a paper-based document").

[6] Coding is defined herein, Facts, *infra*, at 6-7; Discussion, *infra* at 18-19.

[7] Hosting involves holding databases or digital information in a central computer that controls and permits access by remote computers in a network. Sedona Conference Glossary at 26.

[8] The redacted copy of the Master Agreement filed with the court, Molloy Declaration Exh. A, does not state the exact nature of any services to be performed by D4 thereunder.

As D4's director of sales, Karahasanovic assists D4's clients in "obtaining the best solution for their litigation needs," however, Karahasanovic is "not a member of D4's consulting group," known as "D4's Advisory and Consulting group," Karahasanovic Affirmation ¶ 20 ("the D4 Advisory and Consulting Group" or "the Advisory and Consulting Group"), and does "not provide consulting or expert services," particularly "e-discovery expert guidance," as does the Advisory and Consulting Group, nor does Karahasanovic provide "expert witness services to [D4's] clients." Karahasanovic Affirmation ¶ 5. D4 was not engaged in 2010 to perform E-Discovery consulting services for Nixon, such as the "identification, collection, processing, review and production" of ESI and related consulting services in this case, Karahasanovic Affirmation ¶ ¶ 7-8; Molloy Declaration ¶ 6, nor was Karahasanovic retained by Nixon to serve as a consultant or potential expert witness. Karahasanovic Affirmation ¶ 5.

Nixon maintains in-house staff, its Legal Technology Services department, with the capability of providing E-Discovery and ESI consulting services to Nixon in connection with this and other cases. Cressman Affirmation ¶ ¶ 16, 17; Cressman Affirmation Exhs. E & F. Nixon recently engaged the Ricoh Company, an E-Discovery services provider, to assist it in using the predictive coding software, a specialized software package Defendants recently decided to use to facilitate the review of Defendants' voluminous e-mails responsive to Plaintiffs' production demands using relativity software. Cressman Affirmation ¶ ¶ 11, 18; Cressman Affirmation Exh. C at 1; Plaintiffs' Memorandum at 14. Nixon has also engaged Pangea3, a leading provider of E-Discovery and ESI review services. Cressman Affirmation ¶ 17; Cressman Affirmation Exh. F. Plaintiffs' counsel does not have an in-house litigation support capability to

provide ESI consulting assistance.  Cressman Affirmation ¶ 19.

Beginning in March 2011 Nixon requested D4 to provide scanning and coding services for 5-10 boxes containing Defendants' paper documents relating to this case.[9] Molloy Declaration ¶ 6; Karahasanovic Affirmation ¶ ¶ 7, 9-11, 13.  Nixon also serves as counsel to defendants in *Gordon v. Kaleida Health*, 08-CV-378S(F), another action in this court alleging claims similar to the instant action against the region's other major hospital system ("*Gordon*" or "the *Gordon* case").  Molloy Declaration ¶ 3; Karahasanovic Affirmation ¶ 7 ("D4 was asked to scan and code paper documents" for Nixon in the *Gordon* case).  Defendants in the *Gordon* case are represented by Susan C. Roney, Esq. ("Roney"), another member of the Nixon firm.  Molloy Declaration ¶ 4. The "strategy" for the performance of D4's work in this, the *Hinterberger* case, for which D4 was paid $5,000, and Nixon's "working relationship with D4" was "expected to be substantially similar" to D4's scanning and coding work for Nixon in the *Gordon* case. Molloy Declaration ¶ ¶ 6-7; Defendants' Memorandum at 4.

The scanning and coding of Defendants' documents took place at D4 facilities in D4's scanning department located in Rochester.  Karahasanovic Affirmation ¶ ¶ 7, 9-10, 13-14.  D4's objective coding of the documents, as requested by Nixon, Karahasanovic Affirmation ¶ 10, required a D4 employee, or "coder," reviewing the document and enter "certain categorical information [regarding the Defendants' form] into a form or database."  Karahasanovic Affirmation ¶ 11.  For example, the Karahasanovic Affirmation would be coded as "affirmation," and "Karahasanovic" as its author.

---

[9]  Although the record does not specifically identify the owner of the documents, the court presumes the documents are business records belonging to Defendants.

Karahasanovic Affirmation ¶ 11. Objective coding involves the coders being "shown examples of the document categories and instructed to code the documents by filling in fields in a database." Karahasanovic Affirmation ¶ 12. The coders of Defendants' documents, which presented Defendants' "forms,"[10] "were not asked to identify substantive issues or make subjective decisions" concerning the relevance or import of the documents or their contents to the issues in the case. *Id.* The coding fields, or "assigned fields," included, for example, the beginning and end of the document, box sources (referring presumably to the storage boxes in which the documents were contained and delivered for scanning and coding), cost center and employee number, to be used in the objective coding process and were established by Nixon following discussions between Karahasanovic and Nixon representatives, Colleen Durawa and Josh Headley, Nixon's Senior Legal Technology Specialist ("Headley").[11] Karahasanovic Affirmation ¶ ¶ 13, 15, 17; Cressman Affirmation ¶ 18. As D4's representative, Karahasanovic's discussions with Nixon's staff members were limited to formulating a list of document types, field categories, and the handling of illegible documents in order to facilitate D4's scanning and objective coding of the documents. Karahasanovic Affirmation ¶ ¶ 10-12, 15, 18. Karahasanovic did not discuss case strategy or the contents of the documents with Nixon's representatives. Karahasanovic Affirmation ¶ 17.

---

[10] The record does not further describe the nature of such "forms," but, presumably, the forms are used for recording Defendants' hourly employee work time or other information related to Plaintiffs' claims for unpaid wages and overtime in this case.

[11] While the record does not specify which Nixon representatives Karahasanovic discussed the scanning of Defendants' documents with, the court presumes they were the same persons with whom Karahasanovic discussed the coding work.

In August 2011, Karahasanovic informed Roney that D4 wished to perform services for Plaintiffs in the *Gordon* case and was told by Roney that the Defendants in *Gordon* objected to such work based on an "inherent and obvious conflict of interest." Molloy Declaration ¶ 8. Subsequently, after D4 decided, notwithstanding Roney's objection, to assist Plaintiffs, Karahasanovic advised Molloy of D4's intention to work for Plaintiffs in *Gordon.* Karahasanovic Affirmation ¶ 21. Later, in early 2012, Karahasanovic informed Molloy that D4's Advisory and Consulting was assisting Plaintiffs in the *Hinterberger* case by providing "consulting services" presumably regarding "ESI," Karahasanovic Affirmation ¶ 19. Molloy objected to D4 performing any services for Plaintiffs for the same reason as had Roney in *Gordon*. Molloy Declaration ¶ 9; Defendants' Memorandum at 5 n. 2.[12] According to Molloy, Karahasanovic acknowledged Nixon's objections and gave Molloy the impression D4 would decline to work for Plaintiffs. Molloy Declaration ¶ 10.[13] In the spring or early summer of 2012, Karahasanovic advised Molloy that D4 had been providing ESI consulting services to Plaintiffs in the *Gordon* case and this action. *Id.* ¶ 13; Karahasanovic Affirmation ¶ 19. Karahasanovic recalled that Molloy objected to D4 providing ESI consulting services to Plaintiffs in this action. Karahasanovic Affirmation ¶ 19. When in early 2012 Karahasanovic learned from Molloy that Nixon objected to D4 providing ESI consulting services to Plaintiffs in this case, Karahasanovic was unaware D4's Advisory and Consulting Group, led by Peter Coons ("Coons"), a D4 Senior Vice-President, along with

---

[12] This footnote asserts Karahasanovic informed Molloy in August 2011 that D4 would assist Plaintiffs in *Hinterberger,* referencing Molloy Declaration ¶ ¶ 7-8. However, neither paragraph of the Molloy Declaration supports this assertion.

[13] The precise date of this conversation is not indicated in the record.

Cynthia Courtney ("Courtney") another D4 vice-president who had recently joined D4 earlier in 2012 had been providing such services to Plaintiffs . *Id.* ¶ ¶ 19-20. Neither Coons nor Courtney were involved in performing the scanning and coding services D4 provided to Nixon in connection with this case, nor has Karahasanovic provided any information about this work to Coons or Courtney. Karahasanovic Affirmation ¶ ¶ 21-23. Karahasanovic has had no communications with Coons or Courtney regarding D4's consulting work for Plaintiffs' in this case. Karahasanovic Affirmation ¶ ¶ 21-23. As expressed to Karahasanovic, Molloy's objection to D4's Advisory and Consulting Group's ESI consulting services to Plaintiffs was not based on Karahasanovic having had access to Defendants' or Nixon's confidential information in connection with D4's scanning and coding of Defendants' documents. Karahasanovic Affirmation ¶ 19.

Like defendants in *Gordon*, Defendants in *Hinterberger*, claim they "shared confidential information under a reasonable expectation of confidentiality" with D4. Shinaman Reply Declaration ¶ ¶ 7-8. "[G]iven Plaintiffs' counsel's extensive discussions with Mr. Karahasanovic regarding D4's project for Defendants and Kaleida and their [Plaintiffs' attorneys']<sup>14</sup> curious insistence on using D4 to consult regarding [Defendants'] Custodians [of Defendants' e-mails]," as part of Defendants' motion, Defendants also requested that the court consider disqualifying Plaintiffs' counsel as well as D4. *Id.* ¶ 9.

Approximately one year prior to the filing of Defendants' motion, in an attempt to resolve technical issues regarding production of Defendants' ESI, Defendants' attorneys, specifically Molloy and Shinaman, participated in several telephone conference calls, on

---

[14] Unless otherwise indicated, all bracketed material is added.

October 13, 2011, December 1, 2011, and June 20, 2012, with Plaintiffs' counsel, in which Coons also participated, without any objection by the Nixon attorneys, Cressman Affirmation ¶ 4, a fact acknowledged contemporaneously by Defendants.  Cressman Affirmation ¶ 9; Cressman Affirmation Exh. C (Letter from Mark A. Molloy, dated February 10, 2012, to the court advising that the parties had conducted "multiple 'meet and confer' discussions" regarding ESI discovery issues in which "the parties' respective ESI experts/consultants have participated" and stating that such discussions "served as a tool for idea-sharing and seeking compromises between the parties with regard to ESI issues" in the case).[15]  Molloy also informed the court that Defendants had provided Plaintiffs with a "proposed list of custodians [of Defendants' e-mails]" to facilitate a key-word search of the e-mails.  *Id.* at 3.  In February 2012, Courtney participated in "numerous telephonic conferences" regarding enforcement of Plaintiffs' third party subpoena with Shinaman and Roney without objection by them.  Cressman Affirmation ¶ 10.  No objection to the participation or Plaintiffs' use of Coons in the various conferences regarding ESI issues is expressed in Molloy's letter.  Cressman Affirmation ¶ 9; *see* Cressman Affirmation Exh. B (*passim*).

At a discovery status conference conducted on January 11, 2012 by the court with the parties in both the *Gordon* and *Hinterberger* cases, Plaintiffs' counsel, Michael J.  Lingle ("Lingle"), advised the court, confirmed by Roney, that the *Gordon* defendants objected to Plaintiffs' use of D4 to assist Plaintiffs in addressing ESI matters.  Cressman Affirmation ¶ ¶ 6-8; Molloy Declaration ¶ 9.  Following discussion of the status of the ESI

_____

[15]  Unless otherwise indicated all underlining has been added.

discovery issues in *Gordon* and Defendants' objection to D4's ESI consulting services to Plaintiffs in that case*,* in response to the court's question as to whether a similar issue regarding Plaintiffs' use of D4 as Plaintiffs' ESI consultant in this case had been raised by Defendants in *Hinterberger,* Plaintiffs' counsel stated: "It's [Plaintiffs' use of D4] not a problem in <u>this</u> case." Cressman Affirmation Exh. A at 4. Although Defendants' attorneys in this action, Molloy and Shinaman, were present during the conference, Cressman Affirmation ¶ 6; Cressman Affirmation Exh. A at 1, 4, neither Molloy nor Shinaman contradicted Lingle's representation to the court at that time, *i.e.*, that unlike defendants' objection in *Gordon,* which had been previously discussed at length by Lingle and Roney with the court on the record, Plaintiffs' use of D4 was not a "problem" in this [*Hinterberger*] case after the court raised the issue with Plaintiffs' counsel on the record. Cressman Affirmation ¶ 7 ("when the Court inquired as to the status of ESI discovery in this case," alluding specifically to the D4 matter discussed in *Gordon*, the court clarified that the issue was "to assist you [Plaintiffs' counsel] in reviewing – –," Cressman Exh. A at 4, yet "defense counsel in this case remained silent"). *Id.*

Beginning in February 2012, Defendants' counsel participated in telephone conference calls with Plaintiffs' counsel in which Courtney participated, without Defendants' objection, and provided, with Defendants' awareness, consulting assistance to Plaintiffs regarding the subject matter of the conference call, specifically Plaintiffs' efforts to enforce a subpoena in Maryland against a non-party to obtain documents relevant to Plaintiffs' claims in this case. Cressman Affirmation ¶ 10. In those calls, neither Molloy nor Shinaman expressed to Plaintiffs' counsel any objection to D4 providing ESI consulting services to Plaintiffs, or Coons and Courtney's participation in

the conference calls.  *Id.*  It was not until Defendants stated in a September 13, 2012 e-mail to Plaintiffs that Defendants objected to D4 providing ESI consulting services to Plaintiffs that Plaintiffs learned of Defendants' objections.  Cressman Affirmation ¶ 11; Cressman Affirmation Exh. C (e-mail from Todd Shinaman to Sarah Cressman dated September 13, 2012) ("[w]e [defendants in the *Hinterberger* case] are aware that Kaleida [defendants in *Gordon*] has raised an objection related to D4's involvement in these cases . . . [and] [b]ecause the substantive objection obviously impacts Catholic Health Systems [the primary defendant in *Hinterberger*] as well, we are taking the same position in regard to D4's participation.").  In response to Plaintiffs' assertion that Defendants had not earlier raised such objection Defendants stated that "we [defendants in *Hinterberger*] preserved our objection while making a good faith effort to resolve the issue."  Cressman Affirmation Exh. D at 1-2 (e-mail from Todd Shinaman to Sarah Cressman dated September 27, 2012).  Plaintiffs received no response from Defendants to Plaintiffs' responding e-mail, dated September 27, 2012, requesting Defendants specifically "direct [Plaintiffs] to those [Defendants'] communications [to Plaintiffs]" constituting Defendants' "'preservation of objections' by defendants to plaintiffs' use of D4 as an ESI consultant." Cressman Affirmation Exh. D (e-mail of September 27, 2012 from Sarah Cressman to Todd Shinaman).  Defendants state Defendants' objection to Plaintiffs' use of D4 for ESI consulting in this case was made by Molloy in his August 2011 and February 2012 conversations with Karahasanovic.  Shinaman Reply Declaration ¶ 4 (citing Molloy Declaration ¶ 9 referencing, without giving a date, a telephone conversation with Karahasanovic and Karahasanovic Affirmation ¶ 19 (referencing an "early 2012" telephone conversation with Molloy).  Neither the Molloy Declaration ¶ 9 nor the

Karahasanovic Affirmation ¶ 19 states Molloy informed Karahasanovic in August 2011 of Defendants' objection.

Defendants' objection to D4's ESI consulting assistance to Plaintiffs as stated in the September 13, 2012 e-mail from Shinaman to Cressman, Plaintiffs' counsel, Cressman Affirmation Exh. C at 1, was sent "less than 2 hours prior to the parties' previously scheduled [telephone] conference to discuss defendants' announced intention to utilize predictive coding as the search methodology for their [Defendants'] ESI [Defendants' e-mails] production." Cressman Affirmation ¶ 11. Defendants' objection followed by one-week defendants' objection to Plaintiffs use of D4 as communicated to Plaintiffs' counsel by Roney in the *Gordon* case. Roney Declaration, Exh. E at 1 (e-mail from Susan Roney to Sarah Cressman dated September 7, 2012) (*Gordon* Doc. No. 377-6). Defendants' motion in this case followed the filing of defendants' motion in *Gordon*. Based on the following, Defendants' motion should be DENIED.

## DISCUSSION

**A.** **Disqualification of D4**.

The court's authority to disqualify a party's expert or consultant is based on "'its inherent power to preserve the integrity of the adversary process.'" *Eastman Kodak Company v. Kyocera Corporation*, 2012 WL 4103811, at *7 (W.D.N.Y. Sept. 17, 2012) (quoting *1210 Colvin Avenue, Inc. v. Tops Markets, L.L.C.*, ("*1210 Colvin Avenue, Inc.*), 2006 WL 3827429, at *4 (W.D.N.Y. Dec. 28, 2006) (disqualification of trial consultants providing litigation services to adversary (citing *Hempstead Video, Inc. v. Village of*

*Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) and *Eastman Kodak Company v. Agfa-Gevaert N.V.*, 2003 WL 23101783 (W.D.N.Y. Dec. 4, 2003) (citing *Popular, Inc. v. Popular Staffing Servs. Corp.,* 239 F.Supp.2d 150, 152 (D.P.R. 2003)))).  Disqualification of a party's expert is "designed to protect the integrity of the judicial process by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit." *Kyocera Corporation*, 2012 WL 4103811, at *8 (expert cannot separate confidential information learned from first party during course of later litigation because "'the human brain does not compartmentalize information in that manner.'").  *Id.* (quoting *Pellerin v. Honeywell Int'l Inc.*, 2012 WL 112539, at *3 (S.D. Cal. Jan. 12, 2012)).  *See also Grioli v. Delta Int'l Machining Corp.*, 395 F.Supp.2d 11, 14-15 (E.D.N.Y. 2005) (noting that courts also recognize public interest in maintaining integrity and fairness of judicial process but that disqualification of experts is "rare").  However, against the public interest in preserving judicial integrity and fairness, courts must also balance the parties' right to the assistance of experts "'who possess specialized knowledge'" and the right of such experts to "'pursue their professional calling.'" *Mays v. Reassure America Life Ins. Co.,* 293 F.Supp.2d 954, 957 (E.D.Ark. 2003) (quoting *English Feedlot, Inc. v. Norden Laboratories, Inc.*, 833 F.Supp. 1498, 1504-05 (D.Colo. 1993) (citations omitted)).  Disqualification of an expert or consultant generally requires counsel hold an objectively reasonable belief in the existence of a confidential relationship with the challenged expert or consultant to avoid waiver, *Wang Laboratories, Inc. v. Toshiba Corporation*, 762 F.Supp. 1246, 1249-50 (E.D.Va. 1991) (citing caselaw), and that during the relationship there was a disclosure of "confidential or privileged information to the expert

that is relevant to the current litigation." *Agfa-Gevaert N.V.*, 2003 WL 23101783, at *1 (citing *Greene, Tweed of Delaware v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 428 (E.D. Pa. 2001)). Where circumstances indicate disclosure of confidential information to an expert was "highly unlikely," disqualification will be denied. *Mays,* 293 F.Supp.2d at 957.

The burden is on the party seeking disqualification to show party's counsel's "objectively reasonable" belief that a confidential relationship existed with the expert or consultant and that the party's confidential information was "actually disclosed" to the expert or consultant. *The Topps Company, Inc. v. Productors Stani Sociedad Anomina Industrial y Commercial*, 2001 WL 406193, at *1 (S.D.N.Y. Apr. 20, 2001) (burden on party seeking disqualification)*; Wang Laboratories, Inc.*, 762 F.Supp. at 1249 (courts may disqualify consultants where there is "persuasive evidence that a lawyer was objectively reasonable in assuming the existence of a confidential relationship and that confidential information was disclosed."). "[T]he party seeking disqualification may not meet its burden with 'mere conclusory or ipse dixit assertions,'" *Kyocera Corporation*, 2012 WL 4103811, at *8 (quoting *Greene, Tweed of Delaware, Inc.*, 202 F.R.D. at 429); *see also In re Orthopedic Bone Screw Prods. Liab. Litig.,* 1995 WL 925673, at *6 (E.D.Pa. May 5, 1995) (disqualification of plaintiff's expert denied where "concrete evidence" failed to show defendant's confidential information was disclosed during meeting with expert); *Nikkal Indus., Ltd. v. Salton, Inc.,* 689 F.Supp. 187, 191 (S.D.N.Y. 1988) ("meaningful inquiry into the existence of the relationship" required). "'[S]pecific and unambiguous disclosures that if revealed would prejudice the party,'" are required. *Kyocera Corporation*, 2012 WL 4103811, at *8 (quoting *Hewlett-Packard Company v. EMC Corp.*, 330 F.Supp.2d 1087, 1094 (N.D. Cal. 2004)).

Defendants first contend that because D4 had provided scanning and coding services to Defendants and later agreed to provide Plaintiffs with ESI consulting services, D4 has "switched sides" in this litigation and [D4] must be disqualified. Defendants' Memorandum at 4. According to Defendants, where an expert or consultant like D4 has "switched sides" disqualification is required regardless of whether Defendants held a reasonably objective belief that D4 provided the scanning and coding services to Defendants during a confidential relationship and that in reliance on such confidential relationship Defendants provided confidential information to D4. *Id.* ("In cases like the present . . . where an expert has switched sides in litigation, satisfying the test [for disqualification] is not necessary and an expert must be disqualified because of the inherent and obvious nature of the conflict" (citing *Koch Refining Company v. Jennifer L. Boudreau M/V* ("*Koch*"), 85 F.3d 1178, 1881 (5th Cir. 1996))).[16] Defendants' initial contention is in error for several reasons.

Disqualification of an expert or consultant is justified by the need to avoid the "risk of prejudice from possible disclosure and use of confidential client communications" by an opponent and the fundamental unfairness that would arise if "an expert hired by a party, who at that party's expense obtains specific knowledge and expertise in the issues involved in the litigation, [were permitted] to then be hired by the opposing party and allow the opposing party to reap the benefits of that work." *Great Lakes Dredge & Dock Company v. Harnischfeger Corp.* ("*Great Lakes*"), 734 F.Supp. 334, 336 (N.D. Ill. 1990) (citing *Paul v. Rawlings Sporting Goods Company*, 123 F.R.D. 271, 277 (S.D. Ohio

---

[16] Other than this statement, Defendants do not directly contend D4 acted as an expert or consultant in providing scanning and coding services to Defendants.

1988)).  *See also Kyocera Corporation*, 2012 WL 4103811, at *8 (purpose of disqualification of experts is to avoid misuse "even unwittingly" of confidential information obtained from prior party to engagement with challenged expert).  Implicit in this rationale is that in an expert or consultant-client relationship such confidential information may be obtained as necessary to the effective delivery of the expert's or consultant's services, typically opinions or specialized knowledge, helpful to the party's conduct of the litigation.  For example, where a former employee through his employment garners detailed knowledge of the development of an employer's patent such intimate knowledge of the employer's technical information enables the employee to serve an adversary as an expert in a later infringement action based on the patent and gives the alleged infringer an unfair advantage warranting disqualification of the expert.  *See Agfa-Gevaert*, 2003 WL 23101783, at *5 (allowing former employee who helped develop plaintiff's patented process to serve as defense expert would give defendants an "unfair advantage" requiring disqualification); *Cordy v. Sherwin-Williams Co.,* 156 F.R.D. 575, 582-83 (D.N.J. 1994) (where plaintiff's accident reconstruction expert formed opinion as to causal factors of railroad crossing accident based in part on plaintiff's attorney's impressions and investigation provided to expert, expert was disqualified from later serving and providing contrary opinion as defendant's trial expert on same issue).  Here, in opposition to Defendants' motion, Plaintiffs argue, Plaintiffs' Memorandum at 1, that Nixon "never retained D4 as any type of expert or consultant in this case" and that, based on the record, Defendants have failed, in meeting Defendants' burden, to establish that in providing the scanning and coding services, D4 functioned as an expert or consultant for Defendants.  Plaintiffs' Memorandum at 3.

Thus, if the scanning and coding of Defendants' documents performed for Defendants by D4 did not constitute expert or consulting services potentially warranting disqualification under applicable caselaw even assuming D4 "switched sides," Defendants' motion fails at the outset.

Experts "are sources of information and opinions in technical, scientific, medical or other fields of knowledge." *Wang Laboratories, Inc.*, 762 F.Supp. at 1250. A consultant is "one who gives professional advice or services regarding matters in the field of his special knowledge or training" like an expert. WEBSTERS THIRD NEW INTERNATIONAL DICTIONARY at 490. In this case, the record does not demonstrate, as is Defendants' burden, that the scanning of Defendants' paper documents by D4 or the objective type of coding of the scanned documents provided by D4 to Defendants involved services requiring specialized knowledge, skill, training or education establishing D4's or its representative, Karahasanovic's, status as an expert or consultant in regard to the delivery of these services. *See* Fed.R.Evid. 702 (expert witness qualifies to give expert testimony by "knowledge, skill, experience, training, or education" of subject matter of testimony). Scanning, in the context of E-Discovery, of paper documents involves the use of an "[i]nput device" such as an optical character reader or OCR to electronically convert paper documents into images using "[s]oftware that enables a scanner to deliver industry standard formats for images in a collection" and "the coding of the images," using a computer. Sedona Conference Glossary at 46 (defining Scanner and Scanning Software); Lexbe Scanning Services, http://www.lexbe.com/hp/define-scanningservices-software.htm at 2 of 2 ("Lexbe") (defining scanning as "[s]ervices that create an electronic image or electronic document

version of a paper-based document").

Coding is an "[a]utomated or human process by which documents are examined and evaluated using predetermined codes," such as "names, dates, and relevant terms and phrases."  Sedona Conference Glossary at 9. "Coding may be objective, i.e., the name of the sender or the date [of a document], or subjective, i.e., evaluation as to the relevancy or probative value of the document."  Sedona Conference Glossary at 9 ("Coding may be structured (limited to the selection of one of a finite number of choices), or unstructured (a narrative comment about a document)).  *Id.*  "Objective coding" involves the manual recording of "objective information from documents such as date, authors/recipients/carbon copies, blind copies, and associating the information with specific documents."  Sedona Conference Glossary at 6.  Defendants do not dispute that at Nixon's request Defendants' documents scanned by D4 were to be objectively coded by D4 as stated by Karahasanovic.  *See* Karahasanovic Affirmation ¶ 10 ("along with the scanning of the documents, [Nixon] wanted to have [Defendants'] documents coded for objective information ("objective coding"); Roney Declaration ¶ 12 (*Gordon* Doc. No. 377-1) (D4 scanning and coding "project [for Nixon was] . . . done <u>solely</u> to facilitate [Nixon's] <u>internal</u> <u>handling</u> of <u>data</u> in preparation for depositions and continuing litigation").[17]  In objective coding, the Karahasanovic Affirmation would be coded as an affirmation and its author as Karahasanovic.  Karahasanovic Affirmation ¶ 11; Molloy Declaration ¶ 6 (D4's work in this case was "substantially similar" to D4's work in *Gordon*).  To accomplish the objective coding of Defendants' documents in accordance

---

[17] Unless otherwise indicated, all underlining has been added.

with Nixon's request, the D4 coders working on Defendants' scanned documents were "shown examples of the document categories and instructed to code the documents by filling in fields in a database; they were not asked to identify substantive case issues or make subjective decisions." Karahasanovic Affirmation ¶ 12. Defendants also do not contest D4's description of how the coding work on Defendants' documents was to be done, nor that the coding was performed in accordance with "fields" and "document types" established by Nixon representatives, including Headley, as communicated to Karahasanovic, Karahasanovic Affirmation ¶ 15; Cressman Affirmation ¶ 5, by "filling in [the] fields," with "categorical information into a form or database." Karahasanovic Affirmation ¶ 11. That Defendants have not rebutted Plaintiffs' description regarding the nature of the scanning and objective coding services provided to Defendants by D4 supports a finding that Defendants have acquiesced in D4's descriptions. *See Felske v. Hirschmann,* 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) (by failing to respond to defendant's argument regarding personal jurisdiction, plaintiff effectively conceded point); *Goodwin v. Burge*, 2011 WL 2117595, at *12 (W.D.N.Y. Mar. 7, 2011) (holding plaintiff, by failing to argue in opposition to summary judgment on a claim for relief, effectively conceded to defendant's argument that there was no factual basis for such claim); *Gonzalez v. City of Schenectady*, 2001 WL 1217224, at *11 (N.D.N.Y. Sept. 17, 2011) (deeming defendant's failure to present a position on one plaintiff's motion to sever his claim from those of other plaintiffs showed acquiescence in the relief sought).

Defendants contend that by having several meetings with Nixon representatives in connection with the scanning of Defendants' documents during which Nixon discussed Defendants' "claims and defenses," D4 performed more than "clerical duties."

Defendants' Reply Memorandum at 2, 8. However, Defendants provide no details of such discussions from persons present, *see Kyocera Corporation*, 2012 WL 4103811, at *10 (noting, in denying disqualification of expert, plaintiff's failure to provide affidavits from employees present during conversations between plaintiff's attorney and expert to support attorney's "conclusory" assertion that confidential information was conveyed to expert), and, based on accepted definitions of document scanning, Discussion*, supra*, at 18, the court fails to see, and Defendants do not explain, how passing paper documents through an OCR involves special, technical or scientific knowledge, *Wang Laboratories, Inc.*, 762 F.Supp. at 1250, or that other specialized skills, experience, training or education qualifying one as an expert, *see* Fed.R.Evid. 702, are necessary to enable a person to successfully perform such activity. Except for some minimal training on how to operate an OCR, a device used to scan a document into a digital form for storage and retrieval in a computerized database, Sedona Conference Glossary at 46, Facts, *supra*, at 4, n. 6, the activity involved in scanning, as performed for Defendants in this case, is more akin to a routine clerical function, such as photocopying paper documents, well outside the scope of any activity that would be reasonably considered as requiring expert knowledge or skills, as Plaintiffs contend, Plaintiffs' Memorandum at 2 ("The type of clerical document scanning work D4 performed for Nixon does not establish an expert or consultant relationship."), and Defendants do not demonstrate otherwise. Moreover, given the non-technical nature of the scanning function, Defendants' assertion that a discussion of Defendants' "claims and defenses" with Karahasanovic was needed to enable D4 to scan Defendants' documents, Defendants' Reply Memorandum at 2,8, appears to the court to be highly unlikely. Additionally, as the "claims and defenses" in

this case are reflected in the pleadings, which are public record, any disclosure by Nixon to Karahasanovic regarding such claims and defenses would not, without a disclosure of specific related attorney work product, constitute a disclosure of confidential information. *See Stencel v. Fairchild Corporation*, 174 F.Supp.2d 1080, 1084 (C.D. Cal. 2001) (pleadings provided to expert are "public record" and not a party's "confidential information"). Thus, discussion by Nixon with Karahasanovic of the "claims and defenses" as pleaded, even assuming it occurred, in this case does not establish that Defendants' confidential information was disclosed to D4 or Karahasanovic in connection with the scanning work. Defendants also do not attempt to explain how Karahasanovic's involvement with the scanning work should be considered as rendering of expert or consultant services. Plaintiffs' Memorandum at 1 ("The document scanning project for Nixon was facilitated by [Karahasanovic]."). Defendants therefore have failed to meet their burden to establish that Karahasanovic or D4 served as an expert or consultant in providing scanning services to Nixon and Defendants.

Defendants do not dispute that the coding services, facilitated by Karahasanovic, Plaintiffs' Memorandum at 1, performed by D4, were to be carried out using the objective method of coding which, by definition, does not require the coder to review or evaluate the content of the document to assess its potential probative value or relevance to particular issues in the case, Sedona Conference Glossary at 9. Instead, objective coding requires merely a judgment by a coder regarding straightforward, objective questions as to the type of document, the document's nature, date, and author, and other indicia of interest, Sedona Conference Glossary at 6, facts readily discernible by the coder from a general inspection of the face of the document, rather than its content,

to make the digital form of the coded document more readily available to those having access to the resulting database the parameters of which, in this case, were established by Nixon and communicated to Karahasanovic.  Karahasanovic Affirmation ¶ ¶ 15-16. As with D4's scanning services, the coding of Defendants' documents performed by D4 did not involve specialized training, knowledge, education or skills, and Defendants have not, as is their burden, provided any evidence to the contrary.  As such, the court finds on this record, these services were also of a more clerical nature, such as routine data entry activity, and did not constitute expert or consulting services to Nixon by Karahasanovic or D4.  Nor have Defendants demonstrated that Karahasanovic's coordination or facilitating of such coding work, Plaintiffs' Memorandum at 1, involved specialized technical skill or knowledge constituting the rendition of services that can be considered as expert in nature.  In *Gordon*, Defendants' Reply Memorandum at 2 (adopting declarations filed in *Gordon*), defendants argued that in connection with the coding of defendants' documents Karahasanovic represented he was serving as a consultant to Nixon, Roney Reply Declaration (*Gordon* Doc. No. 402) ¶ 5 (referring to Karahasanovic Affirmation (*Gordon* Doc. No. 393) ¶ 16); however, a careful reading of paragraph 16 of Karahasanovic's Affirmation finds no support for this assertion.  Indeed, nowhere in his affirmation does Karahasanovic describe his services to Nixon in connection with the scanning and coding of Defendants' documents as that of a consultant or, for that matter, an expert; to the contrary, Karahasanovic denies he did so. Karahasanovic Affirmation (*Gordon* Doc. No. 393) ¶ 5 ("It is not part of my job responsibilities to provide consulting or expert witness services to clients," and "I have never been asked to provide such services . . . by [Nixon]."); *see* Karahasanovic

Affirmation (*passim*). Defendants do not contest Karahasanovic's averments in this regard, and are therefore deemed to have acquiesced in them. *Felske,* 2012 WL 716632, at *3; *Goodwin*, 2011 WL 2117595, at *12; *Gonzalez*, 2001 WL 1217224, at *11. Similar to Defendants' assertions to support a finding that, in providing the scanning services of Defendants' documents, D4's services were more than "ministerial," Defendants' Reply Memorandum at 4-5, and Defendants' contention that because Nixon's representatives discussed with Karahasanovic what information in Defendants' documents were relevant to the issues in the case, Shinaman Reply Declaration ¶ 7 ("Defendants . . . adopt the arguments . . . [in] Kaleida's motion papers and supporting declaration [in *Gordon*] seeking to disqualify D4 for the same issues"), and because Nixon representatives engaged Karahasanovic in several conversations regarding Defendants' "claims and defenses," Defendants' Reply Memorandum at 3, Karahasanovic provided expert services to Nixon, Defendants' contention that the documents could not have been coded "in a vacuum" as Nixon's "litigation insight" was required, *id.*, ignores that the objective coding process did not require knowledge of the claims and defenses in the case or what information Defendants' deemed relevant to their defense, *i.e.*, Defendants' "litigation insight." *See* Sedona Conference Glossary at 9 (distinguishing objective coding which does not entail an evaluation of the relevance of probative value of a document from subjective coding which does involve such a subjective evaluation). Defendants fail to provide any explanation of why such information was relevant or necessary to the coding work of Defendants' documents or why even if such information was conveyed to Karahasanovic, such disclosure transforms what otherwise appear to be services not involving any particular expertise

into services requiring use of such expertise. Defendants' contention also overlooks that the parameters of the resulting database, Roney Declaration ¶ 12 (*Gordon* Doc. No. 377-1) (object was to "facilitate [Nixon's] internal handling of data"); Shinaman Reply Declaration ¶ 7 (Defendants adopt Kaleida's argument in *Gordon*), such as document types and the coding fields expected from the coding process, were established by Nixon representatives including Headley, Karahasanovic Affirmation ¶ 15, who as the head of Nixon's in-house E-Discovery staff, presumably was familiar with database design and implementation. At best, even if facilitating the objective coding of Defendants' documents involved some technical knowledge on Karahasanovic's part of how Nixon's computer database was to be created, nothing in the record shows it required Karahasanovic's access to Defendants' confidential or privileged information regarding Defendants' documents or attorney work product sufficient to show Karahasanovic functioned as an expert or consultant in the design and implementation of the database which resulted from the objective coding process. Plaintiffs' Memorandum at 1-2. *See Nikkal Industries, LTD.,* 689 F.Supp. at 191-92 ("[c]ommunication based on technical information as opposed to legal advice is not considered privileged." (internal citations omitted)). Defendants do not contend that the coding fields as selected by Nixon represent attorney work product. In sum, the record fails to support a finding that in providing the scanning and objective coding of Defendants' documents for Nixon, Karahasanovic or D4 acted as Defendants' experts or consultants so as to make either subject to disqualification based on Defendants' contention that D4 (and Karahasanovic in particular) has "switched sides."

As discussed, Discussion, *supra*, at 15-17, potential disqualification of an expert

or consultant is based on the policy that because the expert or consultant may in the course of providing expert or consulting services acquire access to a party's confidential information, the expert or consultant should not, as a matter of fairness necessary to preserve confidence in the judicial process, be permitted to provide that information to the party's adversary and thus bestow on the adversary the benefit of expert opinion or knowledge based on such information. Here, neither the scanning nor objective coding services for Nixon provided by D4 and Infovision21 constituted expert or consultative services that required or involved access to Defendants' confidential information, specifically, litigation strategies constituting attorney work product or other privileged information, access more typically incident to rendering expert witness or expert consulting services relating to the merits of particular claims or defenses in the context of litigation. *See, e.g., Cordy,* 156 F.R.D. at 582-83. Defendants do not demonstrate any direct connection between the scanning and coding work performed by D4 and Defendants' production of their ESI, particularly Defendants' e-mails relevant to the case. Accordingly, there is no need to protect Defendants from the risk of possible prejudicial disclosure of Defendants' confidential information as a result of D4's providing ESI consulting services to Plaintiffs through its Advisory and Consulting Group in connection with ESI issues in this case. Moreover, Defendants present no evidence that such confidential information has been actually conveyed to Plaintiffs under the circumstances of this case or that the D4 Advisory and Consulting Group gained some unfair advantage in advising Plaintiffs on ESI matters as a result of the scanning and coding work. Although Defendants have failed to establish this threshold ground for disqualification, *i.e.*, that Karahasanovic provided any expert or consulting service to

Defendants thereby, justifying denial of Defendants' motion for that reason alone, in the interest of completeness, the court addresses the remaining issues raised by Defendants' motion, specifically, whether assuming D4 served as Defendants' expert or consultant, D4 has "switched sides" requiring its disqualification precluding the ESI services to Plaintiffs by D4's Advisory and Consulting Group, whether Defendants have waived their objection to such services, Plaintiffs' Memorandum at 5-6, and whether Plaintiffs' counsel should be disqualified.

Defendants' contention that as an expert or consultant D4 "switched sides" by subsequently providing ESI consulting services to Plaintiffs also fails because it erroneously assumes that the same rule upon which a law firm is disqualified based on a prior representation of a client by one of its attorneys also applies where two experts or consultants employed by the same firm provide services to adversaries in the same case. "An attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences." *Hempstead Video, Inc.,* 409 F.3d at 133. However, as the presumptions and standards relevant to disqualification of attorneys do not apply to experts, *Stencel*, 174 F.Supp.2d at 1085; *Cordy,* 156 F.R.D. at 580; *In re Ambassador Group, Inc., Litig.*, 879 F.Supp. 237, 243-44 (E.D.N.Y. 1994), there is no presumption that Defendants' or Nixon's confidential communications were provided to D4, specifically Karahasanovic, as a D4 employee and a non-attorney, *see Hewlett-Packard Company*, 330 F.Supp.2d at 1094 ("'unlike attorney client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged.'" (quoting *Stencel*, 174 F.Supp.2d at 1083)), by Nixon during the scanning and coding project and,

27

even assuming such information was disclosed to Karahasanovic, there is no basis to find that the information was in fact communicated by Karahasanovic to Coons and Courtney, either actually or impliedly, as Defendants contend, Molloy Declaration ¶ 15 ("D4 cannot work both sides of the same litigation"), simply because Karahasanovic, Coons and Courtney are employed by D4. *Stencel*, 174 F.Supp.2d at 1085 (expert witness not disqualified by fact that another expert employed by same firm who had previously agreed to serve as expert to plaintiff but had withdrawn based on unrelated conflict – court refused to apply vicarious disqualification principle applicable to attorneys and their respective law firms, despite fact that first expert had received some work product from plaintiff's counsel, absent a showing that such information actually was disclosed to second expert working for defendant). Here, the record supports that Karahasanovic had no contact with the Advisory and Consulting Group and neither received nor disclosed Defendants' confidential information to Coons and Courtney, Karahasanovic Affirmation ¶ ¶ 23, 24 (Karahasanovic had no contact with the Advisory and Consulting Group about scanning and coding project), a fact seemingly acknowledged by Defendants, *see* Roney Reply Declaration (*Gordon* Doc. No. 402) ¶ 16 (Karahasanovic "skipped the middle-man [*viz.* Coons and Courtney] and [has] spoken directly with Plaintiffs' counsel.") and negates any basis to disqualify D4 because it allegedly has "switched sides." For example, in *Great Lakes* the court refused to disqualify an expert and the expert's engineering firm on the ground that the expert and another expert for an adverse party were employed by the same engineering firm but did not work in same department. *Great Lakes*, 734 F.Supp at 339. Finding attorney disqualification rules to be inapplicable to questions of expert disqualification, the court

denied disqualification of both defendant's expert and the common employer engineering firm at which experts were employed "unless there had been a disclosure of confidential or privileged information to the prejudice of a party due to the relationship of the experts, or that such a relationship between the experts poses a significant risk of such disclosure and resulting prejudice."  *Great Lakes,* 734 F.Supp. at 339; *see also E.E.O.C. v. Locals 14 and 15, Int'l Union of Operating Engineers*, 1981 WL 163, at **4-6 (S.D.N.Y. Feb. 11, 1981) (refusing to disqualify plaintiff's expert as member of consulting firm of which defendant's former expert was member absent showing that defendant's confidential information received by former expert was disclosed to plaintiff's expert or a serious risk of an "inadvertent disclosure" of such information to plaintiff's expert).  As in *Great Lakes*, in this case neither Plaintiffs nor Defendants have "retained an expert that has worked or been associated with the opposing side."  *Id.* at 338.  In particular, Defendants do not contend that  Defendants have used Coons or Courtney as ESI consultants or that Plaintiffs have used Karahasanovic for any litigation support or other expert or consulting services in this case.

Because rules of presumed confidential communications between client and attorney, imputation of shared confidences, and vicarious disqualification applicable to attorneys and their law firms, necessary to assure protection of client confidences, do not apply to client-expert relationships,  that Karahasanovic, Coons and Courtney share a common employer, D4, does not create a basis for disqualification of D4 or, for that reason, Coons and Courtney.  *See Great Lakes*, 734 F.Supp. at 339 (fact that experts for opposing parties worked for same engineering firm did not warrant vicarious disqualification).  Thus, because there is no presumption that a party has disclosed

confidential information to an expert, *Hewlett-Packard Company,* 330 F.Supp.2d at 1094, there is, contrary to Defendants' unsupported supposition, no vicarious disqualification of the asserted expert's firm (*i.e.*, D4) or of a second expert (*i.e.*, Coons and Courtney) employed by the same firm who is later retained by the party's adversary. *See Stencel*, 174 F.Supp.2d at 1087 (refusing to disqualify defendant's expert employed by same firm as plaintiff's expert because "concerns of loyalty that in large part drive imputed disqualification [in case of law firm] are absent [in case of experts]"); *Great Lakes*, 734 F.Supp. at 339 (disqualification protects against adversary's use of expert's opinion based on client's confidential information). As noted, in this case, "[n]either party alleges it has disclosed confidential or privileged information to the opposing side's expert." *Id.* Although Defendants assert confidential information was conveyed to Karahasanovic, Defendants do not contend they provided such information to either Coons or Courtney who are assisting Plaintiffs. Conversely, Plaintiffs do not allege providing such information to Karahasanovic. That these individuals have a common employer, D4, is, as discussed, Discussion, *supra*, at 27-30, irrelevant. Therefore, contrary to Defendants' predicate contention, neither Karahasanovic nor D4, assuming they served as Defendants' experts or consultants, have "switched sides" in this case.

Moreover, Defendants have not disputed, and accordingly have acquiesced in, *see Felske,* 2012 WL 716632, at *3; *Goodwin*, 2011 WL 2117595, at *12; *Gonzalez*, 2001 WL 1217224, at *11, Karahasanovic's averments that he had no communication with Coons and Courtney regarding the scanning and coding services provided for Nixon and that until he was informed of the fact that the Advisory and Consulting Group had been providing ESI consulting services to Plaintiffs when Molloy advised Karahasanovic

of this fact in early 2012, Karahasanovic had no prior knowledge of it. Karahasanovic Affirmation ¶ 19. While such lack of interaction does not establish the existence of a formal policy of screening between Karahasanovic, as head of D4's scanning and coding services, and the Advisory and Consulting Group in order to prevent inadvertent disclosures, such a *de facto* operational separation in the functioning of the two D4 units provides reasonable assurance against the risk of potential "leakage," *Great Lakes,* 734 F.Supp. at 338, of any confidential information Karahasanovic may have acquired from Nixon between Karahasanovic and the D4 Advisory and Consulting Group of which Coons and Courtney are members. *See Stencel*, 174 F.Supp.2d at 1087. The record therefore supports that D4's scanning and coding department headed by Karahasanovic, functions separately and independently of the D4 Advisory and Consulting Group sufficient to obviate any risk that Defendants' confidential information, even if disclosed to Karahasanovic during the scanning and coding project as Defendants maintain, was in fact disclosed to Coons and Courtney or is likely to be disclosed and, as a result, potentially to Plaintiffs' counsel. Defendants have failed to submit any evidence to establish facts to the contrary as is Defendants' burden. *See Kyocera Corporation,* 2012 WL 4103811, at *8 ("party seeking disqualification may not meet its burden with 'mere conclusory or ipse dixit assertions' but must identify 'specific and unambiguous disclosures that if revealed would prejudice the party.'" (internal citations omitted)). In *Kyocera Corporation,* the court refused to disqualify defendant's expert, who had served as plaintiff's expert in prior litigation involving the same patents as in the present case, where plaintiff's attorney's affidavit "alleged in conclusory terms only that [plaintiff's] employees shared with [the expert] information about [plaintiff's]

digital camera technology" and related features. *Kyocera Corporation*, 2012 WL 4103811, at *9. Accordingly, Defendants have failed to demonstrate Karahasanovic or D4 has, as Defendants' asserted experts or consultants, "switched sides" in this litigation requiring disqualification irrespective of whether Defendants held a reasonable expectation that a confidential relationship between Defendants and D4, in particular Karahasanovic, existed covering the scanning and coding work D4 performed for Nixon, and that, in the course of this work, Defendants' confidential information was disclosed to Karahasanovic and has been, or is likely to have been, communicated to Plaintiffs resulting in prejudice to Defendants.

Defendants' reliance on *Koch* is undermined by a second reason. As the court in *Koch* found the challenged expert had in fact received confidential information from his prior client, *Koch Refining Co.*, 85 F.3d at 1182, thereby satisfying the general requirement that to support disqualification the challenged expert must be shown to have acquired confidential information, *id.* at 1181 (citing *Wang Laboratories, Inc.,* 762 F.Supp. at 1248 ("*Wang*"); *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C. 1991) ("*Mayer*")), the court's statement in *Koch*, that "[i]n disqualification cases <u>other</u> <u>than</u> <u>those</u> <u>in</u> <u>which</u> <u>the</u> <u>expert</u> <u>clearly</u> <u>switched</u> <u>sides</u>, lower courts have rejected a 'bright-line' rule and have adopted the following test," 85 F.3d at 1181, upon which Defendants' rely, is *dicta*. Additionally, the cases cited by the court in support of this statement, *Wang* and *Mayer*, do not support Defendants' reading of *Koch*. For instance, in *Wang,* the court stated that "where it is <u>undisputed</u> that the consultant had been previously retained as an expert . . . by the adverse party in the same litigation <u>and</u> <u>had</u> <u>received</u> <u>confidential</u> <u>information</u> <u>from</u> <u>the</u> <u>adverse</u> <u>party</u> <u>pursuant</u> <u>to</u> <u>the</u> <u>earlier</u> <u>retention</u>," such facts would

constitute "a <u>clear</u> case for disqualification." *Wang Laboratories, Inc.*, 762 F.Supp. at 1248. Similarly, in *Mayer*, the court required that both elements – a prior confidential relationship and a disclosure of confidential information to the challenged expert – be shown to warrant disqualification. *Mayer*, 139 F.R.D. at 4. Defendants cite to no caselaw holding that an expert or consultant having previously been retained to assist a party will be disqualified from later serving as an expert or consultant to an adverse party in the same litigation in the absence of a confidential relationship with the first party to retain the expert or consultant as well as the expert or consultant's receipt of confidential information from such party, and the court's own research reveals none. Thus, any suggestion in *Koch* that in considering disqualification of experts or consultants, courts may dispense with finding a prior confidential relationship and disclosure of a party's confidential information as prerequisites "[i]n disqualification cases . . . <u>in</u> <u>which</u> <u>the</u> <u>expert</u> <u>clearly</u> <u>switched</u> <u>sides</u>," *Koch*, 85 F. 3d at 1181, refers to cases, in contrast to the present case, Plaintiffs' Memorandum at 10 ("There <u>Was</u> <u>No</u> <u>Confidential</u> <u>Relationship</u> [between Defendants and D4] and <u>No</u> <u>Confidential</u> <u>Information</u> <u>Was</u> <u>Disclosed</u>."), where the existence of these prerequisites is not disputed. *See Wang*, 762 F.Supp. at 1248 ("<u>Less</u> <u>clear</u> are those cases where, as here, the parties <u>dispute</u> whether <u>the</u> <u>earlier</u> [confidential] <u>retention</u> <u>and</u> <u>passage</u> <u>of</u> <u>confidential</u> <u>information</u> <u>occurred</u>.").

Even where, in making reference to an expert's switching sides during litigation as a ground for disqualification, courts cite *Koch*, the courts nevertheless required a showing of both a prior confidential relationship between a party and the expert, as well as a disclosure to the expert of the party's confidential information relevant to the instant litigation if either factor is disputed. *See, e.g., Kyocera Corporation,* 2012 WL 4103811,

at *7 ("disqualification may be appropriate . . . where an expert switches sides during the course of litigation" – expert's receipt of confidential information disputed (citing *Koch*)); *Lacroix v. BIC Corporation*, 339 F.Supp.2d 196, 199 (D.Mass. 2004) ("Disqualification of an expert is appropriate when a party retains an expert who previously worked for an adversary and received confidential information from the first client" – expert's confidential relationship and exposure to confidential information disputed (citing *Erickson v. Newmar Corporation*, 87 F.3d 298, 300 (9th Cir. 1996) (in a "switching sides" case the "court may grant the original hiring party's motion to disqualify the expert when it is determined that the expert is in possession of confidential information received from the first client."), and *Koch* ("there is a 'clear case for disqualification' when an expert switches sides in the same litigation after receiving confidential information from the adverse party pursuant to its earlier retention."))).  Thus, Defendants' reading of *Koch* as permitting courts to forgo finding grounds for disqualification where an expert has switched sides, is not supported by apposite caselaw applying *Koch*.

Further, as Plaintiffs point out, Defendants' argument, in reliance on *Koch*, that because D4 provided scanning and coding services to Nixon, D4, including the Advisory and Consulting Group, for that reason alone, must be disqualified from providing ESI consulting services to Plaintiffs because in doing so D4, as an expert, has switched sides in this litigation, ignores the difference, recognized by the relevant caselaw, between experts as "sources of information and opinions" and attorneys as "advocates in litigation," and that experts are accordingly not properly "held to the stringent attorney-client conflict standards."  Plaintiffs' Memorandum at 8-9 (citing *In re Ambassador Group, Inc. Litig.*, 879 F.Supp. at 242; *Grioli*, 395 F.Supp.2d at 13; and *Paul*, 123 F.R.D.

at 281). *See also Cordy*, 156 F.R.D. at 580 ("Because experts and attorneys perform different functions in litigation, the standards and presumptions applicable to the attorney-client relationship have little bearing on an expert's disqualification"); *In re Ambassador Group, Inc., Litig.,* 879 F.Supp. at 242 (refusing to apply the "stringent attorney-client conflict standards in determining whether [expert] should be disqualified" (citing *English Feedlot, Inc.,* 833 F.Supp. at 1505 (citing *Paul*, 123 F.R.D. at 281-82)). Specifically, "'[u]nlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged.'" *Hewlett-Packard Company*, 330 F.Supp.2d at 1094 (quoting *Stencel,* 174 F.Supp at 1083, and citing *Paul*, 123 F.R.D. at 281). Defendants have not addressed this issue. Thus, courts do not apply the standard for disqualification of an attorney barring subsequent representation of a party presently adverse to the attorney's previous client, to questions of expert disqualification as necessary to fully protect against a loss of privileged communications and, instead, require "[a] predicate showing that confidential information has been divulged." *In re Ambassador Group, Inc., Litig.*, 879 F.Supp. at 243-44. Accordingly, *Koch* does not support Defendants' contention that D4 should be disqualified based solely on the ground that it has "switched sides" in this litigation without a showing of a prior confidential relationship between Defendants and Karahasanovic and an actual or a highly likely, *Mays*, 293 F.Supp.2d at 957, disclosure of Defendants' confidential information to Karahasanovic relevant to this case and prejudicial to Defendants.

To the extent that the statement in *Koch*, relied on by Defendants, represents, as Defendants maintain, a holding that expert disqualification is required where an expert

has "switches sides" in the course of the same litigation regardless of whether the confidential nature of the expert's prior relationship with a party and receipt of confidential information from that party is disputed, this court respectfully declines to follow it. *See Anita Foundations, Inc. v. ILGWU National Retirement* Fund, 902 F.2d 185, 190 (2d Cir. 1990) (holding district court in this circuit not bound by Ninth Circuit decision (citing cases)); *see also Board of Trustees of Aftra Retirement Fund v. JPMorgan Chase Bank, N.A.*, 806 F.Supp.2d 662, 687-88 (S.D.N.Y. 2011) (refusing to apply caselaw on which plaintiff relied because the circumstances of the cited case were sufficiently different from the case before the court that the legal theory on which the referenced case relied was inapplicable).

The court thus turns to whether the record supports a finding that Defendants and Nixon held an objectively reasonable belief that a confidential relationship existed with Karahasanovic, *Lacroix*, 339 F.Supp.2d at 200 (citing *Hewlett-Packard Company*, 330 F.Supp.2d at 1093), and "'whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate.'" *Id.* (quoting *Paul*, 123 F.R.D. at 278). In determining this prerequisite to disqualification, courts consider several relevant factors including the existence of a confidentiality agreement between the party and the expert or consultant, *Hewlett-Packard Company*, 330 F.Supp.2d at 1093; the extent to which the expert or consultant received a party's confidential information such as attorney work product, *Grioli*, 395 F.Supp.2d at 14-15; the length of the relationship, *Marvin Lumber & Cedar Company v. Norton Company,* 113 F.R.D. 588, 591 (D.Minn. 1986); whether the expert or consultant had access to the party's confidential information, *Agfa-Gevaert N.V.,* 2003 WL 23101783, at *1;

contemporaneous documentation that confidential information had been provided to the expert or consultant, *Wang*, 762 F.Supp. at 1249; and the payment of a fee, *Hewlett-Packard Company*, 330 F.Supp.2d at 1093 (citing cases).

Here, although the Master Agreement, Section 3, required D4 not to disclose any of Nixon's or Defendants' confidential information, it did not prohibit D4 from accepting consulting work from Plaintiffs, and Defendants provide no evidence that Karahasanovic or any employees of D4 have disclosed to Plaintiffs any of Nixon's or Defendants' confidential information Karahasanovic may have obtained as a result of the scanning and coding work in violation of Section 3. Moreover, while the Master Agreement was executed in February 2010, the scanning and coding work Nixon requested did not commence until July 2011, well over a year later. As demonstrated, Discussion, *supra*, at 18-25, the scanning and objective coding did not involve expert or consulting services that required Karahasanovic's access to Defendants' confidential information, including any work product such as Nixon's assessments of the strengths and weaknesses of Plaintiffs' claims or Defendants' defenses. Further, Defendants do not contest that the coding work was to be performed on an objective rather than on a subjective basis which, had the latter been selected as the coding method for Defendants documents, could have required assessments by Karahasanovic and the D4 coders of the relevance or probative value of the information recorded in the coded documents, Sedona Conference Glossary at 9, conceivably involving a degree of attorney guidance qualifying as work product. Thus, regardless of Nixon's generalized statements asserting Karahasanovic was given work product preparatory to the coding work, because such information was superfluous to the objective coding of Defendants'

documents being performed by D4, facilitated by Karahasanovic, it is unlikely such information was in fact disclosed to Karahasanovic, thereby substantially reducing any risk that Karahasanovic would have retained and divulged such information in violation of his obligation under Section 3, even assuming he actually had received such information from Nixon.  Significantly, Defendants do not assert that the documents to be coded contained any privileged material or other confidential matter and, as the documents were primarily Defendants' business records relating to Defendants' hourly employees work schedules, it is highly unlikely that they did; Defendants' failure to state otherwise supports this conclusion.  That the nature of the scanning and coding services performed by D4 did not require access to Nixon's work product is therefore consistent with Karahasanovic's averment that no such information was provided to him in connection with the services.  Karahasanovic Affirmation ¶ 17 ("My only discussions with [Nixon] . . . regarding the documents . . . concerned the configuration of the field categories that would be coded . . . as opposed to case strategy or the content of the documents in relation to the claims in the case.").  Defendants provide no contemporaneous documentation that attorney work product was communicated to Karahasanovic or from other persons, including Defendants' counsel, who were parties to such discussions.  *See Wang*, 762 F.Supp at 1249.  Nor do Defendants' contend that any work product was disclosed to D4 through Nixon's request to have Defendants' documents scanned and coded, based on the organization of the documents or selection of the coding fields and categories established by Nixon, through its litigation support staff including Headley, for the D4 coders' use as communicated to Karahasanovic.  *See, e.g., Cordy*, 156 F.R.D. at 579 (recognizing that attorney's

selection and grouping of photos provided to expert represented protected work product as one factor in support of disqualification based on expert's access to work product (citing *Sporck v. Peil*, 759 F.2d 312, 315 (3d Cir.), *cert. denied*, 474 U.S. 903 (1985))).

Additionally, the period of D4's scanning and coding services, over a period of perhaps two months, July and August in 2011, was relatively short. *Cf. Marvin Lumber & Cedar Company,* 113 F.R.D. at 591 (long-term relationship between plaintiff's former testing company and plaintiff supported inference of access to plaintiff's manufacturing and research facilities and plaintiff's confidential information supporting disqualification as defendant's expert). The relative brevity of the scanning and coding period in the instant case militates against any reasonable likelihood that Karahasanovic was actually exposed to significant work product through his interactions with Nixon representatives during the project. In addition, the relatively modest fee for these services, $5,000, Molloy Declaration ¶ 7, Nixon paid to D4, Karahasanovic Affirmation ¶ 7, further supports that the scanning and coding work was not likely to entail any extensive exposure to Nixon's work product or Defendants sensitive or confidential information requiring more than a minimal amount of review of Defendants' documents by the coders.

Further, Defendants have failed to establish that Defendants' confidential information was in fact disclosed to Karahasanovic incident to the scanning and coding work, and the Master Agreement does not substitute for this demonstrated lack of evidence by Defendants. "The existence of a confidentiality provision does not transform non-confidential information into confidential information." *Kyocera Corporation*, 2012 WL 4103811, at *10. Thus, in this case, the reasonableness of Defendants' objective

belief in the existence of a confidential relationship with Karahasanovic and D4 depends more on whether Defendants' attorneys actually conveyed confidential information to Karahasanovic incident to the D4 scanning and coding work than on the presence of the Master Agreement's confidentiality provision, Section 3. However, Defendants fail to establish that any confidential information was in fact communicated by Nixon to Karahasanovic during D4's scanning and coding work sufficient to support Defendants' reasonable belief that a confidential relationship existed between D4 and Defendants. Defendants do not demonstrate that D4's scanning and objective coding work constituted expert or consulting services requiring access to Defendants' confidential information reasonably supporting an inference that D4 or Karahasanovic had need for such information in order to perform expert or consulting services as Defendants assert. Discussion, *supra*, at 18-25. Defendants ignore that neither the scanning nor objective coding of Defendants' documents required reliance on the contents of the documents or attorney work product such as litigation strategies. Defendants also fail to show that such work product or other confidential information was in fact provided to Karahasanovic by Defendants' attorneys or Nixon's representatives Headley and Durawa, in the process of Nixon's designation of the coding fields, during the scanning and coding work.

In particular, Defendants fail to provide any evidence, by affidavit or otherwise, that any of Defendants' attorneys, Molloy, Shinaman, or Joseph A. Carello ("Carello") even communicated with Karahasanovic during the period July 2011 to August 2011,[18]

---

[18] While the record is silent as to the exact date the scanning and coding work concluded, there is nothing to suggest it extended beyond August 2011.

the period during which D4 performed the scanning and coding work, for Defendants. Instead, Defendants merely assert that the services D4 provided were to be "substantially similar," Molloy Declaration ¶ 6, to those services D4 provided to defendant Kaleida in the *Gordon* matter. *Id.* Although Defendants rely on Roney's declarations supporting defendants' motion to disqualify in *Gordon*, to support this assertion, Shinaman Reply Declaration ¶ 7 ("Defendants . . . adopt the arguments . . . [in] Kaleida's motion papers and supporting declarations [in *Gordon*] seeking to disqualify D4 for the same reasons, including the fact that Defendants shared confidential information with D4."); Shinaman Reply Declaration ¶ 8 ("Defendants and Kaleida shared confidential information with D4"), such reliance fails to satisfy Defendants' burden. Significantly, nowhere in Roney's declarations in support of Defendants' motion to disqualify D4 as submitted in the *Gordon* matter, specifically *Gordon* Doc. Nos. 377-1 ("Roney Declaration") and 402 ("Roney Reply Declaration") does Roney state she communicated with D4 with regard to the scanning and coding of Defendants' documents in this – *Hinterberger* – case. Rather, Roney averred that "[o]ur [Nixon] paralegals and I spoke with him [Karahasanovic] . . . on multiple occasions to discuss the [scanning and coding] project for *Kaleida*." Roney Reply Declaration ¶ 4 (italics added). Further, in her declarations in support of defendants' disqualification motion in *Gordon,* Roney fails to even mention the *Hinterberger* matter or the involvement of any other Nixon attorneys – particularly Molloy, Shinaman, Carello – who are counsel of record for defendants in *Hinterberger*, in the scanning and coding work performed by D4, nor does she indicate, based on her personal knowledge, *see* Fed.R.Evid. 602 (personal knowledge of witness required for evidence), that these

attorneys met with Karahasanovic to discuss the specifics of the expected scanning and coding of Defendants' documents by D4 for Defendants in this case. *See* Roney Declaration (*Gordon* Doc. No. 377-1) (*passim*). Moreover, in her reply declaration, Roney also failed to provide any indication based on her knowledge, that Nixon's attorneys who represent defendants in *Hinterberger* had met with Karahasanovic and provided *Hinterberger* defendant, Catholic Health System's, confidential information to Karahasanovic incident to the scanning and coding work. Roney Reply Declaration (*Gordon* Doc. No. 402) (*passim*).[19] Instead, Roney stressed that "*Hinterberger* is a separate action involving different parties." *Id.* ¶ 21 (italics in original). Thus, contrary to Defendants' assertion, the record does not demonstrate that simply because defendants in *Gordon* claimed disclosure by one of their attorneys, Roney, of their confidential information to Karahasanovic in *Gordon,* that a similar disclosure by any of Defendants' attorneys of Defendants' confidential information occurred in this case as well. In fact, neither Molloy, Shinaman or Carello make any averment to this effect based on personal knowledge.[20]

Consistent with Roney's recall of the extent of her interactions with Karahasanovic in the *Gordon* matter, Karahasanovic avers that in connection with the D4 coding work for defendants in *Gordon*, Karahasanovic met with "Roney and [Nixon]

_____

[19] Defendants' statement, Defendants' Memorandum at 1, that in connection with D4's scanning and coding of Defendants' documents commencing in July 2011, "none of Kaleida's confidential information was shared," provides no factual basis for this assertion. Even if true, the statement supports an inference that the converse is also the fact, *i.e.*, that none of Catholic Health System's confidential information was shared with Roney and thus could not have been disclosed by her to Karahasanovic in connection with the scanning and coding work by D4.

[20] The failure of Roney's declarations to substantiate Molloy and Shinaman's representations is particularly persuasive on this question given that all three attorneys are members of the same law firm, Nixon.

employees Colleen Durawa ("Durawa"), Josh Headley and Julie Letgers to discuss the coding." Karahasanovic Affirmation ¶ 15 (*Gordon* Doc. No. 393). However, in contrast to his contact with Nixon attorneys and staff members, regarding D4's and Infovision21's coding work for the *Gordon* case, in connection with D4's scanning and coding work for the *Hinterberger* case, Karahasanovic stated that his contact with Nixon in this case was limited to discussions with "[Nixon] employees Colleen Durawa and Josh Headley to discuss the coding." Karahasanovic Affirmation ¶ 15. In fact, Karahasanovic does not aver he ever met with Molloy, Shinaman or Carello with regard to D4's scanning and coding work for Defendants. There is no indication in the record that any of the persons with whom Karahasanovic did meet – Durawa and Headley – are Nixon attorneys or that they have access to, or knowledge of, Defendants' confidential information, particularly attorney work product as regards Defendants' litigation strategy in this case. Rather, according to the record, the only contact Karahasanovic had with any Nixon attorneys who serve as Defendants' counsel in this case was, according to Karahasanovic – uncontradicted by Defendants – in two telephone calls, the first in "early 2012," well after completion of the scanning and coding work for Defendants in the summer of 2011, in which Karahasanovic called Molloy to seek payment of D4's then unpaid bill for the scanning and coding work. Karahasanovic Affirmation ¶ 19. During this call Molloy complained to Karahasanovic that D4 had been providing ESI consulting services to Plaintiffs, which Karahasanovic was then unaware of, Karahasanovic Affirmation ¶ 19, and, following that conversation, a second phone call, when Karahasanovic called Molloy to confirm D4 had provided ESI consulting services to Plaintiffs. *Id.*; Molloy Declaration ¶ 9 ("Subsequent to [Karahasanovic's August 2011 conversation with Roney

advising Plaintiffs desired to engage D4 as an ESI consultant] Mr. Karahasanovic contacted me to advise that D4 intended to work for plaintiffs in *Hinterberger*"); Molloy Declaration ¶ 13 ("In either late Spring or early Summer of 2012 . . . Mr. Karahasanovic phoned me to advise that D4 . . . [would] perform work for plaintiffs' counsel in both the [*Gordon* and *Hinterberger*] cases").  The court notes Molloy's Declaration fails to further define "subsequently."[21]  Other than these two conversations, which occurred more than six months after the scanning and coding work for Defendants was completed in the summer of 2011, the record is devoid of any evidence that prior to or during the scanning and coding work any Nixon attorney discussed the work with Karahasanovic, in the course of which Defendants' confidential information could have been or was in fact disclosed.  Specifically, both the Molloy Declaration (Doc. No. 351-1) and Shinaman Reply Declaration (Doc. No. 381-1) are devoid of any averment that either attorney ever met personally with Karahasanovic to discuss the scanning and coding work where such a meeting could conceivably create an opportunity for the Nixon attorneys to have

---

[21] Defendants state the initial call to Molloy in which Karahasanovic advised D4 intended to work for Plaintiffs on the *Hinterberger* matter occurred in August 2011.  Defendants' Memorandum at 5, n. 2 (referencing Molloy Declaration ¶ ¶ 7-8).  Assertions of fact in legal memoranda are not evidence, *Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) (unsworn statements in a memorandum of law are not evidence (citing *INS v. Phinpathya*, 464 U.S. 183, 188-89, N. 6 (1984)));  moreover, the referenced paragraphs in the Molloy Declaration do not support this statement.  For example, in paragraph 8 of this Declaration Molloy states that in August 2011 he learned that Karahasanovic contacted Roney to advise that D4 was asked to assist Plaintiffs in the *Gordon* matter and that Roney objected on behalf of the *Gordon* defendants.  Molloy Declaration ¶ 8.  In the Shinaman Reply Declaration, Defendants assert Defendants objected to Plaintiffs' use of D4 in this case by referencing paragraph 9 of the Molloy Declaration.  Shinaman Reply Declaration ¶ 4.  However, Molloy's averment, Molloy Declaration ¶ 9, does not particularize that he conversed with Karahasanovic about D4's assistance to Plaintiffs in *Hinterberger* in August 2011.  Rather, Molloy unspecifically states that after the August 2011 Roney-Karahasanovic communication, he "subsequently" was contacted by Karahasanovic about D4's intention to provide assistance to Plaintiffs in this action, with Karahasanovic's recollection that this communication occurred in "early 2012."  Karahasanovic Affirmation ¶ 19.  Significantly, Molloy did not submit anything contradicting Karahasanovic's recollection of the relevant time frame related to Molloy's conversation with Karahasanovic about the issue.  The record therefore supports that Molloy discussed the issue with Karahasanovic in two telephone calls which occurred in early 2012, well after the scanning and coding work for Defendants was completed by D4.

disclosed Defendants' confidential information, such as Defendants' litigation strategies, responsive to Karahasanovic's request for such information in order to facilitate the scanning and coding work for Defendants or that either attorney in fact disclosed Defendants' confidential information including any attorney work product during either a face-to-face meeting or the later telephone calls between Molloy and Karahasanovic.

Significantly, neither Molloy nor Shinaman states that they provided Defendants' confidential information to Karahasanovic during the scanning and coding work either verbally or in written form.  In particular, Shinaman's failure to contest Karahasanovic's averment that his contact with Nixon in connection with the coding work was limited to non-lawyers Durawa and Headley, Karahasanovic Affirmation ¶ 15, and did not include Molloy, Shinaman, or Carello, supports Defendants' acquiescence in the accuracy of Karahasanovic's recollection of those meetings.  *Felske*, 2012 WL 716632, at *11; *Goodwin*, 2011 WL 2117599, at *12; *Gonzalez*, 2001 WL 1217224, at *11.  Significantly, no affidavit from Durawa or Headley testifying that they provided Defendants' confidential information to Karahasanovic during any meetings they had with Karahasanovic has been submitted by Defendants.  *Kyocera Corporation*, 2012 WL 4103811, at *10 (failure of employee witnesses who allegedly participated in conversations with challenged expert to provide affidavits stating that the confidential information at issue was disclosed to expert at that time demonstrates plaintiff's failure to establish such fact supported denial of requested disqualification of expert). Moreover, Shinaman's generalized assertion that "Defendants shared confidential information with D4," Shinaman Reply Declaration ¶ 8, fails to state that either Durawa or Headley had any knowledge of such confidential information including, for example,

attorney work or privileged communications, and further fails to state which of Defendants' attorneys could conceivably have done so, nor, more pertinently, that he, Shinaman, ever met with Karahasanovic and disclosed such information. Such vague and generalized statements by an attorney for a party seeking disqualification of an opponents' expert or consultant have been rejected as not satisfying a moving party's burden to establish disclosure of confidential information in support of a motion to disqualify an expert. *See Kyocera Corporation*, 2012 WL 4103811, at *10 (attorney's affidavit which alleged "in conclusory terms only" that moving party's employees had provided party's "confidential information" to challenged expert absent supporting affidavits from the employees insufficient to support expert's disqualification). Accordingly, Defendants have failed to demonstrate that any of Defendants' confidential information was communicated to Karahasanovic in connection with the scanning and coding project negating that Defendants could have reasonably believed D4's services were being rendered in a confidential relationship. Further, nothing in the record supports that either Headley and Durawa acted as Molloy or Shinaman's representatives in disclosing attorney work product during their discussions with Karahasanovic regarding selection of the coding fields and general considerations of design of the resulting data base or even possessed such confidential information.

As the court in *Paul* stated "there may be situations where, despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." *Paul*, 123 F.R.D. at 278. Defendants' failure to establish that D4 had any need for or access to

Defendants' confidential information in connection with the routine scanning and objective coding services provided by D4, as well as the non-expert or non-consultative nature of those services, demonstrates that despite the existence of the two confidentiality agreements in this case, "so little of substance occur[red] during [Nixon's] relationship [with Karahasanovic]," *id.*, thereby negating any justification for D4's disqualification.

Nor do the circumstances of the relationship between Defendants and D4 support a reasonably objective belief by Defendants that a confidential relationship between D4 and Defendants existed. Specifically, the relationship between D4 and Defendants was relatively short-lived, beginning in July 2011, Molloy Declaration ¶ 6, and ending, apparently, in August 2011. *Cf. Grioli*, 395 F.Supp.2d at 14-15 (lengthy prior representation of defendant by former expert attorney who admitted detailed familiarity with defendant's product design and alternative designs provided ground to disqualify expert attorney from serving as plaintiff's expert); *Marvin Lumber & Cedar Company*, 113 F.R.D. at 581 (long-standing prior relationship by testing laboratory support finding that laboratory thereby acquired knowledge of plaintiff's manufacturing and quality control processes supporting laboratory's disqualification as defendant's consultant). Further, Defendants do not claim that Karahasanovic attended any meetings with Defendants' counsel or executives at which litigation strategy was discussed. *See 1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at **5-6 (challenged expert-consultants admitted presence at several meetings where "strength and weaknesses" of defendant's position and litigation strategy in ensuring litigation discussed by defendant's executives and attorneys required expert-consultant's disqualification.).

Significantly, nothing in the nature of the scanning or coding work D4 performed for Defendants supports that Defendants' attorneys could have had a objectively reasonable belief that the work was performed in the court of a confidential relationship. In the context of E-Discovery, "scanning" of paper documents involves the use of an electronic device or optical character reader to convert paper documents into electronic images and software to enable the coding of the images. Discussion, *supra*, at 18 (quoting Sedona Conference Glossary at 46). As also discussed, objective coding is an "[a]utomated or human process by which documents are examined and evaluated using predetermined codes," such as "names, dates, and relevant terms and phrases." Sedona Conference Glossary at 9. As to the coding of Defendants' documents by D4 in this case, coding meant that a D4 employee examined Defendants' documents and entered "certain categorical information into a form or database." Karahasanovic Affirmation ¶ 11. "Coding may be objective, i.e., the name of the sender or the date [of a document], or subjective, i.e., evaluation as to the relevancy or probative value of the document." Sedona Conference Glossary at 9 ("Coding may be structured (limited to the selection of one of a finite number of choices), or unstructured (a narrative comment about a document)). Defendants do not dispute that D4's coding services for Nixon in this case, like *Gordon,* were to be performed as objective coding. Karahasanovic Affirmation ¶ 10.

Given that Defendants do not dispute that the D4 coding of Defendants' documents were objective in nature, the record supports Karahasanovic's averment that his discussions with Nixon's representatives Durawa and Headley, Karahasanovic Affirmation ¶ 15, were limited to establishing the categories or fields of information for

the documents into which the coders were to enter objective or descriptive information about the documents – Defendants' internal business forms recording hourly employee work information – including the beginning and end of the document, box source, cost center, and employee number. Karahasanovic Affirmation ¶ ¶ 13, 15. As discussed, Discussion, *supra*, at 38 (citing cases), Defendants also do not contend that the design of the coding fields established by Nixon's representatives represent Nixon's work product. Finally, Defendants do not assert that D4 or Karahasanovic were engaged by Defendants to provide, or provided to Defendants, any ESI or other E-Discovery consulting services which could conceivably have required access to Defendants' confidential information. *See* Karahasanovic Affirmation ¶ 5 ("It is not part of my job responsibilities to provide consulting or expert witness services to clients [and] I have never been asked to provide such services nor have I been retained as an expert by [Nixon]."). Defendants make no argument that in preparing for or performing the scanning of Defendants' forms Karahasanovic, or other D4 employees who carried out the scanning, received confidential information from Nixon, as such information would in all likelihood also have been irrelevant to the largely mechanical and electronic nature of scanning documents using an OCR to convert the documents into digital form for use in a database upon completion of D4's coding of the documents.

Although Defendants allege that the D4 scanning and coding "project involved multiple confidential communications and meetings between [Nixon] and D4 in which counsel discussed the content of the documents and what information they deemed relevant to the defense of these nearly identical cases," Defendants' Reply Memorandum at 2, this allegation also fails to satisfy Defendants' burden for two

reasons.  First, it is well-established that statements appearing in legal memoranda do not constitute evidence. *Kulhawik,* 571 F.3d at 298 (unsworn statements in a memorandum of law are not evidence).  Second, even if the statement were credited, it does not state that any of Defendants' attorneys in this case – Molloy, Shinaman, or Carello – ever discussed such alleged confidential information with Karahasanovic prior to or during the scanning or coding work, and Karahasanovic Affirmation, uncontradicted by Defendants, supports an opposite conclusion.  Nor do Defendants state that either Durawa or Headley, who met with Karahasanovic to facilitate D4's scanning and coding work for Defendants, had access to Defendants' confidential information, particularly, attorney work product.  Moreover, as discussed, Discussion, *supra*, at 37-38, Defendants' offer no evidence that the documents – Defendants' internal business records relating to Defendants' hourly employees – contained confidential information which if revealed could prejudice Defendants' case.  Further, as the coding of the documents was admittedly to be performed on an objective basis, Karahasanovic and D4's coders had no need for Defendants' counsel's views as to which information in the documents "they [counsel] deemed relevant to the defense."  Defendants' Reply Memorandum at 4.  Accordingly, it is highly unlikely that Defendants' or their counsel made any such disclosures.  Further, any discussion with Karahasanovic of the "information," *id.*, required for coding deemed by counsel to be relevant, as Defendants assert, does not unequivocally state that counsel disclosed to Karahasanovic or the coders that any information in the documents was "relevant to the defense."  *Id.; see Wang*, 762 F.Supp. at 1249 (contemporaneous documentation that confidential information had been provided to challenged expert or consultant factor relevant to

whether party seeking disqualification had reasonable objective belief that a confidential relationship with such expert or consultant existed).  Importantly, this allegation, Defendants' Reply Memorandum at 2, 4, which, significantly, does not appear in either the Molloy or Shinaman declarations, *see* Molloy Declaration (*passim*); Shinaman Reply Declaration (*passim*), fails to establish Defendants in fact disclosed their confidential information, including any work product, to Karahasanovic, and again fails to support a finding that Defendants held a reasonable belief D4's scanning and coding work created a confidential relationship between Defendants and D4.  Thus, the record supports that D4 was not involved in the creation of any of Defendants' confidential information, and had no access to Defendants' confidential information, privileged communications, or Nixon's work product.  Defendants have therefore failed to demonstrate that any of Defendants' confidential information was communicated to Karahasanovic in connection with the scanning and coding project negating that Defendants could have reasonably believed D4's services were being rendered in the course of a confidential relationship.

Where, as in this case, the party seeking to disqualify an opponent's expert or consultant fails to meet its burden of establishing that it held a reasonably objective belief in the existence of a confidential relationship, disqualification should be denied on that basis and it is unnecessary for the court to further consider whether confidential information was in fact disclosed to the challenged expert or consultant.  *Kyocera Corporation*, 2012 WL 4103811, at *8 ("'if only one of the two factors is present, disqualification likely is inappropriate'" (quoting *Hewlett-Packard Company*, 330 F.Supp.2d at 1093)).  "The party seeking disqualification bears the burden of establishing 'that a confidential relationship exists and that the confidentiality has not

been waived.'" *Id.* (quoting *Agfa-Gevaert N.V.,* 2003 WL 23101783, at *1). This controlling principle is particularly applicable in this case, as here there is a patent lack of evidence supporting a finding that Defendants' confidential information was in fact, or could have been, disclosed to Karahasanovic as part of the scanning and coding work performed by D4. Not only, as demonstrated, Discussion, *supra,* at 39-46, is there no evidence that any of Defendants' attorneys actually communicated with Karahasanovic regarding the scanning and coding work, but by their nature, neither the scanning nor objective coding work required any access or need for such confidential information, including attorney work product. Thus, further discussion of the other element required for disqualification, *viz.,* that the challenged expert or consultant be shown to have actually received a party's confidential information, is unnecessary. However, based on the foregoing discussion demonstrating Defendants' failure to satisfy Defendants' burden to show Nixon reasonably believed a confidential relationship existed between D4 and Defendants, the court also finds that Defendants have failed to establish that any of Defendants' confidential information, including attorney work product, was in fact disclosed to Karahasanovic or D4 in their expert or consulting capacity.

As such, it is also unnecessary to address Plaintiffs' contention that even assuming a confidential relationship existed between Defendants and D4, and that Defendants' confidential information was disclosed to Karahasanovic, Defendants have waived any objection to such disclosure. Cressman Affirmation ¶ 13 ("defendants' failure to raise this issue for almost a year while participating in conferrals on ESI issues in this case with Peter Coons of D4 acting as plaintiffs' ESI consultant constituted a waiver of their right to object."); Plaintiffs' Memorandum at 5 ("Defendants' unreasonable

delay of approximately one year in objecting to plaintiffs' retention of D4 for ESI consulting services constitute a *de facto* consent to plaintiffs' relationship with D4 and waiver of any right to seek disqualification," (citing *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87-88 (9th Cir. 1983) (failure to object to expert-attorney based on conflict of interest and to assert objection by timely request for disqualification waived objection))). Nevertheless, in the interest of completeness, the court addresses whether Defendants have waived their objection to D4 serving as Plaintiffs' ESI consultant in this case.

Defendants oppose Plaintiffs' contention arguing that because Defendants had informed D4, specifically Karahasanovic, of Defendants' objection to its providing Plaintiffs with ESI consulting services in this case in August 2011 and again in February of 2012, Defendants' Reply Memorandum at 2 (citing Molloy Declaration ¶ 9 and Karahasanovic Affirmation ¶ 19), Defendants cannot be held to have waived this objection. Defendants' opposition overlooks several flaws in its premises. First, as discussed, Discussion, *supra*, at 43-44, nothing in Molloy's Declaration states that he communicated with Karahasanovic in August 2011 about the issue. Rather, the declaration refers to a conversation between Karahasanovic and Roney, defendants' lead attorney in the *Gordon* matter, in which Karahasanovic informed Roney that Plaintiffs had requested ESI consulting services from D4 in connection with the *Gordon* case. Molloy Declaration ¶ 8 ("Karahasanovic contacted Ms. Roney to advise D4 wanted to work for the plaintiffs in the *Kaleida* case," "Roney believed there was an inherent and obvious conflict of interest and that *Kaleida* would not waive such a conflict" (referencing Roney Declaration (*Gordon* Doc. No. 277-1) ¶ 15)). According to Molloy

"[s]ubsequent to that conversation," Molloy Declaration ¶ 9, Karahasanovic informed

Molloy D4 intended to work for Plaintiffs in the *Hinterberger* case and that Molloy stated

as that time to Karahasanovic that Defendants objected to such "representation."[22]  *Id.*

However, Karahasanovic avers he first learned of Defendants' objection to D4's

assistance to Plaintiffs in this action in "early 2012," Karahasanovic Affirmation ¶ 19,

during a telephone conversation with Molloy regarding D4's unpaid bill in this matter, an

averment uncontradicted by Defendants, and until that time he, Karahasanovic, had

been unaware D4 had even agreed to perform such services for Plaintiffs in

*Hinterberger*.  *Id.*  Given that Defendants do not contest that their attorneys, Molloy and

Shinaman, participated in conference calls with Plaintiffs' counsel to discuss ESI issues,

in which Coons participated with Defendants' attorneys' awareness and without

objection by Defendants' attorneys, it is inconsistent and thus implausible that Molloy

expressed in August 2011 any objection to D4's assisting Plaintiffs.  Indeed, these

conversations were later acknowledged, favorably, by Molloy in his February 10, 2012

letter to the court.  *See* Cressman Affirmation Exh. B at 3 (reporting that parties had

conducted several conversations with assistance of consultants helpful to attempt to

resolve ESI issues regarding use of key-word search method).  Moreover, even

assuming an objection to D4's ESI services in this case was communicated by Molloy to

Karahasanovic in August 2011, it was not communicated to Plaintiffs' counsel until

Shinaman's September 13, 2012 e-mail to Cressman, immediately prior to the filing of

Defendants' motion, and even then Defendants took no action to disqualify D4 in this

---

[22]  Although Molloy states the relationship was one involving a "representation," it is an inaccurate characterization as engagement to provide ESI consulting services implies no form of legal representation; it is simply, a contract to provide ESI, not legal, services.

case until Defendants' motion was filed in early October 2012, following defendants' motion in *Gordon*, facts also not contradicted by either Molloy or Shinaman. *See* Molloy Declaration (*passim*); Shinaman Reply Declaration (*passim*). Thus, the relevant question as to Plaintiffs' waiver contention is whether Defendants were aware of D4's assistance to Plaintiffs at a point when disqualification by the court could reasonably and timely have been sought and whether Defendants' delay in seeking such relief constitutes a waiver.

"Waiver is the intentional relinquishment of a known right or privilege." *English Feedlot, Inc.*, 833 F.Supp.2d at 1504 (citing cases). In *English Feedlot,* the court found defendant's eight-month delay in seeking disqualification of its former expert to constitute defendant's assent to the expert's disclosure of a negative opinion of defendant's product in a prior litigation, and thus a waiver of defendant's right to seek disqualification in the case. *Id.* In that case, contrary to defendant's claim that the expert had beclouded defendant's awareness of the extent of the expert's prior disclosure of defendant's alleged confidential information, the court found the expert deposition testimony was not "evasive," and that if defendant then had "any confidentiality concern, it could have been timely addressed." *Id.* Here, Defendants make no allegation that Plaintiffs hindered Defendants knowledge of D4's ESI or consulting assistance or Defendants ability to seek judicial disqualification of D4's assistance at any earlier point.

Thus, Defendants' assertion that because they objected to D4 on two occasions prior to making the instant motion no waiver occurred despite the 12-month lapse from the time Defendants became aware of D4's assistance to Plaintiffs in the fall of 2011

and the filing of Defendants' motion merely demonstrates that Defendants indeed had knowledge of the asserted ground for D4's disqualification well prior, at least approximately nine months from Molloy's conversation with Karahasanovic in early 2012, to filing Defendants' motion, and that Plaintiffs did nothing to prevent Defendants from doing so.  However, the only relevant communication of an objection to a challenged expert or consultant's services to an opponent is not to the objected expert or consultant, or, for that matter, to the opponent's counsel, but to the court by a formal request to disqualify.  *See English Feedlot, Inc.*, 833 F.Supp.2d at 1504 (relevant time period to determine waiver question measured from date defendant first became aware of existence of ground for disqualification to date of motion filed with court).  Thus, Defendants' theory, unsupported by caselaw, that despite failing to inform Plaintiffs' counsel and the court Defendants somehow preserved their right to timely seek disqualification from the court, without having waived Defendants' objection, after Defendants' alleged complaints to D4 were ignored, over more than one-year prior to the motion, is untenable.

The more significant infirmity undermining Defendants' attempt to avoid denial of Defendants' motion based on waiver, is that in this case the record provides several grounds to find that Defendants were well-aware that, despite Defendants' objections to D4's ESI services to Plaintiffs, as communicated to Karahasanovic in "late spring or early summer 2012," Molloy Declaration ¶ 13, D4 had previously provided ESI consulting services to Plaintiffs, Molloy Declaration ¶ 9, since the fall of 2011, without objection communicated to D4 or Plaintiffs, but that Defendants expressed no objection until "early 2012," Karahasanovic Affirmation ¶ 19; Molloy Declaration ¶ 9, and took no steps to

request disqualification of D4 until October 2012. Specifically, Nixon attorneys participated in at least two telephone conference calls, on October 13 and December 1, 2011, with Plaintiffs' counsel to discuss ESI production issues in the case and were then aware that Coons, a D4 consultant who, along with Plaintiffs' counsel, participated in such calls without Defendants' objection, Cressman Affirmation ¶ 4, averments which Defendants do not contest.  Further, in February 2012, following the court's January 11, 2012 discussion of the D4 issue with the *Gordon* Defendants and Plaintiffs, Cressman Affirmation Exh. A; Roney Declaration Exh. D (Doc. No. 377-5 *Gordon*)  at 40, 49, Courtney participated in telephone calls with Plaintiffs and Shinaman including one to discuss a related third-party subpoena enforcement proceeding in the District of Maryland, whose participation was known to Defendants at that time, Cressman Affirmation ¶ 10 (Shinaman and Roney participated in this call and "in numerous telephonic conferences and conferrals with Ms. Courtney acting as plaintiff's ESI consultant without objection"), facts not denied by Shinaman.  *See* Shinaman Reply Declaration (*passim*).[23]

Thereafter, also undisputed by Defendants, Molloy sent a letter dated February 10, 2012, to the court outlining the parties' efforts during conferences in this case to resolve the pending ESI issues acknowledging (in undeniably favorable terms) the participation of Plaintiffs' ESI consultants.  Cressman Affirmation ¶ 9; quoting Cressman Affirmation Exh. C ("The parties' respective ESI experts/consultants [Coons and

---

[23]  While Roney insists she was unaware that Courtney participated in this conference call, (Roney Reply Declaration (*Gordon* Doc. No. 402) ¶ 21), given that two other Nixon members also participated without objection to Courtney's participation, a fact undenied by Molloy, *see* Molloy Declaration (*passim*), or Shinaman, *see* Shinaman Reply Declaration (*passim*), renders such unawareness implausible.

Courtney] have participated in these conferences, and the discussions have served as a useful tool for idea-sharing and seeking compromises between the parties with regard to ESI issues.").  Although Molloy's letter does not identify D4 as Plaintiffs' consultants, given that as of that date D4 had been serving, with Molloy's knowledge, as Plaintiffs' ESI consultants in the *Gordon* case, since August 2011, and later that fall in this case, it is difficult to imagine who else Molloy referred to in the letter.  "In early 2012, . . . Mr. Molloy objected that D4 was consulting with plaintiffs," Karahasanovic Affirmation ¶ 19, despite Defendants' previous participation in telephone conference calls with Plaintiffs' D4 consultants on three occasions over the prior six-month period, and a favorable report by Defendants to the court in February 2012 regarding the benefit to the parties of having Plaintiffs' consultants' participation and contributions to these discussions. Cressman Affirmation ¶ ¶ 4, 10; Cressman Affirmation Exh. B at 3.  Significantly, Defendants' reply papers make offer no rebuttal to these facts asserted by Plaintiffs. *See* Defendants' Reply Memorandum (*passim*); Shinaman Reply Declaration (*passim*).

Defendants participation in the ESI discovery conference before the court on January 11, 2012, provides additional evidence that Defendants have, by their subsequent delay in seeking disqualification, acquiesced in and waived any objection to the D4 consultants' participation and ESI assistance to Plaintiffs.  Immediately following a discussion with Plaintiffs and Defendants in the *Gordon* matter in which Plaintiffs' counsel, Lingle, reported to the court that the *Gordon* defendants had recently raised an objection to Plaintiffs' use of D4 as Plaintiffs' ESI consultant, in discussing with Lingle the status of ESI matters in both cases, the court attempted to determine whether a similar issue had been raised by Defendants in *Hinterberger* to which Plaintiffs' counsel

responded (by interjecting) that no similar dispute between the parties existed in that

case.  Cressman Affirmation ¶ ¶ 6-7.

> COURT:    As with . . . this whole issue of [the *Gordon* Defendants'
>           objection to D4] . . .
>
> LINGLE:   Not a problem.
>
> COURT:    . . .  to assist you in reviewing . . .
>
> LINGLE:   It's not a problem <u>in</u> <u>this</u> <u>case</u>.

Cressman Affirmation Exh. A at 5

Despite the fact that both Molloy and Shinaman, Defendants' counsel in this case, were

present, *id.*, no expression of any disagreement with Plaintiffs' counsel's representation

to the court as to this case was presented to the court by Defendants' attorneys at that

time. Indeed, in none of the five written ESI status reports provided, as requested by the

court, by Defendants to the court in this case, Doc. Nos. 444, 445, 446, 447, and 448,

between February 10, 2012 and June 20, 2012, did Defendants' attorneys raise any

objections to D4's ESI consulting services to Plaintiffs in this case.  Cressman

Affirmation ¶ 8; Plaintiffs' Memorandum at 2.  Defendants do not argue otherwise.  Any

basis for Defendants' assumption, Defendants' Reply Memorandum at 3, that, following

the court's suggestion at the January 11, 2012 ESI discovery status conference,

Defendants expected Plaintiffs' would avoid further potential issues of improper access

to defendants' privileged information raised by defendants in the *Gordon* case by

engaging a different ESI vendor for both the *Gordon* and *Hinterberger* cases, was

removed by Karahasanovic's subsequent confirmation to Molloy that D4 would continue

to perform ESI consulting work for Plaintiff in "both the *Gordon* and *Hinterberger* cases."

Molloy Declaration ¶ 13 (in the "late Spring or early Summer of 2012 . . . Karahasanovic phoned me to advise that D4 had made a business decision to perform work for Plaintiffs' counsel [in the two cases].").  Thus, it is not credible that, following the January 11, 2012 court conference, "Defendants <u>reasonably</u> assumed Plaintiffs – as advised by this court – were in the process of switching vendors."  Defendants' Reply Memorandum at 3.[24]  Based upon Karahasanovic's advice to Molloy, following the January 11, 2012 ESI status conference that D4 was providing ESI services to Plaintiffs, Karahasanovic Affirmation ¶ 19 ("I confirmed [to Molloy] . . . Coons <u>was</u> <u>providing</u> consulting services for plaintiff [*sic*] in this case."), Defendants could not have "reasonably assumed" that Plaintiffs intended to discharge D4 and retain a new ESI consultant to assist Plaintiffs in this case.  Shinaman's statement itself further undermines Defendants' assertion. "Plaintiffs provide [ ] <u>no</u> <u>basis</u> <u>for</u> <u>Defendants</u> or the Court <u>to</u> <u>believe</u> [Plaintiffs] <u>would</u> <u>discontinue</u> <u>using</u> <u>D4</u> in this case had Defendants objected at an earlier date." Shinaman Reply Declaration ¶ 4.  If, as Defendants now admit, they "had no basis . . . to believe" Plaintiffs would cease using D4 even if Defendants had objected prior to the January 11, 2012 conference, Defendants cannot also credibly maintain, in support of Defendants' motion, they genuinely believed that Plaintiffs would do so following the January 11, 2012 court conference.

Defendants' assertion, contrary to the record, that they failed to move earlier for disqualification because they expected Plaintiffs to retain a new ESI consultant also ignores that if improper disclosures had by then occurred, as Defendants in this motion

---

[24]  A careful reading of the Shinaman Reply Declaration ("the Declaration") indicates this assertion does not appear in the Declaration.  Factual assertions in legal memoranda are not considered as evidence.  *Kulhawik,* 571 F.3d at 298 ("unsworn statements in a brief are not evidence").

contend, Defendants were already then prejudiced, yet Defendants failed to ascertain Plaintiffs' intentions and to seek disqualification at that time in order to minimize any potential further prejudice to Defendants' case. Defendants' delay, until October 2012, in seeking relief from this court after being undeniably confronted, approximately six months earlier, with D4's continued ESI consulting assistance to Plaintiffs, Karahasanovic Affirmation ¶ 19, a continuation of D4's ESI consulting assistance to Plaintiffs known to Defendants since the fall of 2011, further establishes that Defendants' cannot avoid a finding that Defendants were for approximately one year before filing the instant motion, well-aware of D4's assistance to Plaintiffs, including the asserted prejudice to Defendants' case, and have thus waived their objections by acquiescing in such assistance. *See English Feedlot, Inc.*, 833 F.Supp.2d at 1504 (eight-month delay in seeking judicial disqualification constituted waiver).

The record also indicates that, although Molloy, informed Karahasanovic of Defendants' objection contemporaneously with his February 10, 2012 letter to the court, inconsistently expressing satisfaction with D4's assistance to Plaintiffs, or shortly thereafter, Defendants informed Plaintiffs' counsel of Defendants' objection concerning D4's services to Plaintiffs for the first time on September 13, 2012, Cressman Affirmation Exh. C at 1 (e-mail from Todd Shinaman to Sarah Cressman stating "We are aware that Kaleida [Defendants in *Gordon*] has raised an objection related to D4's involvement in these [*Gordon* and *Hinterberger*] cases. Because the substantive objection [raised by defendants' attorney, Roney, in *Gordon*] obviously impacts CHS [Catholic Health Systems, Inc., the institutional defendant in *Hinterberger*] as well, we are taking the same position with regard to D4's participation."). As is apparent on its face, this

statement seriously damages Defendants' effort to avoid Plaintiffs' waiver contention. First, it acknowledges Defendants' awareness that D4's assistance was, in Defendants' opinion, harmful ("obviously impacts") to Defendants' position in this case, and that despite Defendants' awareness of such perceived litigation harm, Defendants inexplicably delayed in so informing Plaintiffs' counsel until September 2012 and in deferring seeking disqualification until early October 2012. Relevantly, the "objection" expressed by defendants in *Gordon* was communicated to Plaintiffs' counsel six days prior to Shinaman's e-mail to Plaintiffs' counsel on September 7, 2012. Roney Declaration Exh. E (*Gordon*) (Doc. No. 377-6) ("Kaleida objects to the plaintiffs engaging D4 as their expert in connection with Kaleida's production of its ESI in light of the [scanning and coding] work D4 has already done for Kaleida in this same action."). Further, despite acknowledging to the court the benefits to both parties of involving Plaintiffs' D4 consultants in attempting to resolve ESI production issues over the preceding 12 months, as confirmed by the Molloy February 10, 2012 letter to the court, Cressman Affirmation Exh. B at 3, involving the key-word search method as the parties had agreed, Defendants elected, as noted, for the first time, according to the record, to inform Plaintiffs' counsel in the September 13, 2012 e-mail, Cressman Affirmation ¶ 11 ("The first time defendants raised an objection to plaintiffs regarding [plaintiffs'] retention of D4 as [plaintiffs'] ESI consultant was via e-mail on September 13, 2012."), that Defendants objected to D4 providing further ESI assistance to Plaintiffs shortly after Defendants announced their intention to use predictive coding, (Roney Declaration Exh. E, Doc. No. 377-6, September 6, 2012 e-mail regarding "Predictice [*sic*] Coding Conference Call"), a much more sophisticated and technically complex process, as

Defendants' preferred method to addressing the voluminous ESI production required in this case, an intelligent software more likely to reasonably require specialized ESI assistance to Plaintiffs by an expert ESI consultant like D4. Nor did Shinaman respond directly to Cressman's request, Cressman Affirmation Exh. D (e-mail from Sarah Cressman to Todd Shinaman dated September 13, 2012) that Defendants' particularize where and when Defendants had objected to Plaintiffs regarding D4's consulting services to Plaintiffs. The court finds significance in the fact that although Molloy purportedly (and inconsistently with his February 2012 letter to the court) objected to Karahasanovic in "spring or early summer" 2012 about D4's ESI services to Plaintiffs, neither he nor Shinaman aver that, until Shinaman's September 13, 2012 e-mail to Cressman, either he or Shinaman ever conveyed such an objection to Plaintiffs' attorneys. Defendants therefore appear to believe that by keeping Plaintiffs' counsel 'in the dark' as to Defendants' "objection" to D4's assistance, Defendants can now avoid waiver, a proposition which Defendants make no attempt to support by reference to any authority. To the contrary, a similar stance has been rejected. *See Trust Corporation of Montana v. Piper Aircraft Corporation*, 701 F.2d 85, 86-87 (9th Cir. 1983) (defendant's failure to timely communicate defendant's objection to plaintiff's counsel asserting counsel's disqualification as substantial part of defendant's delay in filing disqualification motion constituted "*de facto*" consent and waiver).

As with the sequence of the e-mail communications regarding Defendants' purported objections to D4 in *Gordon* and *Hinterberger*, respectively, Defendants' motion in this case, followed by one week the filing of the defendants' motion to disqualify D4 in *Gordon*. *Gordon* – September 25, 2012 (*Gordon* Doc. No. 377); *Hinterberger* – October

2, 2012 (Doc. No. 351). The court is thus compelled to conclude, based on the record, that had defendants in *Gordon*, represented, as are Defendants, by Nixon, not objected to D4 serving as, as Defendants now assert, Plaintiffs' expert consultant to assist Plaintiffs in the ESI production issues that had been addressed with the court over the preceding 12-month period by the parties, and not moved for D4's disqualification in *Gordon*, Defendants would not have objected to Plaintiffs' use of D4 as their ESI consultant nor moved to disqualify D4 in this case. Such conclusion strongly demonstrates that Defendants' motion represents not a *bona fide* effort to avert further, or any, actual harm to Defendants' defense based on the alleged disclosure of Defendants' confidential information by D4 to Plaintiffs, but, rather, an effort to gain a tactical advantage over Plaintiffs by belatedly compelling Plaintiffs to engage new ESI consultants thus limiting Plaintiffs' participation in, or oversight of, Defendants' implementation of predictive coding, thereby delaying completion of ESI discovery in this case.[25] Defendants' successive motion also bolsters the *Gordon* defendants' motion to disqualify D4, eliding the inconsistent positions of defense counsel in the two cases regarding the propriety of D4's providing ESI consulting services to Plaintiffs: previously accepted by Defendants' counsel in *Hinterberger*; opposed in *Gordon*. The record also supports finding Defendants had no intention of seeking D4's disqualification until defendants in *Gordon* decided to do so, further demonstrating that Defendants waived their objection. Thus, Defendants' unexcused delay in seeking D4's disqualification

---

[25] Pending before the court are Plaintiffs' motions, filed October 5, 2012 in *Gordon* and *Hinterberger*, to compel defendants in *Gordon* and *Hinterberger* to meet and confer regarding protocols to guide implementation of predictive coding (*Gordon* Doc. No. 384) (*Hinterberger* Doc. No. 360). In opposition, defendants represented their refusal to do so is subject to the court's determination of defendants' motion to disqualify D4 (*Gordon* Doc. No. 396 ¶ 22) (*Hinterberger* Doc. No. 369 at 6).

amply supports that Defendants have acquiesced in D4's ESI assistance to Plaintiffs and waived their purported objection. *See Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634, 639, (2d Cir. 1989) (plaintiff's six-month delay in moving to disqualify defendant's counsel, on appeal, as factor supporting denying motion); *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d at 87-88; *English Feedlot, Inc.*, 833 F.Supp.2d at 1504. Additionally, even if, *arguendo*, Defendants did waive their objection to D4's assistance, Defendants' unexcused delay in seeking judicial relief severely undermines Defendants' contention that confidential information, including work product, was disclosed to Karahasanovic and D4.

Finally, there is no merit in Defendants' contention that Plaintiffs' desire to include D4's consultants in discussions with Defendants regarding the matter of Defendants' ESI "Custodians" in connection with Defendants' then recent discussion to utilize predictive coding instead of the key-word method, indicates that Plaintiffs' counsel has received confidential information from D4. Defendants' Reply Memorandum at 6-7. The record is replete with evidence that Defendants were prepared to discuss this subject with Plaintiffs as recently as September 13, 2012. Cressman Affidavit Exh. C (e-mail from Todd R. Shinaman to Sarah Cressman September 13, 2012 stating need to begin discussing list of Defendants' e-mail custodians "whose e-mails have already been restored."). Molloy's February 10, 2012 letter to the court also confirms that Defendants were then prepared to provide information regarding Defendants' e-mail custodians to Plaintiffs. Cressman Exh. B at 5 ("defendants had no objection to substance of [Plaintiffs'] request [for custodian information]"). Thus, it is unpersuasive for Defendants to contend that such "Custodian" information or subject matter could reasonably be

considered as constituting Defendants' confidential information, and that Plaintiffs somehow had wrongfully acquired access to such confidential information is a result of Karahasanovic's involvement with the scanning and coding of Defendants' documents in this case. Defendants' contention in support of Defendants' requested disqualification on this ground is therefore baseless.

As there is, on this record, no reasonable basis to believe that further proceedings involving D4's Advisory and Consulting Group – Coons and Courtney – as Plaintiffs' ESI consultants will taint the integrity of future proceedings in this case, D4's disqualification is not required on this ground. Further, Defendants do not dispute Plaintiffs lack such expertise on an in-house basis, in contrast with Nixon which has an extensive in-house E-Discovery and ESI advisory group as well as two outside ESI contractors. Cressman Affirmation ¶ 16 ("Counsel for defendants in this case have their own in-house ESI experts."); Cressman Affirmation Exh. E. Thus, given Defendants' recent decision to use predictive coding, Cressman Affirmation ¶ 11; Cressman Affirmation Exh. C at 1, to facilitate review of Defendants' voluminous and potentially probative ESI, requiring Plaintiffs to obtain different competent ESI consultants at this stage would unduly disadvantage Plaintiffs without promoting judicial integrity. D4's disqualification as Defendants request, would, therefore, not serve the public interest in a fair and prompt adjudication in this court. *See Grioli*, 395 F.Supp.2d at 14 (courts consider "public interest" in whether to disqualify an expert) (citing cases).

**B.** **Disqualification of Plaintiffs' Counsel.**

As with Defendants' motion to disqualify D4, Defendants' request to disqualify

Plaintiffs' counsel, Shinaman Reply Declaration ¶ ¶ 6, 9; Defendants' Reply

Memorandum at 4 ("the court should also <u>consider</u> whether to also disqualify Plaintiffs'

counsel from proceeding with this litigation."), fails for similar reasons.[26]  Disqualification

motions to disqualify an adversary's attorney based on the attorney's alleged access to

an opponent's confidential information from a challenged expert or consultant are

viewed with disfavor and require a "high standard of proof."  *1210 Colvin Avenue, Inc.*,

2006 WL 3827429, at *6 (citing caselaw).  Such a heightened burden is necessary to

protect a party's right to choose counsel requiring the court to balance this right against

the need to maintain high professional standards.  *Id.*  Courts also consider the risk that

a disqualification request is motivated by tactical reasons.  *Id.* (quoting *Nyquist*, 590 F.2d

at 1246).  As Defendants state, Defendants' Reply Memorandum at 2 (citing *1210 Colvin*

*Avenue, Inc.*, 2006 WL 3827429, at *7), a requested disqualification of an opponent's

attorney depends on whether a party's expert or consultant wrongly disclosed

confidential information to the adversary's attorney, which the expert or consultant

acquired from the party that previously retained the expert or consultant, having the

capacity to effect significant prejudice to the party or whether some other cognizable

conflict of interest exists.  *Id.*  *See also Cordy*, 156 F.R.D. at 584 (disqualifying defense

law firm which received advice from plaintiff's former expert who had access to plaintiff's

---

[26]  While Defendants' request appears only in Defendants' Reply Memorandum papers, (manifesting a degree of uncertainty regarding the merits of Defendants' request), because a charge of disqualifying attorney misconduct invokes the court's responsibility to enforce applicable professional standards, the court addresses the merits of Defendants' request. *See Dunton v. Suffolk County, State of New York,* 729 F.2d 903, 908-09 (2d Cir. 1984) ("'[w]hen a potential or actual conflict of interest situation arises, it is the court's duty to ensure that the attorney's client, so involved, is fully aware of the nature of the conflict and understands the potential threat to the protection of his interests'" (quoting *In re Taylor*, 567 F.2d 1183, 1191 (2d Cir. 1977))).  *See also Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 565 (2d Cir. 1973) ("even an appearance of impropriety requires prompt remedial action by the court" with regard to attorney conflict of interest).

counsel's trial strategies).  Absent such showing, there is no presumption that opposing counsel obtained such information requiring disqualification.  *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *9 (evidence demonstrated consultants obtained confidential information from defendant, consultant's former employer, but did not disclose such information to plaintiff's attorneys – court denied disqualification of plaintiff's attorneys).  Courts "hesitate to impose [the] drastic . . . measure [of] disqualification [of a party's attorney] except when absolutely necessary."  *MMR/Wallace Power & Industrial, Inc. v. Thames Associates* ("*MMR/Wallace*"), 764 F.Supp. 712, 718 (D.Conn. 1991) (citing *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 718 (7th Cir. 1982)).

Here, the court has found Defendants have failed to meet their burden that D4, particularly Karahasanovic, received any confidential information from Defendants or Nixon, or created such information for Defendants or Nixon, incident to its engagement to provide scanning and objective coding of Defendants' documents during 2011.  Discussion, *supra* at 36-52.  Accordingly, as the record fails to support that D4 obtained Nixon's work product or Defendants' confidential information concerning this case, it follows that Defendants have, by the same token, failed to meet Defendants' heavy burden to establish that Plaintiffs' attorneys obtained any such information which could be used to Defendants' prejudice.  *See 1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *9 ("'nagging suspicion'" that plaintiffs "have been unfairly advantaged" by asserted disclosures to plaintiffs' counsel insufficient to warrant disqualification of counsel (quoting *MMR/Wallace*, 764 F.Supp. at 718.  On this record, Plaintiffs' counsels' "continued representation [of Plaintiffs] does not threaten to taint the integrity of these proceedings and disqualification is not required."  *1210 Colvin Avenue,* Inc., 2006 WL

3827429, at *9. Defendants do not point to any basis to find Plaintiffs' counsel operates under a disqualifying conflict of interest.

Defendants also contend that by obtaining from D4, *i.e.*, Karahasanovic, information concerning its engagement with Nixon to provide the scanning and coding services at issue, Shinaman Reply Declaration ¶ 6, in order to oppose Defendants' motion, Plaintiffs' counsel violated certain ethical requirements applicable to attorneys in communications with an opponent's experts, *viz.*, the duty not to cause others to reveal a client's confidences, Defendants' Reply Memorandum at 4-5 (citing *MMR/Wallace* , 764 F.Supp. at 718, and former New York Rules of Professional Conduct 1.6 (duty to protect client confidences), 4.2 (prohibition against communication with represented party) and 8.4 (prohibit conduct prejudicial to administration of justice)). Defendants also argue Plaintiffs' counsel engaged in an ethical violation of Rule 3.4(c) of Model Code of Professional Responsibility which requires lawyers to comply with the rules of the tribunal before which the lawyer is engaged in a matter. Specifically, Defendants maintain Plaintiffs' attorneys' contact with D4, specifically Karahasanovic, violated Fed.R.Civ.P. 26(b)(4)(D)(ii) (permitting adverse party to obtain "facts" or "opinions" from an opponent's non-testifying expert where party unable to obtain facts or opinions by other means) ("Rule 26(b)(4)(D)(ii)" or "the Rule"). Defendants' Reply Memorandum at 5 (referencing ABA Comm. on Ethics &* Prof'l Responsibility, Formal Op. 378 (1993) ("ABA Op. 93-378")). Defendants' Reply Memorandum at 1, 4. However, the court has found the record does not support that D4 actually received such information in connection with the scanning and coding work which could have been transmitted to Plaintiffs' counsel. Discussion, *supra*, at 36-51. Moreover, Defendants fail to point to

any "fact" or "opinion" Plaintiffs' counsel have sought or obtained from Karahasanovic, as a non-testifying expert, within the meaning of Rule 26(b)(4)(D)(ii). By its terms, the rule limits access to an opponent's non-testifying expert's knowledge of "facts" or "opinions" relevant to the merits of the claims or defenses in the case. *See* Fed.R.Civ.P. 26(b)(1) (federal civil discovery generally limited to matter "relevant to any party's claim or defenses"). Although D4 was hired to provide scanning of Defendants' documents and objective coding services to Nixon, there is no indication that D4 also served, contrary to Defendants' assertion, Defendants' Reply Memorandum at 1, as Defendants' non-testifying expert or as Defendants maintain, a "consultant" for the purposes of this litigation by providing expert investigation or evaluation of Plaintiffs' claims or Defendants' defenses, or expert testimony regarding such claims or defenses, or otherwise creating confidential information or material helpful to Defendants which could be subject to the limitations established by Rule 26(b)(4)(D)(ii) for obtaining such information. Discussion, *supra*, at 18-25, 68-69. Rather, Karahasanovic assisted Nixon in establishing the fields or categories, determined by Nixon, to be used by D4 coders in objectively coding the numerous documents – Defendants' internal records or forms relating to Defendants' hourly employee work schedules – D4 had scanned preliminary to the coding process according to Nixon's objective requirements to create the database Nixon desired. Karahasanovic Affirmation ¶ ¶ 13, 15-17. Defendants do not contest Karahasanovic's description of D4's work performed by Nixon. ABA Op. 93-378 upon which Defendants rely, Defendants' Reply Memorandum at 5, holding that *ex parte* contact with an adversary's "expert witness" may violate Model Rule of Professional Conduct 3.4(c), ABA Op. 93-378 at 2, is also inapposite given that the opinion is directed

to a party's "expert witness," and as such is subject to Fed.R.Civ.P. 26(b)(4)(A) (permitting deposition of "expert whose opinions may be presented at trial"); Defendants do not assert Karahasanovic was retained to serve, nor served, as Defendants' "expert witness." Thus, ABA Op. 93-378 has no relevance to issues in the present case. Defendants therefore fail to establish that the services rendered by D4 or Karahasanovic qualify as expert services, or that Karahasanovic's description of the scanning and coding work constitutes a disclosure of "facts" or "opinions" "known" or "held" by Karahasanovic as an expert within the ambit of Rule 26(b)(4)(D)(ii), or that Plaintiffs' counsel violated any applicable ethical standards based on violation of Rule 26(b)(4)(D)(ii) or other ethical rule, requiring disqualification.

In contrast to the work performed by the disqualified experts or consultants in *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *4, relied on by Defendants in attempting to establish Plaintiffs' counsel improperly obtained from Karahasanovic "facts" relevant to the defense, Defendants' Reply Memorandum at 4, D4 did not develop "'a strategy for . . . combing through the documents,'" *id. (*quoting *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *4, to locate those most helpful to Defendants' case. By definition, D4's work allowed Nixon to have coded all of the scanned documents into a database to enable Nixon, not D4, to "comb," *i.e.*, review, the scanned documents by computer using the coding system established, not by D4, but by Nixon. Roney Declaration (*Gordon* (Doc. No. 377-1)) ¶ 12 (goal of project was to "facilitate [Nixon's] handling of data" [*i.e.*, the objectively coded information concerning Defendants' documents] to assist Nixon in further litigation); Molloy Declaration ¶ 6 (D4's work for Defendants "substantially similar" to that performed in *Gordon* case). This fact

distinguishes the instant case from the facts in *1210 Colvin Avenue, Inc.* and other

cases cited in that case in which expert disqualification was granted as the challenged

experts or consultants in that case intended to use, as the court found, knowledge

concerning defendant's confidential business operations and decision-making

procedures relevant to plaintiff's price discrimination allegations, obtained by the

consultants while employed by defendant, to assist plaintiff in its review of defendant's

documents, in order to more effectively support plaintiff's claims. *1210 Colvin Avenue,*

*Inc.*, 2006 WL 3827429, at *7. Here, the coding system for Defendants' documents did

not entail any review of the documents' contents and was established by Nixon for

Defendants' benefit to facilitate Nixon's computerized access and use of the scanned

and coded documents in later phases of the instant litigation, not to facilitate any access

to such information by Plaintiffs in support of Plaintiffs' claims. Roney Declaration

(*Gordon* Doc. No. 377-1) ¶ 12; Molloy Declaration (*Hinterberger* Doc. No. 351-1) ¶ 6.

Unlike the "facts" obtained by the disqualified consultants from defendant's record in

*1210 Colvin Avenue, Inc.*, the information – descriptive elements of the Defendants'

documents – regarding the scanning and coding work performed by D4 are not facts

relevant, *i.e.*, probative, to the claims or defenses in this case, and Defendants have not

demonstrated otherwise. Thus, *1210 Colvin Avenue, Inc.* does not support Defendants'

request for Plaintiffs' counsel's disqualification. Nor, in contrast to the instant matter,

were the former employees of defendant in *1210 Colvin Avenue, Inc.*, disputed to be

experts or consultants for any purpose. *See 1210 Colvin Avenue, Inc.*, 2006 WL

3827429, at *1 (plaintiff "retained Bridgeport Partners LLC to assist [plaintiff] in this

litigation . . . Bridgeport is a consulting firm owned by [defendant's former employees"]).

Therefore, nothing in *1210 Colvin Avenue, Inc.* supports Defendants' contention that Plaintiffs' counsel obtained facts from Karahasanovic in violation of Rule 26(b)(4)(D)(ii), and disqualification of Plaintiffs' counsel is not warranted on that ground asserted by Defendants.

Defendants also argue, that "D4 could not have coded the documents in a vacuum" and that D4 required Nixon's "litigation insight" to execute the project. Defendants' Reply Memorandum at 4-5.  Defendants' overly broad assertion that some assistance from Nixon was required to enable D4 to perform the scanning and coding work avoids the relevant question of whether Defendants provided confidential information to Karahasanovic as a required element in D4's ability to carry out this work. That Defendants' "litigation insight" may have been needed to establish the document coding fields Nixon selected and that Nixon's staff discussed with Karahasanovic, does not imply that such "litigation insight," a plainly vague concept, was, or needed to be, revealed to Karahasanovic.  Defendants' assertion again overlooks the important undisputed fact that the coding by D4 of Defendants' documents was to be performed using the objective coding method, a standard coding method which does not, according to published definitions of this coding method, Discussion, *supra*, at 18-20, require discretionary or subjective coding decisions concerning the relevancy or other probative aspects of the scanned documents possibly necessitating disclosure to D4 coders of work product such as Nixon's specific litigation strategies or "insights" in order to carry out such subjective coding.

Defendants also maintain that disqualification of Plaintiffs' counsel is supported by the fact that, by assisting Plaintiffs in opposing Defendants' motion, D4 breached its

confidentiality obligations to Defendants under Section 3 of the Master Agreement. Defendants' Reply Memorandum at 1 (In responding to Defendants' motion, "Plaintiffs' counsel . . . made clear that D4 . . . breached Defendants' confidences" and provided confidential information regarding the scanning and coding work to Plaintiffs' counsel). There is no merit to this contention. First, finding that Nixon, other than revealing that the coding work was to be done on an objective, as opposed to a subjective, basis and that Karahasanovic was assisted by several members of Nixon's staff identified by Karahasanovic in establishing parameters for the coding, Karahasanovic's Affirmation provides no information regarding Karahasanovic's communications with Defendants, except examples of the coding fields selected for coding of Defendants' business forms, such as document type, cost center, or employee number, Karahasanovic Affirmation ¶ ¶ 13, 15, relating to Defendants' hourly employees work schedules as recorded on the documents to be coded. Significantly, Defendants do not contend that this information is confidential as Defendants' business records relating such facts are, given Plaintiffs' claims for unpaid wages and overtime, in all likelihood subject to discovery in any event, and Defendants fail to establish or argue otherwise. Additionally, as discussed, Discussion, *supra*, at 37-38, Defendants do not contend that such information disclosed was privileged or attorney work product. Because Defendants have not demonstrated that the information regarding the scanning and coding work for Nixon provided by Karahasanovic in support of Plaintiffs' opposition to Defendants' motion constituted confidential information that could be prejudicial to Defendants' case, that such information was disclosed by Karahasanovic to Plaintiffs' counsel is insufficient to require counsel's disqualification. In sum, the record does not support Plaintiffs' counsel

solicited or obtained Defendants' confidential information creating any prejudice to Defendants warranting counsel's disqualification.

Defendants' reliance, Defendants' Reply Memorandum at 5-8, on *Tyco Healthcare Group L.P. v. Ethicon Endo-Surgery, Inc.*, (*"Tyco Healthcare"*) No. 10-60, Slip. Op. (D.Conn. Dec. 30, 2011), *United States ex rel. Grimm Construction, Co., Inc. v. SAE Civil Construction Inc.,* (*"Grimm"*), 1996 WL 148521 (D.Neb. Jan. 29, 1996), *Cordy*, 156 F.R.D. 575, and *MMR/Wallace*, 764 F.Supp. 712, to support disqualification of Plaintiffs' counsel is misplaced.

*Tyco Healthcare*, an unreported case, on which Defendants rely for the proposition that D4's failure to assure that Karahasanovic was sufficiently isolated from contact with D4's Advisory and Consulting group so as to avoid Plaintiffs' possible access to any of Defendants' confidential information which may have been gleaned by Karahasanovic incident to the scanning and coding work and thereby supporting disqualification of Plaintiff's counsel, Defendants' Reply Memorandum at 6, is, inapposite. A careful reading of the facts in *Tyco Healthcare* reveals significant differences from the facts of the instant dispute which, when contrasted with the instant record, instead of weakening, reinforces the court's conclusion that Defendants' motion is without merit, and that there is no basis for Defendants' request that Plaintiffs' counsel be disqualified. Specifically, in *Tyco Healthcare*, the trial presentation consultant at issue, subsequently hired to perform identical services in the same patent litigation for defendant's attorneys after previously providing such services for plaintiffs, was "'privy to and received [plaintiff's] confidential information'" and participated in "'numerous confidential and privileged discussions,'" concerning "'[plaintiff's] trial tactics and

strategy.'" *Tyco Healthcare*, Slip Op. at 3. The consultant also "acknowledged that he had access to plaintiffs' attorney trial team's confidential and privileged information." *Tyco Healthcare,* Slip Op. at 4 (based on the expert's deposition). Further, significantly, such an extensive involvement with, and detailed comprehension of, plaintiffs' confidential litigation information and strategies was essential to enable the consultant to accomplish his specialized work of assisting plaintiffs' trial counsel in achieving an effective trial presentation of plaintiffs' case. *Tyco Healthcare*, Slip Op. at 2. In contrast, the facts in the instant case fail to support that either Karahasanovic, Coons, or Courtney, were privy to Defendants' counsel's confidential trial strategies and related knowledge, or that such knowledge was even necessary to the successful execution of D4's scanning and coding work for Nixon. Relevantly, other than in obtaining some non-confidential information concerning the nature of the scanning and coding services provided by D4 to Nixon in order to oppose Defendants' motion, Plaintiffs' counsel has not utilized Karahasanovic to provide expert or consultant services to assist in the litigation of Plaintiffs' claims. In contrast, in *Tyco Healthcare*, plaintiffs' former consultant was assigned to defendant for the same type of trial assistance services the consultant had previously provided to plaintiffs in that case. *Tyco Healthcare*, Slip Op. at 17. Thus, in the absence of any evidence that Karahasanovic was retained by Plaintiffs to provide expert or consulting services to Plaintiffs, the lack of formal screening rules to avoid potential leakage of Defendants' confidential information, even assuming any such information was imparted to Karahasanovic, in this case does not require counsel's disqualification, and the holding in *Tyco Healthcare* therefore does not support Defendants' request that Plaintiffs' counsel be disqualified.

In *Grimm*, the court found that the disqualified former employee of defendant later hired by plaintiff's counsel as a trial consultant for plaintiff obtained presumably privileged information about defendant's case, creating a palpable risk of disclosure of defendant's confidential information to plaintiff 's counsel, potentially prejudicial to the defense. *Grimm*, 1996 WL 148521, at **1, 2. Specifically, the court in *Grimm* found the former employee had been "intimately involved" in the construction project and the underlying dispute giving rise to the litigation before being hired by plaintiff's law firm. *Id.* at *4. In the instant case, although Plaintiffs' attorney obtained some information from Karahasanovic, as described in the Karahasanovic Affirmation, not shown by Defendants to be confidential in nature about the general nature of the work performed by D4 on the scanning and coding project for Defendants, the record does not support, as discussed, Discussion, *supra*, at 36-51, that prior to this disclosure Karahasanovic obtained any protected information from Defendants' attorneys in connection with performing this work that could have been disclosed to Plaintiffs' counsel by Karahasanovic. Thus, *Grimm* does not require a disqualification of Plaintiffs' counsel.

In *Cordy*, the court found that an accident reconstruction expert was retained by plaintiff to provide an opinion on the cause of plaintiff's accident and had obtained plaintiff's attorney's work product as a basis for that opinion. *Cordy*, 156 F.R.D. at 577-78. Thereafter, the expert was retained by defendant and provided a different opinion on the same issue. *Cordy*, 156 F.R.D. at 579. Because the expert had previously received plaintiff's confidential information as a basis for the experts' first opinion, including plaintiff's attorney's work product, the expert's subsequent consultations with defendant's attorneys required disqualification of defense counsel to avoid the risk that

such protected information would be used against plaintiff in the litigation. *Cordy*, 156 F.R.D. at 584-85. In contrast, as with *Tyco Healthcare*, *Grimm,* and *Cordy,* Karahasanovic has not served Plaintiffs as an expert or consultant to assist Defendants in defending against Plaintiffs claims, and the record does not support a finding that Defendants' confidential information was disclosed to Karahasanovic. Accordingly, *Cordy* does not support that disqualification of Plaintiffs' counsel is required.

In *MMR/Wallace,* plaintiff's former employee, hired as a consultant in the litigation by defendants' attorneys had, prior to being hired by defendant's attorney, "extensive contact with plaintiff's counsel," "access to confidential information about plaintiff's litigation strategy" as well as the facts concerning the underlying dispute, and assisted plaintiff's counsel in digesting documents, preparing for depositions, and answering interrogatories in connection with the litigation. *MMR/Wallace*, 764 F.Supp. at 725-29. Thus, the court in that case found on the record before it that the former employee had for 10 months served as plaintiff's "trial consultant and paralegal," *id.* at 725, and that, given those circumstances, the employee's presumptive disclosure of privileged information to defendant's attorney required disqualification of the attorney. *Id.* at 726-27. In contrast to *MMR/Wallace*, in this case, Karahasanovic served not as an expert or consultant assisting Defendants' counsel in litigating the merits of Plaintiffs' claims but, rather, as a scanning and coding services contractor meeting with Defendants' staff to determine the fields, not asserted by Defendants as constituting Defendants' confidential information, needed to satisfy Nixon's requirements for the coding of Defendants' documents into a readily useable database to be accomplished over a relatively limited period during the summer of 2011. Importantly, there is also no evidence in this case to

support that, in contrast to the conduct of the attorney disqualified in *MMR/Wallace*, Plaintiffs' counsel attempted to hire Karahasanovic to assist Plaintiffs in any capacity in connection with litigating the merits of this case. *See MMR/Wallace*, 764 F.Supp. at 727 (defense counsel's purpose in attempting to hire plaintiff's former employee, to obtain plaintiff's confidential information to which former employee was privy of assistance to counsel's defensive strategy, a fact known to counsel, provided ground for counsel's disqualification). Thus, in contrast to *MMR/Wallace,* disqualification of Plaintiffs' counsel is not required to negate any potential tainting of further proceedings in this case.

Finally, Defendants attempt to demonstrate that such work product was in fact revealed by D4 to Plaintiffs' attorneys based on a scheduled discussion by counsel concerning Defendants' "Custodians" of the e-mails thus requiring Plaintiffs' counsel's disqualification. Shinaman Reply Declaration ¶ 9; Defendants' Reply Memorandum at 6-7; Cressman Affirmation Exh. C (referring to Defendants' requests that Plaintiffs not include D4 ESI consultants, presumably Coons and Courtney, in telephonic conferences regarding the issue of Defendants' custodians as one element in a protocol needed to guide use of predictive coding software to review the e-mails). *See also Moore v. Publicis Groupe*, 287 F.R.D. 182, 198 (S.D.N.Y. 2012) (emphasizing attorney's need to acquire and share accurate information regarding custodians of subject e-mails in order to facilitate use of predictive coding method), *adopted by* 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012). Defendants contend such "unusual insistence," Defendants' Reply Memorandum at 7, by Plaintiffs to include the D4 consultants in the scheduled conferences demonstrates Plaintiffs' counsel has received, by improperly obtaining from Karahasanovic, Defendants' confidential information provided to him by Nixon as a

result of D4's previous scanning and coding work for Defendants. More specifically, Defendants' attorneys "suggest[ ] that Plaintiffs' counsel seeks to take advantage of Defendants' . . . confidences." *Id.* There are two difficulties with this contention.

First, Defendants make no attempt to explain, and the court fails to see, how the identity, or job titles, of such "Custodians" of Defendants' documents or the extensive e-mails subject to review by the predictive coding or other computerized method constitutes Defendants' confidential or otherwise protected, such as proprietary attorney work product, or privileged, information. To the contrary, the identity and job descriptions of Defendants' document custodians are subject to discovery, *see Heller v. City of New York*, 2009 WL 2944663, at *2 (E.D.N.Y. July 31, 2008) (custodian of relevant records including storage and maintaining evidence subject to deposition); *Philan Insurance LTD. v. Frank B. Hall & Co., Inc.*, 1992 WL 183553, at *2 (S.D.N.Y. July 21, 1992) (deposition of custodian of records permitted where deposition "may lead" to evidence probative of plaintiff's claim and damages), and are, in any event, likely to be required for any workable protocol to guide the predictive coding process Defendants have recently stated they intend to use in order to comply with Plaintiffs' request for production of Defendants' e-mails on a cost-effective basis. Cressman Affirmation ¶ ¶ 11, 18-19; *see Moore*, 287 F.R.D. at 192-93 (discussing attorneys' need to acquire and share accurate information regarding custodians of subject e-mails in order to facilitate use of predictive coding review method). Second, it is undisputed that the D4 scanning and coding work related to 5-10 boxes of paper documents, Karahasanovic Affirmation ¶ 7. While it is possible that some of these documents may be associated in some way with, or have included information regarding the identity of the "custodians" at issue in

connection with the parties' most recent discussions regarding the need for a predictive coding search protocol in order to facilitate a computerized review of Defendants' e-mails, Defendants have failed to provide any explanation as to whether such overlap even exists. It is therefore unlikely that any information Karahasanovic may have obtained regarding the custodians of Defendants' scanned and coded documents is relevant to the parties' scheduled discussions concerning the custodians of Defendants' e-mails. Simply, the record does not support that Karahasanovic had any access to information regarding the identity of Defendants' e-mail custodians that could be prejudicial to Defendants' discussions with Plaintiffs on the matter of predictive coding. Defendants' argument also ignores that Defendants have already revealed a significant amount of information regarding the custodians of their e-mails including their identity. Cressman Affirmation Exh. C, Shinaman e-mail of September 13, 2012 to Sarah Cressman (listing five custodians "whose emails have already been restored."); September 26, 2012 e-mail from T. Shinaman to S. Cressman (discussing Defendants' selection of 40 proposed custodians of Defendants' e-mails for Plaintiffs' review stating "we [Defendants] are providing a list of defendant's proposed custodians [of Defendants' email] for predictive coding."). Defendants' e-mails are also consistent with Molloy's February 10, 2012 letter to the court, Cressman Affirmation Exh. B at 3 ("A proposed list of [Defendants' e-mail] custodians was provided to plaintiff's counsel on December 19, 2011.") and Shinaman's June 20, 2012 letter to the court (Doc. No. 448) (describing efforts of identifying "additional custodians," on which "to run the searches [of e-mails] on a sample of such custodians"). Thus, Defendants' contention that D4's access to important confidential information regarding Defendants' "Custodians," arising from D4's

prior objective coding work on Defendants' documents for Defendants represents the

same group of "Custodians" that were to be discussed (and as had been scheduled to

occur prior to Defendants' motion) with Plaintiffs' ESI consultants evidences an improper

disclosure by Karahasanovic and an improper use of Defendants' confidential

information by Plaintiffs' attorneys, is without basis in fact.  Any conceivable disclosure

of information pertaining to Defendants' documents or e-mail custodians to Plaintiffs'

counsel by D4, is, on this record, insufficient to require disqualification of Plaintiffs'

counsel.

        In sum, Defendants' have failed to meet their burden of establishing that (1) D4

and Karahasanovic provided expert services to Defendants, (2) Defendants reasonably

believed a confidential relationship between Defendants and D4 relating to the scanning

and coding of Defendants' documents existed, and (3) any of Defendants' confidential

information was in fact, or highly likely to have been, disclosed to Karahasanovic or

Plaintiffs' attorneys requiring disqualification of D4, or any of its employees, or Plaintiffs'

counsel as Defendants' motion requests.  In any event, Defendants waived objection to

D4's assistance to Plaintiffs.


**C.      Plaintiffs' Request for Costs.**

        Asserting Defendants' motion to be "frivolous," Plaintiffs' request the court award

Plaintiffs costs including attorneys fees incurred by Plaintiffs in connection with opposing

Defendants' motion.  Plaintiffs' Memorandum at 16.  Defendants have not responded to

this request.  As the court has determined that Defendants failed to satisfy Defendants'

burden to establish the grounds necessary to grant Defendants' motion and the parties

have not specifically addressed Plaintiffs' request for costs, the court directs Plaintiffs file

papers in support of Plaintiffs' request <u>within 20 days</u>; Defendants' response shall be filed <u>within 10 days thereafter</u>; Plaintiffs' reply, if any, shall be filed not later than <u>10 days after</u> filing of Defendants' response.  Oral argument shall be at the discretion of the court.

**CONCLUSION**

Based on the foregoing, Defendants' motion (Doc. No. 351) is DENIED.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated: May 21, 2013
      Buffalo, New York