UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

GAIL HINTERBERGER, et al.,

                    Plaintiffs,

        v.                                    **DECISION AND ORDER**

CATHOLIC HEALTH SYSTEM, et al.,                  08-CV-380S

                    Defendants.


## I. INTRODUCTION

Four Plaintiffs commenced this putative collective/class action on May 22, 2008, claiming that Defendants, a health care network and certain of its officers and member entities, violated the: Fair Labor Standards Act ("FLSA"), New York Labor Law ("NYLL"), Employee Retirement Income Security Act ("ERISA"), Racketeering Influenced Corrupt Organizations Act ("RICO"), and New York common law by failing to pay hourly employees for all hours worked and/or overtime for hours worked over 40 per week.

There are five motions presently before the Court: (1) Plaintiffs' motion for Rule 23 class certification (Docket No. 356), (2) Defendants' motion for summary judgment dismissing certain of the New York minimum wage order and labor law claims of Plaintiffs Hinterberger and Williams (Docket No. 385), (3) Defendants' motion to decertify Plaintiffs' conditionally certified FLSA collective action (Docket No. 397), (4) Plaintiffs' cross motion to finally certify a FLSA class (Docket No. 414), and (5) Plaintiffs' motion for partial summary judgment on liability (Docket No. 466). For the reasons stated below, Plaintiffs'

1

motions are denied and Defendants' motions are granted.

## II.  BACKGROUND

### A.    Procedural Background and Pending Motions

In their Complaint, Plaintiffs alleged that Defendants were applying three policies within their facilities that gave rise to, inter alia, violations of statutory wage and overtime requirements. Only two are relevant to the pending motions. First is a "Break Deduction Policy," pursuant to which a meal break is deducted automatically from the pay of hourly workers.  According to Plaintiffs, this policy is applied even when employees are required to perform patient care duties during all or some portion of the meal period. Next is an "Unpaid Preliminary and Postliminary Work Policy" under which Defendants do not pay employees for work performed before and/or after their scheduled shifts.

Within one week after filing their Complaint, Plaintiffs moved for conditional certification of a FLSA collective action, under 29 U.S.C. § 216(b).  On July 1, 2008, Defendants responded by moving to dismiss the Complaint in its entirety. Thereafter, Plaintiffs voluntarily dismissed all but their FLSA and NYLL claims. These statutory claims survived Defendants' motion to dismiss, and Plaintiffs were directed to file an Amended Complaint that included only the claims that remain. (Docket No. 147, as amended by Docket No. 222.)

On October 21, 2009, this Court issued a decision on Plaintiffs' motion for conditional FLSA certification and concluded that the class description Plaintiffs had proposed was overly vague and not supported by the allegations and affirmations on record. The Court did, however, find there was a sufficient basis to conditionally certify a

2

class that included a limited number of job titles and work locations—more specifically, "all present and former hourly registered nurses, charge nurses, staff nurses, licensed practical nurses, and respiratory therapists who perform(ed) patient care duties" at eleven CHS hospitals, adult homes, and nursing homes. (Docket No. 221.)

Plaintiffs filed their Amended Complaint on December 15, 2009 (Docket No. 227, "Am. Compl."), naming as Defendants Catholic Health System, Inc., twenty of its network entities, and two of its officers (id. Caption, ¶¶ 23, 48), which will together be referred to as "CHS."  Discovery had commenced prior to filing of the Amended Complaint and continued for nearly three more years.

On October 5, 2012, Plaintiffs moved, under Rule 23 of the Federal Rules of Civil Procedure, for certification of two classes of claims under the New York Labor Law. The first involves the Break Deduction Policy, which Plaintiffs now appear to concede is not an unlawful practice in and of itself. Rather, they urge that CHS relies on hourly employees "to provide urgent and around-the-clock services" at its locations, but has a policy of paying for time worked during meal breaks only when an employee affirmatively reports having missed or been interrupted during a meal period. According to Plaintiffs, CHS knows employees do not always report missed or interrupted meal breaks, but it does not take steps to ensure they are compensated for the unreported time. (Docket No. 357 at 1.)

The second class involves what Plaintiffs refer to as a "Rounding Policy," described as a timekeeping policy/system whereby the times clocked by hourly employees to record the start and end of their shifts are rounded forward and backward to the top of the hour, resulting in a loss of credit for time worked. (Id. at 1-2.) Each class is described as including all CHS hourly workers.

3

On October 31, 2012, CHS moved for summary judgment on certain of the New York Minimum Wage Order and Labor Law claims of Plaintiffs Hinterberger and Williams. (Docket No. 385.) Essentially, CHS contends these named Plaintiffs are exempt, or largely exempt, from state law wage and overtime provisions. (Docket No. 385-2.) CHS next moved, on November 26, 2012, to decertify Plaintiffs' conditionally certified FLSA collective action on the ground that "claims of the named and opt-in plaintiffs are highly-individualized and cannot be adjudicated in any meaningful or reliable manner based on representative testimony." (Docket Nos. 397, 397-1 at 2.)

On November 28, 2012, Plaintiffs moved for a stay of "merits discovery"[1] pending resolution of the three motions then filed, on the ground those determinations "may impact the scope of the claims that proceed in this lawsuit." (Docket No. 403-1 at 1.) Defendants joined in the request (Docket No. 416), and the stay was granted (Docket No. 437).

On December 13, 2012, Plaintiffs filed a cross-motion in response to CHS's motion for decertification. They seek final certification of a FLSA collective action to include not just the titles and facilities conditionally certified, but all CHS hourly workers at all facilities. (Docket No. 414.) Thereafter, Plaintiffs moved for partial summary judgment on the question of CHS's liability relative to their meal break claims under both the FLSA and NYLL. (Docket No. 466.)

These five related motions were fully briefed as of November 1, 2013.[2] In light of the

---

[1] The remaining discovery primarily involves Plaintiffs' review of Defendants' voluminous emails. (Docket Nos. 360, 456 (motion to compel regarding establishment of protocol for achieving cost-effective review).)

[2] Plaintiffs' request to file additional briefing was denied. Both parties continued to advise the Court of relevant newly-issued decisions thereafter.

4

extensive materials submitted, the Court determined there was no need for oral argument.

## B.    Factual Background

### 1.    The Named and Putative Parties

CHS, a religious charitable organization, is a network of health care entities including: four hospitals,[3] fourteen primary care centers, several diagnostic and treatment centers, a freestanding surgery center, six long-term care facilities, two adult homes, three home care agencies, and several other community ministries. (Docket No. 386-3[4] ¶¶ 4-7.) CHS has a Board of Directors. (Id. ¶ 8.)

When Plaintiffs commenced this action in 2008, CHS's more than 30 facilities employed  approximately 6,800 persons in nonexempt positions. The employees worked in over 180 departments and more than 350 job titles. (Id. ¶ 38.) After the Court conditionally certified a FLSA class comprised of only certain job titles and facilities, CHS produced a notice list identifying 2,940 potential class members. (Docket No. 358 ¶ 76.)

Network-wide, approximately 40-45 percent of CHS employees are represented by unions, and their terms and conditions of employment are governed by thirteen different collective bargaining agreements ("CBAs").[5] (Docket No. 386-3 ¶ 40.) The various entities

---

[3] The four are: Kenmore Mercy Hospital ("Kenmore Mercy"), Mercy Hospital of Buffalo ("Buffalo Mercy") St. Joseph Hospital, and Sisters of Charity Hospital ("Sisters"). In 2009 St. Joseph's became a campus of Sisters of Charity Hospital. The resultant three hospitals are separately licensed under New York Health Law, separately accredited under the New York Public Health Law, which governs the incorporation of hospitals, and have a separate president, CEO and acute board of directors. (Docket No. 385-3  ¶¶ 7, 9 12-14; N.Y. PUB. HEALTH LAW § 2801-a.)

[4] Declaration of Mary E. Farallo, Vice President, Human Resource Services for CHS since March 2009.

[5] The representative unions are the Communications Workers of America Local 1133, 1199 SEIU United Healthcare Workers East, United Food and Commercial Workers International Union CLC District Union Local One, and the International Union of Operating Engineers Local 17S. (Docket Nos. 86-1 ¶ 2, 86-2.)

pay overtime at different daily or weekly thresholds and, for unionized positions, that threshold is governed by the applicable union contract. (Id. ¶ 42.)

The four name Plaintiffs were each formerly employed at one of three CHS entities. Current and former employees falling within the conditionally certified FLSA class description were notified of this action and some have opted-in to this case (the "opt-in plaintiffs"). The putative plaintiffs, for purposes of both Rule 23 certification and also a broader proposed FLSA class, include all current and former hourly CHS employees at all CHS facilities who were employed during the relevant time period.

2.     CHS Policies

Since 1991, CHS has had a network-wide Time and Attendance Policy which requires that employees accurately report all time worked using the reporting mechanism(s) in place at their respective work sites. (Id. ¶¶ 47, 52, Exh. B.) In the event that a portion of a CHS policy conflicts with any collective bargaining agreement, the CBA's provisions dictate the terms and conditions of employment. (Id. ¶ 56.)

The Time and Attendance Policy is distributed to all employees, who also receive instruction on the policy at orientation. (Id. ¶¶ 48, 63.) Individual supervisors and managers are responsible for: (a) instructing employees working in their department or unit on correct timekeeping procedures, (b) counseling employees who do not follow procedure, and (c) performing timekeeper duties, including reviewing, auditing and approving their employees' time records. (Id. ¶ 48.) Managers may designate timekeeping duties in their department. They or their designated timekeepers are expected to correct any hours an employee did not record, or recorded incorrectly, before submitting time records to the payroll department. (Id.)

For many years after CHS implemented its Time and Attendance Policy, different CHS work sites continued to use different systems for recording time worked. (Id. ¶ 44.) In 2005, CHS contracted with Kronos to provide a timekeeping system that would be used to record employee work hours at all its network facilities.[6] (Id.) CHS implemented the Kronos system on a rolling basis from September 2005 to March 2006. (Id.) Since then, employees use a telephone access code system ("TACS"), or a badge swipe, to record their work day start and end times in Kronos. (Id. ¶ 45.) Employees are provided written instructions regarding the appropriate method for clocking in and out for their department or unit, and must verify receipt of those instructions. (Id. ¶51, Exh. C.) In addition, instructions are posted and are available for viewing on the CHS intranet. (Id. ¶¶ 51, 62.)

Under the Time and Attendance Policy, hourly employees are not permitted to clock in more than six minutes before the beginning of their shift or more than six minutes past the end of their shift unless authorized by their supervisor. The timekeeping system automatically rounds times that are entered within six minutes of the scheduled start or end time. (Id. ¶ 53, Exh. B; Docket No. 358-3 at 9.) In other words, when an employee clocks in up to six minutes before or after the beginning of his or her shift, or clocks out up to six minutes before or after the end of the shift, the time is rounded forward or backward to the scheduled shift time. (Id.) The six-minute grace period is applied at each hour, half-hour, and quarter-hour. If an employee clocks in or out in between these grace periods—i.e., at :06– :09, :21– :24, :36– :39, or :51–:54—he or she is paid from exactly the clocked time, calculated to the nearest hundredth of an hour. (Docket No. 358-3 at 9.) Under CHS's

_____

[6] The only exception is field workers in CHS's Homecare Division, who do not record their time in Kronos. (Id. ¶ 45; Docket No. 358-1 ¶ 4.)

policies for "Conduct Principles and Corrective Action" and "Attendance" employees are subject to discipline for: (1) a pattern of clocking in more than six minutes prior to, or out more than six minutes after their scheduled shift times, as well as (2) a pattern of clocking in more than six minutes after, or out more than six minutes prior to their scheduled shift times. (Docket No. 358-1 at 46, 56.)

CHS acknowledges there was a period of approximately two months in 2005 during which certain of its facilities implemented a practice of rounding the six-minute grace times only in favor of the employer; they did not round clocked time if an employee arrived late or punched out early. (Docket No. 386-3 ¶ 53.) It is undisputed that the practice was discontinued and employees subjected to the two-month practice were paid for any late clock-ins and early clock-outs as if the time had been rounded in their favor. (Id.)

CHS provides a meal period to all hourly employees who work a shift longer than six hours. (Id. ¶ 54.)

> A 30-minute meal period is automatically assumed and calculated by the KRONOS time and attendance systems for all associates working any shift longer than six hours. An associate may only work through a meal period when required by management. Associates must notify and have management approval prior to working through the mealtime.

(Id. Exh. B.) When employees take their meal break on the premises, CHS does not require that they clock out and back in for meal periods; 30 minutes is deducted automatically from their clocked time. (Id. ¶55.) Timekeepers are instructed to maintain a process by which employees can report when they do not receive a full meal period, (id. ¶ 54) and employees are instructed to record time worked during meal periods, to ensure that they are paid for their time worked (id. ¶ 62). The method for reporting such work varies—some departments use exception logs, while others accept handwritten notes,

8

email notice, or verbal reports. (Id. ¶ 50.) Employees are subject to discipline if they fail to accurately record their time worked. (Docket No. 358-1 at 56.) The department manager/timekeeper is trained on how to cancel the Kronos automatic meal deduction, a process known as a "cancel deduct," when an employee reports having worked during a meal period. (Docket No. 386-3 ¶ 65, Exh. E.)

On July 21, 2011, CHS revised its Time and Attendance policy, adding the following language:

> Associates must record the number and length of interruptions during the meal break if they are interrupted. Time keepers would then be advised and adjust the time in Kronos as follows:
>     (a) If there are more than two interruptions, or the total is greater than five minutes, the entire meal period is paid;
>     (b) if there are one or two interruptions and the total is five minutes or less, the Associate is paid for the minutes worked.

(Docket 358-1, Exh. H at 2.)

3.    Name Plaintiffs' Testimony

The name Plaintiffs provided written affirmations and deposition testimony regarding their positions, duties, hours of work, and understanding of workplace policies and practices.

Plaintiff Hinterberger worked as a registered nurse at Buffalo Mercy's medical rehab unit on the 3:00 p.m. to 11:00 p.m. shift, from September 15, 2002 to October 27, 2007. (Docket Nos. 358-4 Ex. P at 7:5-9, 9:14-10:23; 385-5 ¶ 3.) Throughout that time, she was registered with the New York State Education Department. (Docket Nos. 385-1 ¶ 3; 417-1 ¶ 3.) Hinterberger was usually the charge nurse on her shift, and her duties included assessing patients upon admission, patient care, and assigning tasks to other nurses. (Docket Nos. 385-1 ¶ 2; 417-1 ¶ 2.) She, in turn, was supervised by Ms. Terreri, who

9

worked on the day shift and typically left work between 3:00 and 4:00 p.m. (Id. at 10:9-13:1.) If issues arose after Terreri left for the day, Hinterberger would report to a nursing supervisor who was responsible for the entire hospital on the second shift and generally was present on Hinterberger's unit just once per shift. (Docket No. 358-4 Ex. P at 13:2-10, 31:10-19.)

Hinterberger testified that she generally arrived at work up to 30 minutes prior to the start of her shift. She would go to the break room and socialize with other staff until it was time to clock in at 3:00 p.m. She did not perform work prior to clocking in, but approximately three times a year, she would become aware of a crisis on the floor and would go to help. She did not clock in prior to doing so, and did not record her additional time, although she knew her department had an exception log for that purpose. (Id. at 20:6-23:16.)

According to Hinterberger, there was rarely time to take a half-hour break during her shift. Her meal breaks were frequently interrupted to take a doctor's phone call or address a problem with a patient. (Id. at 77:15-78:19.) Sometimes, she would record a missed meal break in the exception log. At other times, she chose not to record a missed break because Ms. Terreri would ask her why it was necessary to work through the break period. Hinterberger attests it was "apparent" to her that Terreri did not want her to use the exception log with frequency, but she could not recall any statements Terreri made or any occasions on which this was made apparent to her. (Id. at 10:10-23, 12:14-13:11, 23:18-25:19, 83:19-84:19, 90:14-92:10.) Hinterberger also testified that, if she did not make an entry in the exception log, Terreri would not know that she had, in fact, worked during her break. (Id. 51:7-22.) Hinterberger, a union member, never filed a grievance or went to

10

human resources about uncompensated work during meal periods. (Id. at 32:21-33:4, 84:21-85:6.)

Plaintiff Weisbecker worked as a LPN at St. Elizabeth's, an assisted-living facility, on the 3:00 p.m. to 11:00 p.m. shift, from April 2006 to January 2008. Her job duties included administering medications, treatments, and doctors' orders. (Id., Exh. Q, 9:15-13:20.) Weisbecker testified that she usually did not have a meal break on her shift (id. at 36:6-37:5), but believes the aides she supervised "made sure they took their breaks" (id. 11:15-13:17), and that employees on other shifts also got a full 30-minute meal break (id. 70:8-23). Weisbecker testified to making a "daily comment" to "whoever was listening" about not getting a lunch break. (Id. at 45:11-47:14.) Typically, no supervisor was on duty on Weisberger's shift, and she never requested that she be paid for a missed break. (Id. at 30:17-31:15, 43:2-9.)

Weisbecker acknowledges she was encouraged to be on the clock when working (id. at 19:5-9), and knew she should not clock in until six minutes before the hour, but she sometimes arrived early and began work before clocking in (id. at 14:20-15:22). She testified that she was told she "had to come in early to get the work done," but could not identify a specific person or conversation in this regard, and also could not recall any specific date or occasion on which she began work prior to clocking in. (Id. 14:17-16:23, 22:14-18.) Later, she stated that "[n]obody needed to tell [her] to start early"; she just "realized" she needed to do so. (Id. at 19:11-20:12.) She was unable to identify any other St. Elizabeth employee who began work before clocking in. (Id. at 86:15-87:4.)

Weisbecker sometimes filled out a document if she worked past the end of her shift,

and assumes she was paid for the additional time. She did not log the times she claims to have worked before punching in or during a meal period, even though she knew she could have done so. (Id. at 48:19-59:1, 146:21-147:23.) Weisbecker never paid attention to how many hours she worked or how many hours she was paid for, so has no idea whether she was paid for all hours worked. (Id. 23:8-25:1.)

Plaintiff Carroll worked as a full-time respiratory therapist at Kenmore Mercy from June 2006 to June 2007. (Id. Exh. R at 13:11-21:16.) She initialed an orientation checklist indicating she understood the "unit routine, including breaks, lunch, including clocking-in and out for lunch and documentation for no lunch required by the department." (Id. 38:12-44:20.) She was to inform her supervisor, Mariella Ceranski, if she worked during lunch (id. 32:6-23, 46:2-11, 80:5-12), and when she did so, she was paid for the meal break (id. 49:3-13). Ceranski worked day shifts and Carroll testified she only reported missed meal breaks if she actually saw Ceranski during or at the end of her own shift; otherwise the department "didn't have anyplace to document it." (Id. 48:2-5, 65:4-22.) Later, however, she confirmed knowing that other employees left notes for Ceranski to document a missed lunch break, and believes that she also left one or two notes. (Id. 48:6-22, 115:4-21.)

Though Carroll's supervisors preferred that she take a full meal break, rather than work during lunch, they did not discourage her from recording work performed during some or all of the meal period, and the hospital did not have a policy against paying overtime. (Id. 118:12-121:6.) Carroll does not know whether any other Kenmore Mercy employees worked during a lunch period without being compensated. She also acknowledged that if an employee did not report having worked during a break, management would not know about it unless a supervisor was present on the floor. (Id. 126:21-129:23.) Carroll is not

seeking money damages, but would like to see policy changes in the medical field. (Id. 130:9-132:11.)

Cynthia Williams worked as a RN in Buffalo Mercy's emergency room from 1999 through January 21, 2005,[7] under nurse manager, Michelle Ford. (Id. Exh. S at 11:9-14:11, 67:15-68:4, 74:8-75:4.) Williams was first assigned to an 11:00 p.m. to 7:00 a.m. shift, and later, to a 12-hour, 7:00 p.m. to 7:00 a.m shift. Ms. Ford rarely worked during those hours, but a house supervisor who was responsible for the entire hospital would appear in the ER two or three times per night, and was available if needed. (Id. at 14:22-21:23.)

Williams worked as charge nurse on her shift on a rotating basis throughout her employment, and consistently during her last year of work, when her "knees got bad." (Id. at 27:13-28:13.) Her duties included patient care and, when she was the nurse in charge, organizing beds for incoming patients and giving assignments to other nurses. (Id.) She was registered with the New York State Education Department during her employment. (Docket Nos. 385-1 ¶ 7; 417-1 ¶ 7.)

According to Williams, because of the immediacy of patient needs in the ER, she and the two other nurses on her shift rarely were able to take a full 30-minute meal break. (Id. at 28:14-31:19.) Williams' employment was governed by a collective bargaining agreement which provided that if she was required, due to workload, to work through a meal period, she would be paid for the time worked. She attests her department did not comply with this provision. (Id. 33:5-36:10.)

Williams did confirm that, at times, there was an exception log at the nurse's station

---

[7] Williams went out on disability thereafter, and while she did not retire until 2006, her last day of work was January 21, 2005.

in which she could record a missed meal break. If the book was not on the unit, she could make a verbal report to Ford or the house supervisor. On occasion, when the house supervisor knew the ER nurses were swamped, she would tell them they would be paid if they needed to work during the meal break. According to Williams, she would, on occasion, request of the house supervisor that she be paid for a missed meal period and, though the supervisor didn't usually say no, there were times when her requests didn't go anywhere. Williams thinks there are a lot of occasions where she did not get paid, but did not check her paystubs to see whether she was compensated for missed meal periods and cannot recall a particular time that she did not get paid. (Id. at 38:8-44:22, 61:11-63:2, 72:17-73:5.) Williams never filed a grievance or complained to human resources about uncompensated work. (Id. at 35:23-36:2.)

Williams further testified that she was not paid for time that she worked after the scheduled end of her shift, even though she remained clocked in to the timekeeping system. She cannot recall a particular occasion on which she was not paid, cannot explain how she knew she was not paid, and did not lodge any complaints about not being paid. (Id. 75:5-84:17.) She later indicated she had misspoken in stating there was a "strict policy" against overtime, and confirmed that she was paid overtime on a number of occasions. (Id. at 96:17-98:5.)

Though Williams maintains that she and the other ER nurses were rarely able to take a meal break, the aides who worked that shift were frequently able to do so. (Id. at 28:14-31:19, 85:7-19.) Williams does not know whether nurses on other shifts in the ER, or elsewhere in the hospital, received uninterrupted meal periods or compensation for missed meal breaks. She is seeking to be compensated for an unspecified number of meal

14

periods. (Id. at 118:2-119:12.)

## III. DISCUSSION

**A.     The Summary Judgment Motions**

1.     Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

 2. CHS's Motion for Summary Judgment on Certain NYLL Claims

CHS is seeking summary judgment only on the NYLL claims of certain Plaintiffs. Nonetheless, a brief discussion of the provisions of both the FLSA and NYLL informs this and other pending motions.

The Fair Labor Standards Act mandates that "employees" receive a minimum wage and overtime pay of one and one-half times the worker's regular hourly rate for each hour worked in excess of forty hours per workweek. 29 U.S.C. §§ 206(a)(1), 207(a)(1) (2002). The FLSA defines an "employee" as "any individual employed by an employer, " subject to certain exceptions. <u>Id</u>. § 203(e)(1). The term "employ" is defined as "to suffer or permit to work." <u>Id</u>. § 203(g).

New York's Minimum Wage Act, like the FLSA, requires employers to pay a minimum wage. N.Y. LAB. LAW § 652.1 (2013). While there is no statutory provision addressing the payment of overtime wages, Department of Labor regulations do mandate that employers pay overtime.[8] Specifically, N.Y.C.R.R. § 142–2.2[9] provides that:

> An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of Section 7 and Section 13 of 29 U.S.C. 201 *et seq.*, the Fair Labor Standards Act of 1938, as Amended . . . . In addition, an employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act, as Amended, . . . overtime at a wage rate of one and one-half times the basic minimum hourly rate.

---

[8] The Labor Law empowers the Commissioner of Labor to appoint a wage board with authority to, *inter alia*, recommend "regulations governing . . . overtime or part time rates." N.Y. LAB. LAW § 655(5)(b).

[9] Plaintiffs cite to N.Y.C.R.R. § 142-2.2, and Defendants contend that § 142-3.2, relating to "employees in nonprofitmaking institutions which have not elected to be exempt from coverage under a minimum wage order" applies. This dispute is of no real consequence here as these regulations are virtually identical.

The regulation defines the term "employee" as "any individual employed, suffered or permitted to work by an employer," subject to certain exceptions. 12 N.Y.C.R.R. § 142-2.14(a).

       a.    *Overtime*

New York's overtime regulation exempts from the definition of "employee" individuals who work in a bona fide executive, administrative, or professional capacity. Id. § 142-2.14(c)(4). This is similar to the FLSA's provision that "employee[s] employed in a bona fide executive, administrative, or professional capacity" are exempt from FLSA overtime requirements. 29 U.S.C. § 213(a)(1). CHS maintains that Plaintiffs Hinterberger and Williams qualify as bona fide professionals under the NYLL and so, are not entitled to, and cannot maintain a claim for, overtime pay.

Where the FLSA's and NYLL's definitions and standards are identical, or nearly so, courts typically apply federal law to claims made under either statute. See, e.g., Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2008) (applying federal law to claims that, under both the FLSA and New York law, defendants were joint employers); Zheng v. Liberty Apparell Co., Inc., No. 99 Civ. 9033, 2002 WL 398663, at *6, n.3 (S.D.N.Y. Mar. 13, 2002) (applying single analysis to claims for overtime wages brought under FLSA and New York law); Oi Kwan Lai v. Eastpoint Int'l, Inc., No. 99-CV-2095, 2000 U.S. Dist. LEXIS 12502, at *9 n.3 (S.D.N.Y. 2000) (applying federal law to retaliation claims brought under FLSA and New York law, as their anti-retaliation provisions are nearly identical). Here, however, there is some divergence.

Under the FLSA, an employee must satisfy both a "salary basis" test and a "duties" test to be considered an exempt professional. 29 C.F.R. §§ 541.2; Auer v. Robbins, 519

U.S.452, 455, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997). New York, in contrast, requires only a duties test—the professional exemption has no salary requirement whatsoever.[10] 12 N.Y.C.R.R. § 142-2.14(c)(4)(iii). That being said, New York's test for the professional exemption is in accord with the duty portion of the FLSA's test:

> In New York:
>
> Work in a bona fide professional capacity means work by an individual:
>
> (a) whose primary duty consists of the performance of work: requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes;

Id. The FLSA's duties test is met by "the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. 541.301(a). Thus, courts considering NYLL overtime claims have applied federal law to conclude that registered nurses, such as Hinterberger and Williams, meet the test for professional employment and so are exempt from New York's overtime provisions, even when they are paid on an hourly basis. See, id. § 541.301(e)(2) ("Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption."); Bachayeva v. Americare Certified Special Servs., No. 12-CV-1466, 2013 U.S. Dist. LEXIS 38740, at *15 (E.D.N.Y. Mar. 20, 2013) (citing Bongat v. Fairview Nursing Care

---

[10] The professional exemption is unique. New York's executive and administrative exemptions parallel the FLSA in that the employee must meet a duties test and also be "paid for his services a salary" at a prescribed minimum rate before the exemptions will apply. 12 N.Y.C.R.R. §§ 142-2.14(c)(4)(i)(e) and (ii)(d).

Ctr., Inc., 341 F. Supp. 2d 181, 187 (E.D.N.Y. 2004) (dismissing NYLL overtime claims with respect to the RN plaintiff and all similarly situated RNs); Gordon v. Kaleida Health, 2012 U.S. Dist. LEXIS 16443, at *14-15 (W.D.N.Y. Feb. 9, 2012) (noting that RNs who are hourly employees are exempt from New York's overtime protection).

Plaintiffs' sole argument in opposition resides in a footnote and posits that employees who "do not qualify as exempt under the FLSA because they were paid on an hourly basis, . . . should also not be exempt from overtime under NYLL."[11] (Docket No. 417 at 1, fn. 1.) This argument is inconsistent with the NYLL's plain text and Plaintiffs offer no authority for interposing a salary requirement where none is otherwise evident. Accordingly, Hinterberger and Williams are not entitled to NYLL overtime protections.

> b.    *Underpaid Wages*

Plaintiffs also contend that, regardless of the Court's determination with respect to overtime pay, Hinterberger and Williams are not exempt from the protection of Section 191 of the Labor Law, which provides for the recovery of wages for all hours worked. Section 191 establishes a schedule for the payment of wages earned by manual workers, railroad workers, commission salespersons, and clerical and other workers. N.Y. Lab. Law § 191(a)-(d). CHS violated this provision, Plaintiffs say, when it suffered or permitted its employees to perform work during meal breaks without compensation.

For purposes of Section 191, the "clerical and other worker" category does not

---

[11] In another footnote, Plaintiffs suggest that because CHS has not provided evidence of Williams's state registration for each year of her employment, there is a question of fact as to whether she was exempt throughout the relevant time period. Williams repeatedly attested to her continuous employment as a registered nurse, and has offered no testimony or evidence that would call into question her ongoing qualifications for professional practice in New York State. Thus, Williams has failed to raise a question of fact in this regard.

19

include "any person employed in a bona fide executive, administrative or professional capacity whose earnings are in excess of nine hundred dollars per week." Id. § 190(7). Prior to January 14, 2008, the applicable income threshold was six hundred dollars. 2007 N.Y. LAWS 304.

As is the case with respect to overtime, Hinterberger and Williams meet the duties test for possible exemption as professional employees. But here, as Plaintiffs correctly note, there is an earnings requirement as well. While the statute does not require that professionals be paid on a "salary basis," the exemption does not apply unless the employee's weekly "earnings" are above the specified threshold. Hinterberger and Williams separated from employment in 2007 and 2006, respectively, so the pre-2008 income threshold of six hundred dollars per week applied throughout their employment.

CHS has submitted payroll records showing that Hinterberger was paid in excess of six hundred dollars per week for all but nine of her 263 weeks of employment from 2002 to 2007, and Williams was paid in excess of six hundred dollars for all but five of the 152 weeks for which she received wages from 2002 to 2006.[12] (Docket No. 385-5 Exhs. C, D.)

Plaintiffs urge that, because CHS concedes Hinterberger and Williams did not meet the six hundred dollar threshold in each week of their employment, they cannot be classified as professional employees for any week, and are entitled to the protections of Section 191 throughout. CHS maintains there is no support for Plaintiffs all-or-nothing

---

[12] According to Williams, her last day of work was January 21, 2005, though she did not officially retire until 2006. Four of the five pay periods in which she received less than six hundred dollars per week post-date her last reported day of work. Similarly, there is one week in 2005 where Hinterberger's "earnings" were 61 cents. Without reaching any conclusion on the merits, it seems unlikely that either of them performed uncompensated work during those weeks.

approach, and reasons that Section 191's weekly earnings requirement necessitates that a week-by-week analysis be conducted. Under this approach, CHS contends, the exemption would apply except for those few weeks in which Hinterberger and Williams earned less than six hundred dollars.[13] Neither side has cited, nor was this Court able to locate, any case discussing the status of employees who meet the duties test for an exemption, but whose earnings may fluctuate because they are paid on an hourly basis. Of the arguments presented, CHS's week-by-week approach is most consistent with the plain text of Section 191. Accordingly, CHS's summary judgment motion is granted with respect to Hinterberger's and Williams's Section 191 claims, and they may maintain their claims only for the few weeks in which they worked, but earned less than six hundred dollars.

c.   *Unlawful Deductions from Wages*

Plaintiffs next argue it would be improper to dismiss the Hinterberger and Williams NYLL claims because they "have claims for unpaid wages under § 193." (Docket No. 417 at 4.) "[B]y not paying Hinterberger and Williams for work performed during meal periods because they did not report that time pursuant to [CHS's] policy, [CHS] unlawfully deducted wages in violation of NYLL § 193." (Id. at 5.) Plaintiffs rely on a Department of Labor opinion letter, dated November 25, 2009, to support their proposition that CHS's failure to compensate them for unreported work during meal breaks constitutes a prohibited "deduction from wages for violating [CHS's] policies." (Id. (citing Docket No. 417-10).) The

---

[13] In short, Hinterberger was an exempt professional 96.6 percent of the time and Williams was an exempt professional 96.7 percent of the time. CHS makes clear that it is not seeking dismissal of the claim with respect to the weeks in which earnings were less than six hundred dollars.

request for a DOL opinion was made by a hotel containing a full-service restaurant.

As CHS correctly observes, Plaintiffs did not assert a Section 193 impermissible deduction claim in their Complaint or Amended Complaint. Even assuming they had, such a claim cannot survive as a matter of law. The DOL letter on which Plaintiffs rely repeatedly confirms that Section 191 is the statutory provision that entitles workers to full payment of wages for all <u>time worked</u>. Section 193, on the other hand, prohibits employers from making deductions from <u>wages earned</u> unless the deduction benefits the employee or otherwise is authorized by law. In this latter regard, the DOL letter advises it would be unlawful for an employer to make deductions from an employee's <u>wages</u> for violating workplace policy. The DOL then cites to two regulations, now repealed, specific to the restaurant industry, 12 N.Y.C.R.R. § 137-2.5, and the hotel industry, 12 N.Y.C.R.R. § 138-3.6. Plaintiffs have not provided any rationale that would justify the extension of this particularized inquiry or the industry-specific regulations to their claims.

Moreover, their argument is contrary to decisions within this Circuit holding that an employer's alleged failure to pay for all hours worked does not constitute an improper deduction from wages for purposes of Section 193. <u>See</u> <u>Church v. St. Mary's Healthcare</u>, No. 11-CV-1198, 2012 U.S. Dist. LEXIS 138338, at *10-11 (N.D.N.Y. Sept. 26, 2012) (section 193 prohibits employers from making unlawful deductions from wages, but does not govern deductions from the number of hours worked; thus, plaintiffs' claim that defendant failed to pay them for hours worked during meal periods is not cognizable under section 193); <u>Ellis v. Common Wealth Worldwide Chauffeured Transp. of NY, LLC</u>, No. 10-CV-1741, 2012 U.S. Dist. LEXIS 40288, at *30  (E.D.N.Y. Mar. 23, 2012) ("Section 193 was intended to place the risk of loss for such things as damaged, spoiled merchandise,

or lost profits on the employer rather than the employee. The provision does not cover failure to pay an employee for time worked.") (internal citation and quotation marks omitted).

* * * * * *

For the reasons stated, CHS's motion for summary judgment on the Hinterberger and Williams NYLL claims is granted and the claims are dismissed, except that the Section 191 claim survives for those weeks not included in CHS's motion, in which these Plaintiffs worked and earned less than six hundred dollars.

3.   Plaintiffs' Motion for Summary Judgment on Liability

Plaintiffs seek summary judgment on the issue of CHS's liability, under both the FLSA and NYLL, for its system-wide policy of "only pay[ing] employees for work performed during meal periods that the employees themselves report . . . ."[14] (Docket No. 466-1 at 1.) CHS "adamantly dispute[s]" Plaintiffs' characterization of its policy and urges that the factual dispute over "plaintiffs' (mis)characterization . . . mandates the denial of summary judgment." (Docket No. 486 at 1.)

It is undisputed that, with certain limited exceptions noted above, CHS's hourly employees are subject to a 30-minute meal period automatic deduction. Courts in this Circuit have expressly recognized that automatic meal deduction policies are not per se illegal. Wolman v. Catholic Health Sys. of Long Island, Inc., 853 F. Supp. 2d 290, 300-301 (E.D.N.Y. 2012), aff'd in  part and rev'd in part on other grounds sub nom, Lundy v. Catholic Health Sys. of Long Island, Inc., 711 F.3d 106 (2d Cir. 2013); see also Fengler v.

_____

[14] Plaintiffs have not moved for summary judgment with regard to the alleged rounding policy.

Crouse Health Found., Inc., 595 F.Supp.2d 189, 195 (N.D.N.Y.2009) ("[T]he mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal breaks in and of itself does not violate the FLSA.").

Even more specific to this case, federal courts have found it is not per se unlawful for an employer to "shift the burden to their employees" to report that they worked during an unpaid meal break. Wolman, 853 F. Supp. 2d at 301 ("there is no duty to ensure that employees are not working through unpaid meal breaks, and employers utilizing an automatic meal deduction policy may legally shift the burden to their employees to cancel the automatic deduction if they work through an unpaid meal break") (citing Frye v. Baptist Mem'l Hosp., Inc., No. 07-CV-2708, 2010 U.S. Dist. LEXIS 107139, at *20 (W.D. Tenn. Sept. 27, 2010) (describing the shift as a "natural consequence of any employer's adopting an automatic deduction policy")).

Regardless of who is responsible for recording time worked, it is the employer's duty to "maintain accurate records of its employees' hours." Kuebel v. Black & Decker, 643 F.3d 352, 263 (2d Cir. 2011) (citations omitted). CHS's Time and Attendance Policy provides that each manager is responsible for "auditing and approving the time records for all their associates . . . [and is expected to] correct any hours not recorded or recorded incorrectly before submitting the time to payroll." (Docket No. 386-6 at 1, 3.)

Plaintiffs concede that CHS's automatic deduction policy and reliance on employee reporting of time worked during meal periods is lawful on its face.. (Docket No. 495 at 4.) But they maintain that summary judgment is warranted because, contrary to its written policy, CHS pays for work performed during meal periods only when an employee affirmatively reports that time. Thus, it is CHS's alleged "hands-off implementation" that

24

Plaintiffs claim violates "the FLSA's requirement that employers police . . . [their employees] to ensure that all time worked is captured." (Id.)

"To establish liability under the FLSA on a claim for unpaid overtime,[15] a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." Kuebel, 643 F.3d at 361 (citations omitted); see also, 29 C.F.R. § 785.11 (where an "employer knows or has reason to believe that [an employee] is continuing to work[,] the time is working time"). "The relevant knowledge is not 'I know the employee was working,' but 'I know the employee was working and not reporting his time.'" White v. Baptist Mem'l Health Care Corp., 699 F.3d 869, 875 (6th Cir. 2012) (citation and alteration omitted) (emphasis supplied). Thus:

> Where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the FLSA. . . . However, an employer who is armed with this knowledge cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation. Constructive knowledge can be imputed to the employer when it has reason to believe that its employee is working beyond his shift. Moreover, when an employer's actions squelch truthful reports of overtime worked, or where the employer encourages artificially low reporting, it cannot disclaim knowledge.

Stanislaw v. Erie Indem. Co., No. 07-1078, 2012 U.S. Dist. LEXIS 19032, at *10-11 (W.D. Pa. Feb. 15, 2012) (internal citations, quotation marks, and alterations omitted).

When, as here, the moving party has the burden of proof at trial, that party must

---

[15] Although there is limited authority on compensation for missed meal breaks, which may involve both overtime and non-overtime hours, two Circuit Courts presented with the issue have concluded that "[a] claim for non-payment of work during an established mealtime is analytically similar to an unpaid overtime claim." Hertz v. Woodbury County, 566 F.3d 775, 783 (8th Cir. 2009) (quoted in White v. Baptist Mem'l Health Care Corp., 699 F.3d 869, 873 (6th Cir. 2012).

affirmatively show the absence of a genuine issue of material fact; in short, that no reasonable jury could find for the non-moving party.

Plaintiffs contend both that CHS had actual knowledge of time worked, but chose not to pay unless the employee reported the time, and also that, for various reasons, it had constructive knowledge of unreported work during meal periods. (Docket No. 466-1 at 21-22.) CHS acknowledges that its employees are busy, and that some occasionally perform work during meal periods, but maintains that its policy and practice is to pay for all time worked of which it has knowledge even when an employee does not report the time worked using the procedures implemented for that purpose. (Docket No. 486 at 9-11, 15.) As explained below, summary judgment is denied because reasonable minds could differ as to whether CHS had actual or constructive knowledge of unreported, uncompensated time.

     a.   *NDNQI Survey Data*

The National Database of Nursing Quality Indicators ("NDNQI") collects survey data from nurses employed at participating hospitals. Each of CHS's hospitals participated in NDNQI's annual "RN Survey" during at least one year from 2006 to 2011.[16] (Docket No. 477, Exh. L-1.)  RNs who worked shifts of 8 hours or more were asked to report whether, during the shift they last worked, they were "Unable to sit down for [meal] break," "Able to sit down, not free of patients," or "Able to sit down, free of patients." (Id.) They were also asked whether the meal break on their last shift was "None," "<30 min," or ">=30 min."[17]

CHS produced the NDNQI survey results to Plaintiffs in discovery. Plaintiffs now

---

[16] There are three years in which just one of four hospitals appear to have participated, and no years in which all of them participated.

[17] The question was presented in this manner from 2007-2011. For the 2006 survey, the categories were "<=15 min," "16-30 min," or ">30 min."

26

present them as evidence of CHS's actual or constructive knowledge of their contents—i.e., the results were "available to [CHS], and [CHS] was or could have made itself aware " of the possibility that employees were working during more meal periods than they were reporting. (Docket No. 466-1 at 4.)

CHS first urges that, because Plaintiffs have not authenticated the survey results by way of an attestation of personal knowledge, they "are inadmissible as a matter of law" and cannot be used on summary judgment to "attempt to establish knowledge of unpaid meal breaks."  (Docket No. 486 at 15.) Federal Rule of Civil Procedure 56(c)(2) provides that, on summary judgment, "[a] party may object that the material cited to support or dispute a fact *cannot be presented in a form* that would be admissible in evidence," and so should be excluded. (emphasis added.) This Rule simply provides that the evidence must be capable of presentation in admissible form at the time of trial; it does not require that the materials be presented in an admissible form on summary judgment.

CHS does not contend it would be impossible for Plaintiffs to authenticate the survey data at trial or that it would otherwise be inadmissible under the Federal Rules of Evidence for the purpose of establishing CHS's knowledge. Because Rule 56(c)(2) does not contemplate the exclusion of evidence based solely on the form of presentation, the Court will consider whether the data establishes CHS's liability. See Sobel v. Hertz Corp., 291 F.R.D. 525, 532 (D. Nev. (2013) (Rule 56(c)(2) focuses on admissibility of evidence's content, not its form); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (on summary judgment, party need not produce evidence in a form that would be admissible at trial).

CHS urges the data does not establish its actual or constructive knowledge. Among

27

other things, it notes that the survey was distributed only to RNs working a shift of 8 hours or more in a hospital setting, whereas the FLSA opt-in plaintiffs include the much broader group of RNs, LPNs and respiratory therapists working in hospitals, adult homes and nursing homes on various schedules.[18] The surveys are anonymous and undated, so it would be impossible to identify the participant or the date and time of his or her "last shift worked." In sum, CHS argues, these limited questions, presented to a discrete and relatively small group of respondents, is not a sufficient basis from which it could draw any informed conclusion about its many and varied employees and worksites.

Plaintiffs urge otherwise, and maintain that by comparing the frequency of interrupted breaks reported in the surveys with timekeeping records showing the overall frequency with which automatic meal deductions were cancelled, CHS "was or could have made itself aware" that employees were performing uncompensated work.

This Court is not persuaded that the survey data is conclusive evidence of CHS's actual or constructive knowledge. The value of comparing the one-shift experience of a discrete group of individuals (RNs) working in a particular setting (acute care in one, two, or three facilities), to timekeeping reports covering multiple job titles and work settings over an extended time period, is debatable at best. The survey data does not sufficiently establish, for purposes of summary judgment, that CHS knew or should have known any particular Plaintiff, or its employees generally, were performing uncompensated work. Camilotes v. Resurrections Health Care Corp., 286 F.R.D. 339, 352-53 (N.D. Ill. 2012) (finding constructive knowledge not established by NDNQI survey results where there is

---

[18] The Court further notes that Plaintiffs' putative Rule 23 class includes not just the FLSA opt-in plaintiffs, but virtually every nonexempt CHS job title at every facility.

no indication the opt-in plaintiffs had experiences comparable to the self-selected nurses surveyed; defendant's knowledge must be established by evidence representative of plaintiffs' specific experiences).

At least one Circuit Court has held that, even where records to which an employer has access indicate that particular employees are working during lunch periods, it is not necessarily sufficient to establish constructive knowledge that the employees were not reporting their time. Hertz v. Woodbury County, 566 F.3d 775, 781-82 (8th Cir. 2009). The Hertz court noted that the FLSA standard for constructive knowledge is whether the employer "should have known," not whether it could have known, and went on to consider whether it would have been reasonable to require the employer to review dispatch records for payroll purposes to determine whether employees were working in excess of their scheduled hours. Id. at 782. It found the proposition unreasonable, particularly where, as is the case here, the employer had procedures for employees to report their additional time worked. Id.

The NDNQI data at issue here is far more attenuated. The documents in Hertz were the employer's own non-payroll business records from which it was possible to glean the on-duty and off-duty status of specific employees. Here, Plaintiffs rely on a sampling of anonymous, unverified data that was reported to a third-party. There is no indication here that Plaintiffs had no means of reporting work during lunch. While they repeatedly characterize CHS's procedures as a "hodgepodge," they also concede that CHS supervisors and managers implemented reporting procedures at the department level. (e.g., Docket No. 466-1 at 21.)

29

b.      *Other Written and Unwritten Policies*

Plaintiffs also point to a number of documents and practices they maintain demonstrate CHS's knowledge of unreported and unpaid work. They contend, for instance, that a September 2006 "Kronos Timekeeper User Manual" in use at CHS (Docket No. 466-10) discouraged timekeepers from recording work they know employees had performed during meal periods (Docket No. 466-1 at , 21). Under the heading "Skip Lunch," the manual provides instructions for cancelling the automatic lunch deduction when employees "worked through their lunch, due to extreme volume and business." The following notice also appears:

> This is only used in manager approved, high volume situations. If you never used it before, do NOT use it now. This is not a policy standard.

Plaintiffs offer this notice as proof that CHS had a policy of paying for work it knew was performed during meal periods only if an employee reported the time.

Mary Farello, CHS's Vice President, Human Resource Services, attests that the "instruction not to use the cancel deduct if it was not used previously merely instructed timekeepers who supervised nonexempt employees who did not frequently perform work during their meal periods to continue restricting work during meal periods." (Docket No. 386-3 ¶ 69.) In other words, employees should not be permitted to skip lunch unless a high volume circumstance required it.

On its face, this Kronos notice is consistent with CHS's Time and Attendance Policy and does not, without more, evidence a policy to undermine the official policy of paying for all time worked.

Plaintiffs next offer four internal CHS documents as additional evidence of policies

or practices that contradict or undermine the official policy of paying for all hours worked, thereby establishing its knowledge for purposes of liability.

First are minutes from a department meeting at one CHS hospital stating that: "an employee that is scheduled for 6 hours or more, must take their 30 minute lunch break, do not skip the lunch or expect to be paid for the missed lunch time. This is a Labor Law requirement." (Docket No. 466-11.) CHS responds with a declaration from the manager who ran the meeting. She avers that the minutes are not a verbatim transcript of what was said, denies telling employees they would not be compensated for time worked, and attests that her actual statement was to the effect of "if you have been working through your lunch in order to be paid an extra 30 minutes, please stop doing this." She further instructed that employees limit their use of overtime and get authorization prior to working overtime. (Docket No. 486-3 at 26-28.)

Second is a portion of an untitled document relating to a particular unit at an unidentified facility. It states, under the heading "Budget:"

> I must watch every dollar that is spent on the MRU. I understand that the census has been low and that you may not get your dinner and I always want you to put patient safety first but I do have a budget that I must adhere to just like you do at home so please be mindful of that.

(Docket No. 466-11.) Plaintiffs urge this document constitutes an acknowledgment that employees would be working during meal periods but, due to the budget, would not be paid. CHS does not offer evidence in response, but maintains the text's clear import is that employees were, in fact, being paid when they worked through lunch, and were being asked to curtail additional hours to the extent possible due to the impact on the department's budget.

Third, Plaintiffs point to a department memo from a second CHS hospital discussing the frequency with which employees were forgetting to swipe in and out at the beginning and end of their shifts, and report missed breaks and lunches. The memo refers to CHS policies and procedures and the need to follow them in order to be paid accurately. (Id.) CHS responds with a declaration from the manager who authored the memorandum. She attests that she checks her department time records and, if an employee she observed working during a meal period did not report that time, she would cancel the meal deduction and instruct the employee on future reporting. The manager further avers that the memo was issued when she introduced the use of an exception log, rather than verbal reporting, for documenting time worked during meal periods, and its purpose was to encourage accurate reporting under the new procedure. (Docket No. 486-3 at 20-21.)

The fourth document, dated September 13, 2005, is directed to "All Associates" from "Human Resources" on the issue of "Clocking in and out, Meal Breaks." (Docket No. 466-11.) Plaintiffs refer to the following language as evidence of CHS's knowledge:

> All associates working six (6) hours or more **MUST** take an uninterrupted meal break. There can be no exceptions.

(Id.) In response, CHS refers to a declaration from the memo's author, who attests that she sent the memo to CHS's long-term care facilities only, and the purpose of that portion of the memo was simply to encourage employees to take the full 30-minute meal break to which they were entitled. (Docket No. 486-3 at 16-17.)

To the extent Plaintiffs contend these documents establish there was a system-wide policy to circumvent or undermine the official Time and Attendance Policy, material questions exist that preclude summary judgment. On their face, it is evident that three of

these documents were confined to a specific department, with at least two of them issued at a single work site only, and that the fourth was distributed to one type of facility only. To the extent the documents suggest CHS knew employees sometimes performed work during meal periods, CHS has conceded as much. However, the documents do not speak to, much less establish, the second requisite factor for liability—i.e., that CHS knew and/or intended its employees would not be paid for such work. To the contrary, the documents encourage employees to take their breaks, and to properly report their time when they cannot do so. In sum, Plaintiffs' evidence is not sufficient to establish liability and, even assuming it were, the sworn testimony offered by CHS raises material questions of fact in this regard.

Lastly, Plaintiffs maintain they were subject to an unwritten policy whereby: "if I and the other hourly employees I worked with ate any food during our shift, management considered that a meal break, even though we did not get a full, uninterrupted 30-minute meal break." (Docket No. 466-2 ¶ 11.) In response CHS has submitted declarations from several managers who attest that under CHS's policy, simply eating some food during a shift does not constitute a meal break, they know they must cancel the automatic meal deduction if an employee does not get a full meal break, and they had procedures in place in their respective departments to ensure employees receive a full break whenever possible, and payment for the time worked when they do not. (Docket No. 486-1 ¶ 11.)

Plaintiffs characterize the declarations as conclusory denials "insufficient to dispute [CHS's] knowledge" of unpaid work. (Docket No. 495 at 14.) The Court disagrees. The CHS declarations come from managers who supervised certain of the name Plaintiffs as well as some of the putative plaintiffs who state the unwritten policy was applied at their

worksite. Resolving these contradictory statements requires credibility determinations by a trier of fact.

c.   <i>The Absence of Evidence</i>

Plaintiffs next contend liability is properly imputed to CHS based on the absence of certain evidence. As a preliminary matter the Court notes that, because Plaintiffs bear the burden of proof at trial, they cannot establish entitlement to summary judgment by simply citing to an absence of evidence; they must affirmatively show that no reasonable jury could find for CHS on the issue of liability.

Plaintiffs' first argument relates to CHS's 2011 addition of the following language to its Time and Attendance Policy:

> Associates must record the number and length of interruptions during the meal break if they are interrupted. Time keepers would then be advised and adjust the time in Kronos as follows:
>     (a) If there are more than two interruptions, or the total is greater than five minutes, the entire meal period is paid;
>     (b) if there are one or two interruptions and the total is five minutes or less, the Associate is paid for the minutes worked.

(Docket 358-1, Exh. H at 2.) Plaintiffs assert, in cursory fashion, that "defendants have produced no records demonstrating that [employee reporting of the number and length of interruptions] actually happens." (Docket No. 466-1 at 21.) They do not identify the records to which they refer (exception logs, pay records, etc.), do not indicate whether they requested the unidentified records in discovery, and offer no explanation as to how and why their purported absence gives rise to the conclusion that CHS knew, or should have known, its employees were performing work for which they were not paid. In short, they have not met their burden on summary judgment.

In a similar vein, Plaintiffs assert that CHS is liable under the FLSA because it

34

"conducts no audits or other investigations concerning time recording to inquire and ensure that all time worked is recorded and paid." (Id.) This "fact" is based solely on an attorney affirmation that: "Defendants have not produced any evidence that they conduct any audits concerning time recording to inquire and ensure that all time worked is recorded and paid." (Docket No. 466-51 ¶ 51.) As a proposed basis for imposing liability, Plaintiffs' "evidence" suffers from the same deficiencies as the prior argument. And even were that not the case, CHS has come forward with declarations from managers stating it is their practice to examine timekeeping records for accuracy in accordance with CHS policy, and to correct for any errors they are notified of or become aware of. (Docket No. 486-3.) This evidence is sufficient to raise a material question.

d.   *The Absence of Procedures and Training*

Plaintiffs also maintain that CHS "failed to implement any system for accurately recording work during meal periods, instead relying on a hodgepodge of methods implemented at the lowest supervisory level." (Docket No. 466-1 at 21.) They point to a Declaration by Mary Farallo, CHS's Vice President for Human Resources, who stated:

> The reporting of work performed during meal periods is at the discretion of the manager or supervisor. Some departments use exception logs, others use handwritten notes, others use email, while still others rely on verbal reports.

(Docket No. 466-5.) Plaintiffs do not contend that managers can decide whether or not they will implement reporting procedures. What they appear to suggest instead is that, because CHS did not promulgate a uniform reporting method for use by every job title in every facility, it should have known the methods its managers implemented would result in unreported and uncompensated work. Plaintiffs' opinion in this regard is not a factual

35

showing sufficient to meet its burden.

In a related argument, Plaintiffs contend that CHS failed to train employees on reporting missed and interrupted meal periods. (Docket No. 466-1 at 22.) They offer their own sworn statements and those of several putative plaintiffs. Some attest to receiving no training, while others knew their departments' procedures for reporting work performed during meal periods, but claim they were discouraged from using those protocols. (Docket No. 466-5 ¶ 10.) In response, CHS offers exhibits and testimony it contends create material factual disputes. For example, Plaintiff Carroll, who testified that she was not informed during her orientation of departmental procedures for reporting missed and interrupted lunches (Docket No. 466-12 at 157:9-20), had initialed a Department Specific Orientation Checklist confirming that she: "Verbalize[d] understanding of unit routine including breaks/lunch. Including clocking in and out for lunch, and documentation for no lunch required by the department." (Id. at 38:8-42:8; Docket No. 386-2). Similarly, though Carroll averred that she was not instructed at any time during her employment of her department's reporting procedures, she stated at the same deposition that she knew she was to make a report to her supervisor when she worked during lunch, and when she did so, she was paid for that time. (supra, at 12.) CHS also has submitted declarations from department managers, some of which supervised certain of the name and putative plaintiffs who offered statements. The managers attest that they established department protocols to ensure employees received a full meal period whenever possible, and trained employees to record missed or interrupted breaks so they would be compensated when they did not get a full 30-minute break. (Docket No. 486-3.) In sum, CHS has succeeded in raising material questions that must be resolved by a trier of fact.

36

e.    *Manager Observations*

According to Plaintiffs, "[e]mployees performed work during meal periods, and the work was performed on [CHS's] premises and in plain sight." (Docket No. 466-1 at 21.) Plaintiffs offer their own testimony and declarations from putative plaintiffs that CHS had actual knowledge of work performed during meal breaks for which employees were not paid. (Docket No. 466-2 ¶ 7.) The Court first notes that, though supervisory personnel were available at each name Plaintiffs' facility who could be contacted in the event a problem arose, there was little to no direct supervision in their respective departments during their scheduled shifts. For example, Plaintiff Hinterberger acknowledged that her supervisor worked a different shift and would not know she had not received a full meal break unless she reported it on the log. Moreover, three of the four name Plaintiffs' supervisors have declared that they are not generally present to observe Plaintiffs' work and so rely on the reporting procedures they have in place, and have cancelled the automatic deduction for all reported time, as well as for any unreported time they became aware of through other means. (Docket No. 486-3 at 33-38.) Thus, disputed questions of fact exist.

Certain of the putative plaintiffs state that CHS "expected and knew that the employees continued to work through some or all of their lunches to take care of patients . . . [and] they saw the work being done . . . [but] did not seem concerned about employees missing meal periods and not getting paid for the time." (Docket Nos. 466-19, -20, -22 through -31, -33, -35, -37 through -44, -47, -48, -49). Missing from each of these conclusory statements is any declarant's averment that they were seen working during a lunch period and were not paid for that time, or that they have personal knowledge of any other employee performing work during lunch in plain sight of their supervisor for which

they were not paid. Absent factual testimony, conclusions about what CHS "knew" or seemed "concerned about" are not a sufficient basis for summary judgment.

Some putative plaintiffs did provide more specificity, attesting that they were not paid for work performed during meal breaks even after their managers were informed of or observed such work. (Docket Nos. 466-21, -32, -34, -36, 46, 50.) In response, CHS points to declarations from the affiants' supervisors and/or employees working in the same job title in the same department or facility. (See e.g., Docket Nos. 116-7 at 32-36, 54-55; 397-3 at 12-13; 486-3 at 5-6, 9-12, 14-15; 116-4 at 46; 386-2 at 2-3, 10-11, 22-23, 26-27, 30-31.) The manager testimony is essentially the same as that of name Plaintiffs supervisors, with some adding that they use staggered lunches and work coverage assignments to ensure employees can take uninterrupted meal periods. Co-workers variously attest that they have never been asked to work off-the clock or discouraged from reporting time worked during meals, there are procedures in place in their department for reporting such work, they have been paid for all hours worked, and their meal breaks are scheduled and/or supervisors and fellow employees cooperate so that uninterrupted meal breaks can be taken. In sum, the parties have provided conflicting testimony of the question of whether CHS knew or should have known that its employees were performing work and not being paid for that time. It will be up to the trier of fact to determine, on a department-by-department or perhaps an employee-by-employee basis whether CHS had actual or constructive knowledge of unpaid work performed for its benefit.

      f.    *Duty to Monitor the Workplace*

Plaintiffs cite a number of cases for the proposition that CHS has a legal duty to exercise reasonable diligence in the workplace, and had it done so here, it could have

discovered that employees were performing work during meal periods that they were not reporting. They urge the Court to find constructive knowledge based on CHS's failure to monitor the workplace and conduct inquiries to ensure that its employee reporting system was capturing all hours worked. (Docket Nos. 466-1 at 9-11, 15-17; 495 at 2-7.)

The cases Plaintiffs rely on are readily distinguished because they involve circumstances where the employer either had actual knowledge of a labor law violation, had promulgated a "no overtime" policy, or had prevented employees from reporting overtime hours. See, e.g., Kuebel, 643 F.3d at 356-57 (finding plaintiff raised genuine issue of fact as to employer's knowledge where he testified, inter alia, that supervisors told him not to put more than forty hours on time sheet no matter how many hours he worked, and, after complaining to supervisor about uncompensated work, was told employer cannot afford overtime); Chao v. Gotham Registry, Inc., 514 F.3d 280, (2d Cir. 2007) (rejecting employer's contention that, because it required employees to get advance authorization before working overtime, unauthorized overtime did not constitute work within meaning of FLSA; employer had knowledge of work through employee time sheets and could not rely on its policy alone to avoid liability); Reich v. Dep't of Conservation & Natural Res., 28 F.3d 1076 (11th Cir. 1994) (where employer had conducted study to determine effectiveness of no overtime policy, knew overtime was required to properly perform duties, and possessed information showing that certain employees were not reporting all hours worked, simply restating its "no overtime policy" was not sufficient to avoid liability); Gulf King Shrimp Co. v. Wirtz, 407 F.2d 508, 512-14 (5th Cir. 1969) (finding employer knew, or with reasonable diligence should have known, that minors were working on its premises where, inter alia, it had been warned twice by Labor Department investigators that minors

39

had been discovered working there, and all work was performed under direct company supervision in open work area where "everyone in it could see everyone else").

In each case involving employer policies against working or reporting overtime, the deciding court cited 29 C.F.R. § 785.13:

> [I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

See Kuebel, 643 F.3d at 365; Chao, 514 F.3d at 288; Reich, 28 F.3d at 1083. Each court reasoned that, when an employer directs employees not to work overtime or states they will not be paid for overtime, it cannot avoid liability by merely promulgating a "no overtime" policy; the employer must take steps to ensure its employees actually comply by, for example, imposing penalties for engaging in prohibited work. In short, an employer that does not want work to be performed has an affirmative duty to see that it is not performed.

At all relevant times, CHS had a Time and Attendance Policy which acknowledged that its employees may experience a missed or interrupted lunch. Though CHS encouraged employees to take their breaks, it also instructed its timekeepers on how to cancel the automatic meal deduction, and directed its supervisors to put procedures in place for reporting work performed during meal periods.

In one of Plaintiffs' cited cases, a district court construed a similar timekeeping system as a prohibition against unauthorized overtime during meal periods. In DeMarco v. Northwestern Mem'l Healthcare., the hospital's policies included a directive to take uninterrupted meal breaks, and provided procedures for cancelling the automatic deduction in the event of missed or interrupted meals. No. 10-CV-397, 2011 U.S. Dist. LEXIS 88651

40

(N.D. Ill. Aug. 10, 2011). After characterizing this system as a prohibition against unreported work, the district court reasoned that 29 C.F.R. § 785.13 imposed a duty on the hospital to "make every effort to ensure that DeMarco complied with those directives." Id. at *41 (citations and internal quotation marks omitted). Concluding that a reasonable jury could find the hospital did not do enough to ensure employee compliance with timekeeping procedures, the court denied the hospital's motion for summary judgment.

Plaintiffs urge the Court to apply the DeMarco analysis here and grant summary judgment on liability due to CHS's inability to show that it monitored managers, conducted surveys or audits to measure unpaid work, assessed the effectiveness of employee training, or made any other inquiry to determine whether its employees were following its policies and procedures. The Court does not agree that the CHS Time and Attendance Policy is properly characterized as an employer-promulgated prohibition against work, and so declines to adopt the DeMarco reasoning here.

Though federal law does not require that CHS provide its employees meal periods and breaks, state law does. See N.Y. LAB. LAW § 162. Directives or policies that notify employees of their legal entitlement to a meal break, and to compensation if they are "suffered or permitted" to work during the meal period, are, in this Court's view, readily distinguished from prohibitions that cap the total hours of work that will be permitted or paid for. It is undisputed here that CHS imposed no such cap and that each CHS entity has daily or weekly thresholds after which its nonexempt employees are entitled to overtime pay. The fact that employees are responsible for reporting their time worked during meal periods does not render CHS's policies a prohibition against work within the meaning of 29 C.F.R. § 785.13. Indeed, several courts have confirmed that requiring employees to

41

take affirmative action to ensure payment for time worked during meal breaks does not support a common theory of statutory violations. See Frye, 2010 U.S. Dist. LEXIS 107139, at *20-21; Camesi v.Univ. of Pittsburgh Med. Ctr., No. 09-CV-85, 2011 U.S. Dist. LEXIS 146067, at *15 (W.D. Pa. Dec. 20, 2011) (collecting cases and noting that, under prevailing view, an employer's default system under which automatic deductions for meal breaks are made does not constitute a unified policy of FLSA violations capable of binding a class action).

In addition, "[w]hen the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." White, 699 F.3d at 876 (citations omitted) (granting hospital's motion for summary judgment on nurses' meal break claims). Several Circuit Courts, in addition to the Sixth Circuit in White, have acknowledged the established principle that an employer with actual or constructive knowledge of hours worked cannot avoid liability under the FLSA, but then expressly declined to place the onus on employers to ferret out work that is not reported under its reasonable procedures. See Hertz, 566 F.3d at 784 (police officers who were required to submit paperwork for overtime pay had burden to show they performed work during uncompensated meal period; they were in best position to do so and holding otherwise would "perversely incentivize employers to keep closer tabs on employees during their off-duty time"); Newton v. City of Henderson, 47 F.3d 746, 749-50 (5th Cir. 1995) (reversing summary judgment in favor of employee officer who was required to accurately report hours worked, was paid for all hours he reported, but sought compensation for unreported work time; officer did not produce sufficient evidence regarding employer's knowledge, and

42

it was reasonable for supervisors to rely on officer's payroll submissions "as a reliable indicator of the number of hours worked"); <u>Forrester v. Roth's I.G.A. Foodliner, Inc.</u>, 646 F.2d 414, 414 (9th Cir. 1981) (affirming grant of summary judgment to employer where store employee was required to  report overtime on time sheets, was paid for all hours he reported, and did not raise material issue of fact as to employer's knowledge). Accordingly, the Court rejects Plaintiffs' contention that CHS is liable under the FLSA and NYLL as a matter of law on the ground it has a duty to "make every effort" to discover whether employees are accurately reporting all time worked. <u>See</u> <u>Wolman</u>, 853 F. Supp. 2d at 301 ("there is no duty to ensure that employees are not working through unpaid meal breaks").

Because material questions of fact exist as to CHS's actual or constructive knowledge of unreported, unpaid time worked, Plaintiffs' request for a finding of FLSA liability with regard to CHS's meal break policy is denied. Plaintiffs urge that their NYLL claims are to be considered under the same standard as their FLSA claims. Thus, for the reasons already stated, the Court denies summary judgment on liability as to the NYLL meal break claims, as well.

**B.**   **The Motions for Certification and Decertification**

As previously noted, Plaintiffs have moved for class certification of their NYLL claims, and for final collective action certification of their FLSA claims. CHS has moved to decertify the conditionally certified FLSA collective action.

In determining whether class/collective treatment is warranted here, the federal and state law claims must be considered separately, even if a single analysis could ultimately

be applied to the merits.[19] Rule 23 of the Federal Rules of Civil Procedure governs whether Plaintiffs may pursue their NYLL claims as representative parties on behalf of class members. The FLSA has its own standard, enacted prior to the current Rule 23, which provides for the maintenance of a collective action, a statutory creation akin, but not identical to a class action. 29 U.S.C. § 216(b). Eldred. v. Comforce Corp., No. 08-CV-1171, 2010 U.S. Dist LEXIS, at *41 (N.D.N.Y. Mar. 2, 2010) (Rule 23's requirements do not apply to court's approval of collective action under FLSA). The Court will address the more procedurally exacting Rule 23 analysis first.

1.    Certification of State Law Claims under Federal Rule of Civil Procedure 23

Plaintiffs have proposed Rule 23 classes consisting of all CHS hourly employees employed during the period May 22, 2002 to the present who were subjected to CHS's allegedly unlawful policies. The proposed classes would include approximately 21,000 individuals. (Docket Nos. 357 at 5-6, fn. 3; 386-3 ¶ 38.)

a.    *Standard of Review*

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." Califano v. Yamasaki, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2009, cert. denied, 132 S. Ct. 368, 181 L. Ed. 2d 234 (2011). The Supreme Court has advised that a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that

---

[19] The parties agree that the FLSA standard for assessing liability on Plaintiffs meal break and rounding claims also applies to the NYLL claims.

the prerequisites of Rule 23(a) have been satisfied." <u>Gen. Tel. Co. of the Southwest v.</u> <u>Falcon</u>, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). "A district judge must assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit." <u>In re</u> <u>Initial Pub. Offering Sec. Litig.</u>, 471 F.3d 24, 42 (2d Cir. 2006). It is understood that this Rule 23 inquiry may overlap with the merits of the underlying claims. <u>Wal-Mart Stores, Inc.</u> <u>v. Dukes</u>, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). When this occurs, courts are to consider the merits questions only to the extent "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[20] <u>Amgen Inc. v.</u> <u>Conn. Ret. Plans & Trust Funds</u>, 133 S. Ct. 1184, 1195, 185 L. Ed. 2d 308 (2013).

Rule 23(a) sets out four threshold requirements for certification:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
  (1) the class is so numerous that joinder of all members is impracticable;
  (2) there are questions of law or fact common to the class;
  (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
  (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Here, Plaintiffs contend that CHS relies on its "hourly workforce to provide urgent and around-the-clock services at their locations, including hospitals and long-term care facilities, but maintain uniform, corporate policies that deprive these hourly employees of

---

[20] Findings of fact for purposes of Rule 23 are not binding on the trier of facts on the merits. <u>In re</u> <u>Initial Pub. Offering Sec. Litig.</u>, 471 F.3d at 41.

45

compensation for time [CHS] suffers or permits them to work." (Docket No. 357 at 1.) CHS

apparently concedes that the proposed classes Plaintiffs describe would meet Rule 23(a)'s

numerosity and adequacy of representation requirements. Thus, if Plaintiffs can

demonstrate that the proposed classes also meet the commonality and typicality

requirements, the Court must go on to determine whether this action is one of three types

specified in Rule 23(b). Plaintiffs contend their claims satisfy Rule 23(b)(3), which permits

the maintenance of a class action if:

> the court finds that the questions of law or fact common to class members
> predominate over any questions affecting only individual members, and that
> a class action is superior to other available methods for fairly and efficiently
> adjudicating the controversy.

Rule 23(b)(3). The analytical principles that apply to Rule 23(a) also apply to 23(b), so

Plaintiffs must show, through evidentiary proof, that the provision they rely on is satisfied.

The predominance requirement is meant to "tes[t] whether proposed classes are

sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v.

Windsor, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).

> If anything, Rule 23(b)(3)'s predominance criterion is even more demanding
> that Rule 23(a). Rule 23(b)(3), as an adventuresome innovation, is designed
> for situations in which class-action treatment is not as clearly called for.

Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013) (citations and

quotation marks omitted).

CHS maintains that Plaintiffs have failed to establish Rule 23(a)'s commonality and

typicality requirements for either proposed class, and furthermore, have not demonstrated

that Rule 23(b) is satisfied.

46

b.    *Analysis*

Under Rule 23(a)(2), Plaintiffs must show that "there are questions of law or fact common to the class." The Supreme Court has observed this language is easy to misread since:

> [a]ny competently crafted class complaint literally raises common "questions." . . . What matters to class certification . . . is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Dukes, 131 S. Ct. at 2551 (quoting, Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. REV. 97, 131-32).

Rule 23(a)(3) requires a showing that claims or defenses of the named plaintiffs are typical of those of the class as a whole. The requirement "is satisfied when each class member's claim arises from the same course of events, and each class member will make similar arguments to prove a defendant's liability." Eldred, 2010 U.S. Dist. LEXIS 18260, at *44 (citation omitted).

> The commonality and typicality requirements of Rule 23(a) tend to merge: Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

Dukes, 131 S. Ct. at 2551 n.5 (quoting General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157-58, n.13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). Consistent with that tendency, Plaintiffs' Rule 23(a) discussion merges the two requirements.

i.   *Meal Breaks*

Plaintiffs maintain that they and all putative class members will be making the same argument—to wit, CHS's "policy of automatically deducting time without ensuring that uninterrupted breaks were actually taken or compensated if not reported by employees violated the law thus entitling them to unpaid wages and overtime for all missed and interrupted meal breaks that went uncompensated." (Docket No. 357 at 26.)The result, according to Plaintiffs, is that they "often worked during their meal breaks but were not paid . . . unless they specifically reported that time." (Id.) They identify the following common questions of law:

• does CHS's failure to ensure that uninterrupted meal breaks are taken when the time is already deducted from the employees' pay constitute a violation of the NYLL;

• does CHS ensure that compensation is provided for missed and interrupted meal breaks that it knows or should know about through due diligence and reasonable inquiry;

• does CHS's policy of only paying for work performed during meal breaks if it is reported by employees comply with the law; and

• does CHS's policy of delegating to its supervisors the task of devising a method for capturing missed and interrupted meal breaks comply with the law.

(Docket No. 357 at 25.)

The first three questions are based on the presumption that CHS has a duty to ensure its employees comply with its meal break and reporting policies. Plaintiffs advanced this same argument in their summary judgment motion, and rely on essentially the same case law here. This Court already has determined the regulation referred to in those decisions, 29 C.F.R. § 785.13—requiring employers that promulgate "no overtime" policies to make every effort to ensure its employees do not work overtime hours—is not triggered

by policies that: (1) encourage employees to take the meal breaks they are legally entitled to, and (2) require that employees advise management when they are unable to take their full break so the employer can properly compensate them for the additional time worked. As the Supreme Court made clear in <u>Dukes</u>, the test for establishing commonality is whether a class action can "generate common answers apt to drive the resolution of the litigation." 131 S. Ct. at 2551. Questions of law that already have been posed and resolved on summary judgment do not serve that purpose.

In their final question, Plaintiffs suggest that, even assuming CHS's official meal break policy is lawful, there is a common question as to whether it is implemented unlawfully. Both here and in their summary judgment motion, Plaintiffs urge that CHS failed to "set clear (or any) uniform guidelines for employee reporting but instead [left] it up to managers and supervisors to use whatever hodgepodge methods they come up with to attempt to capture this time, [causing] not only wholly inaccurate time records but also discouraged and suppressed employee reporting." (Docket No. 357 at 15; <u>see also</u>, Docket No. 466-1 at 21.) In short, they argue that CHS's decision to delegate to department managers the task of implementing a method for employee reporting resulted in wage and hour violations. Although this Court concluded there are questions of fact relative to policy implementation that preclude summary judgment on FLSA liability, such a holding is not determinative of Plaintiffs' claim of commonality for purposes of Rule 23.

CHS, relying on <u>Dukes</u> and its progeny, maintains that affording individual supervisors discretion is "just the opposite of a uniform employment practice that would provide commonality needed for class action." 131 S. Ct. at 2554. The plaintiffs in <u>Dukes</u>, former and current female Wal-Mart employees, alleged that, despite an official corporate

policy prohibiting discrimination, Wal-Mart allowed its managers discretion in pay and promotion decisions with results that disproportionately favored male employees. The plaintiffs maintained that the class was bound by a common corporate culture of gender discrimination. Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 141, 145 (N.D. Cal. 2007.) The district court certified a nationwide class of female employees who had been or may be subject to Wal-Mart's pay and promotion practices. The certification was affirmed by a three-judge panel, Dukes v. Wal-Mart Stores, Inc., 474 F.3d 1214 (9th Cir. 2007), and on rehearing Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571 (9th Cir. 2010) (en banc). The Supreme Court granted certiorari to consider, among other things, whether class certification was consistent with Rule 23(a) and, in particular, whether the commonality prerequisite was met.

The Court explained that a common contention is sufficient for purposes of Rule 23(a) if a determination of its truth or falsity will, "in one stroke," resolve an issue that is central to the validity of each putative plaintiff's claim. Dukes, 131 S. Ct. at 2545. Because Wal-Mart had an announced policy forbidding discrimination, the plaintiffs were required to offer "significant proof" that the company actually operated under a general policy to the contrary. The Court found that the only policy the plaintiffs convincingly established was the "policy" of giving local supervisors discretion in employment matters, and observed it was unlikely that all managers would exercise that discretion in a common way without some common corporate direction. It went on to conclude that the "[plaintiffs'] attempt to show such direction by means of statistical and anecdotal evidence falls well short" of the showing required to establish commonality. Id.

Dukes was decided on June 20, 2011 and, since then, a number of courts have

applied its reasoning to putative Rule 23 class actions alleging state wage and hour violations. For example, the plaintiffs in <u>Fernandez v. Wells Fargo Bank, N.A.</u> were employed at Wells Fargo and Wachovia bank branches located in New York State and held positions that primarily involved customer service and business generation. No. 12-CV-7193, 2013 U.S. Dist. LEXIS 124692, at *3-4 (S.D.N.Y. Aug. 27, 2013). They sought Rule 23 certification of NYLL claims alleging, among other things, that the banks' policies of limiting overtime while delegating responsibilities that could not be met in 40 hours meant they were required to perform uncompensated, off-the-clock work before and after their shifts and also during meal periods due to high volumes of customer traffic. <u>Id</u>. at 5-7. The district court examined the plaintiffs' evidence and found it insufficient to establish that the proposed class was subject to a common, New York-wide policy to limit their hours or require off-the-clock work. The evidence and testimony presented were limited to directives and employee experiences that were branch-specific. While recognizing that such evidence may be used to demonstrate unlawful conduct toward one or more individuals at that location, the district court found it insufficient to demonstrate a common state-wide policy concerning overtime. Moreover, the defendants' official policies were that employees should record all hours worked and that time worked during meal periods is considered paid time. Thus, the plaintiffs were required to offer "significant proof" of a <u>de facto</u> policy to deny payment for such work. <u>Id</u>. at 17-19. Because they had not, the district court held they failed to establish the commonality requirement. <u>Id</u>. at 19; <u>see</u> <u>also</u>, <u>Romero v. H.G. Auto. Group, Inc.</u>, No. 11-CV-386, 2012 U.S. Dist. LEXIS 61151, at *50 (S.D.N.Y. May 1, 2012) (noting that "[a]fter <u>Dukes</u>, . . . the fact that Plaintiff came up with a list of common questions is no longer sufficient," and finding the plaintiff had failed to state a common

51

contention central to the validity of proposed class claims).

Similarly, the plaintiff in <u>Coleman v. Jenny Craig, Inc.</u> brought claims under the FLSA and California labor law alleging, among other things, that employees often worked during meal and rest periods without being paid. No. 11-CV-1301, 2013 U.S. Dist. LEXIS 176294 (S.D. Cal. Nov. 27, 2013). Jenny Craig's official policy was to pay for all hours worked. It also called for employees to take meal breaks and rest periods, and to accurately report their work time. The district court found the plaintiff's anecdotal evidence and testimony actually confirmed "the lack of a uniformly applied . . . policy prohibiting employees from taking meal and rest breaks."[21] <u>Id</u>. at 27-28. In addition, the employer produced evidence that its managers ensured missed meal breaks were entered in its timekeeping system. <u>Id</u>. at 30-31. The district court concluded the plaintiff's evidence did not establish common wage and hour practices that resulted in the underpayment of wages for the described class of employees and that, absent commonality, certification was inappropriate. <u>Id</u>. at 32; <u>see</u> <u>also</u>, <u>Gonzalez v. Millard Mall Servs.</u>, 281 F.R.D. 455, 461-64 (S.D. Cal. 2012) (where employer's meal and break policy conformed to applicable laws and wage orders and project manager at each location had discretion in scheduling hours of work and meal periods, employees' conflicting testimony not sufficient to show there was a uniform practice to require work during meal periods).

District courts applying <u>Dukes</u> also have declined to certify Rule 23 class actions brought by nurses against heath care facilities. <u>Roth v. CHA Hollywood Med. Ctr, L.P.</u>

---

[21] In particular, "some days she took her complete lunch break, some days she did not; some days her centre was too busy for lunch, some days it was not; some days her supervisor would make her feel guilty about taking a lunch break, some days she did not." <u>Id</u>. at 28.

involved meal break claims brought by nonexempt registered nurses and licensed vocational nurses who worked 12-hour shifts in one of 22 departments. No. 12-CV-07559, 2013 U.S. Dist. LEXIS 152856 (C.D. Cal. Oct 25, 2013).The court examined the declarations from putative class members, noting that "they run the gamut on meal breaks," with some nurses testifying they frequently did not have adequate coverage to take breaks, and others asserting they were able to take breaks by using a buddy system or being relieved by a charge nurse. The court concluded such testimony did not demonstrate a uniform, classwide policy of rendering employees unable to take breaks. Id. at 16-18. "[A]djudication of these claims would require an individual determination of whether a particular nurse was too busy, had no coverage, or both for each rest and meal break to which she was entitled. When the impact of an employer's policies depends on each individual employee's circumstances, class certification is not appropriate." Id. at 18-19.

In Camilotes v. Resurrection Health Care Corp., staff nurses employed at the defendant's hospitals alleged that they were regularly required to work through all or part of their meal periods and were not paid for all hours worked due to the employer's use of an automatic meal break deduction. 286 F.R.D. 339. The district court denied the nurses' Rule 23 motion, noting:

> Although Plaintiffs argue that Defendants' implementation of the automatic deduction policy caused [wage and hour] violations, Plaintiffs have not demonstrated that Defendants' implementation of the policy was uniform system-wide. Indeed, the evidence shows the opposite—specifically, that Defendants delegated authority to department managers within each hospital to determine how to implement Defendants' policies, including developing department-specific procedures related to the automatic deduction policy. In particular, managers implemented policies and practices to address how to schedule meal periods, where employees may take their meal periods, how employees are relieved from duty for their meal periods, whether employees may take assigned cell phones or pagers with them on their meal periods,

whether supervisory permission is required to take a meal period, and how employees record time worked.

Id. at 351, 354.

Although the district court ultimately denied certification under Rule 23(b)(3), it did so after expressly finding that the evidence did not support the existence of a uniform, system-wide policy.

Unlike the nurses in Roth and Camilotes, the name Plaintiffs here seek to certify a much broader class of all current and former nonexempt CHS employees working in any position at any CHS facility during the specified time period. Thus, they must show that some common policy extends not only to employees engaged in direct patient care, but to such diverse positions as housekeeping, billing, dietary, groundskeeping and any other of the 350 job titles CHS maintains.

Plaintiffs have offered no meaningful evidence of a system-wide CHS policy that results in employees working through meal periods without pay. As previously noted, CHS's policies are facially valid, and call for employees to be paid for all hours worked. Having fully considered the evidence presented,[22] this Court finds no basis to conclude that CHS maintains a uniform policy of paying only for work that is reported by employees, or that it uniformly implements its policies in a manner that violates the law. Plaintiffs do not cite to any system-wide CHS directive that employees could not work during meal periods, or that they would be paid for such work time only if they reported it. The few documents they do provide apply to particular departments or facilities and suggest, at most, an intent

---

[22]  Plaintiffs deposition testimony and evidence, including the affirmations of putative plaintiffs, as well as CHS's declarations and evidence are cited and discussed above and need not be repeated here.

to limit work during meal periods to the extent feasible—e.g., "I always want you to put patient safety first but I do have a budget that I must adhere to" (Docket No. 466-11).

The testimony given by the name Plaintiffs may be most notable for its vagueness. No name Plaintiff was able to identify, even on a generalized basis, how often they missed meal periods, how often they reported the missed meal periods, or the content of any purported departmental directive or statement advising them they were expected to perform unpaid work during meal breaks. They generally conceded that, when they did report their time in a log book or to their supervisor, they were paid for the time and that their supervisor would not know of mealtime work they did not report.

It is undisputed that each department manager was tasked with developing and implementing CHS meal break and reporting procedures in his or her department. Some scheduled employee meal breaks and arranged for coverage, others left it to employees to decide how to stagger their breaks; some managers asked to be verbally informed of work during meal periods, some relied on department-specific log books, and some accepted notes left by employees.

The declarations and affirmations contain tremendous variation in the circumstances of and frequency with which CHS employees experienced missed or interrupted meal breaks. Plaintiffs and other CHS hourly workers attested to missing from none to most of their meal periods, to reporting from none to all of their missed or interrupted breaks, to having various reasons for not reporting work during meal periods (from "I don't know [why]. I just never did," to "[our supervisor] made us feel we were not doing our jobs [if we had to work during lunch]"), and to having been paid for from none to all of their missed or interrupted meal periods. Experiences differed amongst job titles and duties, the nature of

the facility at which employees worked, and their department-specific work environment.

Plaintiffs contend the differing experiences and circumstances CHS seeks to highlight are of no moment. They urge the Court to follow a trio of cases issued by the District Court for the Northern District of New York on March 8, 2011, in which that court found, in similar circumstances, that the plaintiffs had established commonality. Meyers v. Crouse Health Sys., Inc., 274 F.R.D. 404; Hamelin v. Faxton-St. Luke's Healthcare, 274 F.R.D. 385; and Colozzi v. St. Joseph's Hospital Health Center, 275 F.R.D. 75. In those cases, as here, the employers "delegate[d] to department supervisors the task of overseeing the cancellation of automatic deductions." See Colozzi, 275 F.R.D. at 85. The district court concluded in each case that there was a common question as to, among other things, the lawfulness of this delegation. This Court has reviewed the cited cases, issued more than three months prior to Dukes, and finds them unpersuasive.

Notwithstanding Plaintiffs attempt to distinguish or limit Dukes' applicability, numerous courts have since applied its reasoning in wage and hour cases, finding that giving individual supervisors discretion to apply policies in a manner best suited to their department or unit is just the opposite of a system-wide practice that would provide the commonality needed for class action. Here, Plaintiffs have failed to demonstrate "the existence of a policy that systematically deprived employees of pay for time worked during meal periods." (Docket No. 404 at 16.)

Because the question of CHS's NYLL liability will come down to whether, on a department-specific basis, a particular supervisor did not follow CHS's directive to devise and implement a method for reporting mealtime work, discouraged the reporting of mealtime work, or knew the work was performed but did not audit and correct time cards

56

as required, Plaintiffs have not met the commonality prerequisite. There is an additional factor weighing against commonality here. This Court has granted summary judgment in favor of CHS with regard to most of the NYLL claims advanced by Plaintiffs Hinterberger and Williams on the ground these employees are exempt, or largely exempt, from the NYLL's wage and overtime requirements. Plaintiffs have not raised any question of law or fact that would be common to a mix of hourly exempt and nonexempt workers or, as discussed above, employees whose status may vary based on their earnings in a particular week.

ii.    *Rounding*

Plaintiffs also seek certification of a class consisting of all hourly CHS employees subject to CHS's uniform rounding policy.[23]

Federal regulation describes the circumstances in which rounding is permissible as follows::

> "Rounding" practices. It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48(b). Although no court in this Circuit has been asked to address this standard, other courts have found that rounding policies that "'on average, favor neither

---

[23] While no New York statute or regulation addresses the permissibility of rounding policies, New York's Department of Labor generally follows the FLSA and related regulations in enforcing Articles 6 and 19 of the Labor Law. The parties do not address the issue, but apparently presume that New York follows federal law with respect to rounding.

overpayment nor underpayment'" of wages are permissible, while those that "'systematically undercompensate employees'" are unlawful. Mendez v. H.J. Heinz Co., No. 12-CV-5652, 2012 U.S. Dist. LEXIS 170785, at *6 (C.D. Cal. Nov. 13, 2012) (quoting Alonzo v. Maximus, Inc., 832 F. Supp. 2d 1122, 1126-27 (C.D. Cal. 2011)). According to Plaintiffs, CHS's facially neutral rounding policy results in consistent rounding down of time because the related time and attendance policies subject employees to discipline for clocking in more than six minutes late or out more than six minutes early. (Docket No. 357 at 11-12, 27.)

CHS's first argument in opposition to certification is a procedural one. It notes that "[a]fter over four years of litigating this case, plaintiffs' instant motion is the first mention they have made of any claim arising from allegedly unlawful rounding." (Docket No. 386 at 46.) Neither the Complaint nor Amended Complaint refer to a rounding policy,[24] nor did any name Plaintiff testify regarding injury arising from a rounding policy or to the existence of a rounding policy at all.

Plaintiffs summarily dismiss CHS's argument in a footnote, and maintain the proposed rounding class "is simply a more narrowly defined class of preliminary and postliminary work asserted in conformance with the evidence." (Docket No. 404 at 22 fn.3.)

---

[24] The entirety of Plaintiffs' pleading in this regard alleges:

Catholic suffered or permitted to perform work before and/or after the end of their scheduled shift but were not paid for performing such work as a result of defendants' policies, practices and/or time recording system (the "Unpaid Preliminary and Postliminary Work Policy") (Docket No. 227 ¶ 72); and

Class members are also subject to the Unpaid Preliminary and Postliminary Work Policy and Unpaid Training Policy and are not fully compensated for all work performed pursuant to such policies. (Id. ¶ 89.)

This Court disagrees with Plaintiffs' suggestion that their bare allegations of unpaid preliminary and postliminary work were sufficient to put CHS on notice of a rounding claim. The terms "preliminary" and "postliminary" are given particular meaning in the wage and hour context—"'preliminary activity' mean[s] an activity engaged in by an employee before the commencement of his 'principal' activity . . . and 'postliminary activity' means an activity engaged in by an employee after the completion of his 'principal' activity." 29 C.F.R. § 790.7; see also, § 785.5. A rounding claim is something quite different; it arises, if at all, from rounding the clocked times at which employees start and stop their "principal" activities. See Lacy v. Reddy Elec. Co., No. 11-CV-52, 2013 U.S. Dist. LEXIS 97718, at *37 (S.D. Ohio, July 11, 2013) (to recover damages under rounding theory, employees must show they clocked in and engaged in principal activities before their scheduled start time, but were not compensated); see also, Gorman v. Consol. Edison Corp., 488 F.3d 586, 590 (2d Cir. 2007) (recognizing the substantial body of case law discussing distinction between preliminary and postliminary activities on the one hand, and principle activities of employment on the other). In short, a rounding claim cannot reasonably be read into a claim alleging unpaid preliminary and postliminary work.

Plaintiffs next cite Lundquist v. Security Pac. Auto. Fin. Servs. Corp., 993 F.2d 11, 14 (2d Cir. 1993), and advise "it is well-established that the district court 'is not bound by the class definition proposed in the complaint.'" (Docket No. 404 at 22 fn.3.) This Court does not disagree; in fact, it declined to be bound by Plaintiffs' very broad class definition in conditionally certifying a much narrower group for collective action under the FLSA. What the Court is bound by is the claims that can be reasonably read into the complaint which, here, do not include an unlawful rounding claim. Plaintiffs cannot amend their

59

pleadings by way of the instant Rule 23 motion. For the reasons stated, Plaintiffs motion for certification of a NYLL rounding class is denied.

\* \* \* \* \* \* \*

Having concluded that Plaintiffs' motion for Rule 23 certification of a meal break class and rounding class will be denied, the Court need not address the parties further arguments with respect to Rules 23(a)(2), (a)(3), and (b).

c.   *Plaintiffs' Request for Denial Without Prejudice*

Plaintiffs assert that "discovery to date has revealed more than sufficient evidence to allow class certification of the meal break and rounding claims." (Docket No. 357 at 4.) They request, however, that if the Court intends to deny certification, they be permitted to amend their motion or file a new motion after further discovery. CHS, of course, asks that the motion be denied with prejudice.

Having reviewed the case history, this Court finds no reason to dismiss without prejudice. The Court initially set August 8, 2012 as the deadline for filing the Rule 23 class certification motion. (Docket 329.) On August 6, 2012, Plaintiffs sought to amend this schedule on the ground that certification-related discovery remained outstanding. They proposed a new filing deadline of December 17, 2012. (Docket No. 334.) Magistrate Judge Foschio considered Plaintiffs' request and extended the deadline only to October 5, 2012. Noting that "this case has been on the court's docket for well over four years," Judge Foschio concluded the certification motion should be filed without undue delay. He expressly provided that in the event CHS opposed the motion:

> Plaintiffs may request the court postpone consideration of the [Rule 23] motion until limited discovery reasonably necessary to enable Plaintiffs to meet [their] Rule 23 requirements is taken in response to Defendants'

60

specific grounds for opposing Plaintiffs' motion. Assuming a proper basis for Plaintiffs' request is provided, the court will consider permitting such class precertification discovery to be completed within a limited period, in tandem with the on-going merit-based discovery . . . .

(Docket No. 350 at 2.)

CHS filed its opposition on October 31, 2012, and Plaintiffs filed their reply on November 28, 2012. (Docket Nos. 386, 404.) On November 28, 2012, Plaintiffs moved for a stay of merits discovery. The motion does not mention certification-related discovery. (Docket No. 403.) In short, at no time prior to filing their Rule 23 reply did Plaintiffs take the opportunity to seek additional Rule 23 discovery pursuant to Judge Foschio's Order. Accordingly, Plaintiffs' request for the opportunity to do so now is denied.[25]

### 2. Certification and Decertification under the FLSA

The FLSA permits one or more "similarly situated" employees alleging violations of the statute to institute a collective action. 29 U.S.C. § 216(b). A majority of district courts, including those within the Second Circuit, employ a two-step process to determine whether a lawsuit should proceed as an FLSA collective action.[26]  *See, e.g.,*  Hens v. Clietlogic Operating Corp., No. 05 Civ. 381S, 2006 U.S. Dist. LEXIS 69021, at *9 (W.D.N.Y. Sept. 22, 2006); Zivali v. AT&T Mobility LLC, No. 08 Civ. 10310, 2009 U.S. Dist. LEXIS 74420, at *5-6 (S.D.N.Y. Aug. 24, 2009); Monger v. Cactus Salon & Spa's LLC, No. 08 Civ. 1817,

---

[25] This Court acknowledges that the procedural basis upon which it is denying certification of a rounding class might ordinarily result in a denial without prejudice to allow Plaintiffs to seek leave to replead. I have concluded such a result is unwarranted here. Plaintiffs did not move for leave to amend at any time after CHS challenged the sufficiency of the pleadings with regard to certification. And, although Plaintiffs have now requested a dismissal without prejudice, they do not base the request on an intent to seek leave to amend their Amended Complaint. Thus, dismissal with prejudice is warranted here.

[26] Although the Circuit Court has not addressed directly the standard to be applied to motions seeking FLSA certification, it has noted the district courts' coalescence around the two-step method and characterized this approach as "sensible." Myers v. Hertz Corp., 624 F.3d 537, 554-55 (2d Cir. 2010), cert. denied, 132 S. Ct. 368, 181 L. Ed. 2d 234 (2011).

2009 U.S. Dist. LEXIS 60066, at *4 (E.D.N.Y. July 6, 2009); Ruggles v. WellPoint, Inc., 591 F. Supp. 2d 150, 157-58 (N.D.N.Y. 2008).

At the initial step—the conditional certification or notice stage—the court determines, based on the pleadings, affidavits, and declarations, whether notice will be sent to potential opt-in plaintiffs who may be "similarly situated" to the named plaintiffs with respect to whether a FLSA violation has occurred. Hens, at *10; Bah v. Hoe Mania, Inc., 08 Civ. 9380, 2009 U.S. Dist. LEXIS 40803, at *8 (S.D.N.Y. May 13, 2009) (citation omitted). The evidentiary standard is lenient at stage one; the plaintiffs need make only a "modest factual showing" that they and the other putative collective action members "together were victims of a common policy or plan that violated the law." Rubery v. Buth-Na-Bodhaige, Inc., 569 F. Supp. 2d 334, 336 (W.D.N.Y. 2008) (citation omitted); see also, Realite v. Ark Restaurants Corp., 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998) (collecting cases). A plaintiff's burden on this step is minimal, "especially since the determination that potential plaintiffs are similarly situated is merely a preliminary one." Scholtisek v. Eldre Corp., 229 F.R.D. 381, 387 (W.D.N.Y. 2005) (quoting Gjurovich, 282 F. Supp. 2d at 104 (S.D.N.Y. 2003) (internal quotation marks and citation omitted)).

As discussed above, Plaintiffs moved for FLSA certification early in this case and the Court applied the lenient first-step standard to the pleadings, affidavits and declarations then of record. A collective action was conditionally certified on October 21, 2009, to include all present and former hourly registered nurses, charge nurses, staff nurses, licensed practical nurses, and respiratory therapists who performed patient care duties at eleven CHS hospitals, adult homes, and nursing homes and were subjected to an unlawful meal break deduction policy. (Docket No. 221.) CHS's motion and Plaintiffs' cross-motion

to certify a much broader collective action than was conditionally certified, now call for a

final determination on how this case should proceed.

The second step of the FLSA analysis occurs upon the completion of class

discovery, when the court can examine the evidentiary record and make factual findings

as to whether the conditionally certified plaintiffs are, in fact, similarly situated to the lead

plaintiffs. Romero v. Flaum Appetizing Corp., No. 07 Civ. 7222, 2009 U.S. Dist. LEXIS

80498, at *7-8 (S.D.N.Y. Aug. 17, 2009) (citing Lee v. ABC Carpet & Home, 236 F.R.D.

193, 197 (S.D.N.Y. 2006)).  If the court determines that all plaintiffs are similarly situated,

the collective action will proceed to trial. If the determination is that they are not similarly

situated, "the court will decertify the class, the claims of the opt-in plaintiffs will be

dismissed without prejudice, and the class representatives may proceed to trial on their

individual claims." Rubery, 569 F. Supp. 2d at 336.  Alternatively, if the class description

is shown to require modification, that can be accomplished at the second tier inquiry. Id.

at 338 (citations omitted). The burden remains with Plaintiffs to show, by a preponderance

of evidence, that they and the opt-in plaintiffs are "similarly situated" and the collective

action should be certified for trial.[27] Zavala v. Wal-Mart Stores Inc., 691 F.3d 527, 534 (3d

---

[27] The Second Circuit has not yet addressed the specific level of proof applicable to the second-stage inquiry. See Myers. v. Hertz Corpl, 624 F.3d 537, 555 (2d Cir. 2010), cert. denied, 132 S. Ct. 368 (2011 (simply noting that, at second stage, the district court will consider whether name and opt-in plaintiffs are similarly situated based "on a fuller record"). When the Third Circuit was recently presented with this issue, it concluded that the standard applied when determining whether Rule 23 certification is appropriate—i.e., requiring a showing by the preponderance of evidence—should also apply at the second stage of the FLSA collective action inquiry. The Seventh Circuit, collecting cases, reached a similar conclusion, noting that:

> despite the difference between a collective action and a class action and the absence
> from the collective-action section of the Fair Labor Standards Act of the kind of detailed
> procedural provisions found in Rule 23, there isn't a good reason to have different
> standards for the certification of the two different types of action, and the case law has
> largely merged the standards, though with some terminological differences. Simplification

Cir. 2012).

There is only one determination to be made at this second stage: Were Plaintiffs and the opt-in plaintiffs[28] together subject to a meal break policy or practice, the lawfulness of which is susceptible to generalized.

The parties have supplied substantial briefing on this question,[29] along with declarations and exhibits. The Court has reviewed all submissions, but concludes it can forego additional analysis here. The "fuller record" on which this Court must base its final determination has been fully discussed and considered in the contest of Plaintiffs' Rule 23 motion. For purposes of the instant motions, the Court notes that Plaintiffs concede CHS's official policies, as written, comply with the FLSA. They have not identified any system-wide policy or practice that was applied uniformly to each of the four name Plaintiffs, much less the numerous opt-in plaintiffs and thousands of putative plaintiffs. To the contrary, Plaintiffs contend the alleged FLSA violations arise from a hodgepodge of procedures implemented at the department level. As such, a determination of the merits is not susceptible to generalized proof, but will require individualized inquiries regarding the procedures in place at each department, and the conduct of individual managers and employees.

Accordingly, the conditional FLSA collective action is decertified, and the claims of

---

is desirable in law, especially in the present context, because joining a collective and a class action or actions in one suit, as in this case, is both common and, we have held, permissible.

Espenscheid v. DirectSat USA, LLC, 705 F.3d 770, 772 (7th Cir. 2013) (citations omitted).

[28] While recognizing that Plaintiffs seek final certification of a much larger group of employees, the appropriate place to start the analysis is, in this Court's view, with the class conditionally certified.

[29] In all, the briefing on the motion and cross-motion total approximately 120 pages.

the opt-in plaintiffs are dismissed without prejudice.

## IV.  CONCLUSION

For the reasons given above, Defendants' motions are granted, Plaintiffs' motions are denied, the opt-in plaintiffs' FLSA claims are dismissed without prejudice, and this case will proceed on the individual claims of the name Plaintiffs.

## V.  ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' motion for Rule 23 class certification (Docket No. 356) is DENIED;

FURTHER, that Defendants' motion for summary judgment dismissing certain of the New York minimum wage order and labor law claims of Plaintiffs Hinterberger and Williams (Docket No. 385) is GRANTED;

FURTHER, that Defendants' motion to decertify Plaintiffs' conditionally certified FLSA collective action (Docket No. 397) is GRANTED;

FURTHER, that Plaintiffs' cross motion to finally certify a FLSA class (Docket No. 414) is DENIED;

FURTHER, that Plaintiffs' motion for partial summary judgment on liability (Docket No. 466) is DENIED; and

FURTHER, that the FLSA claims of all Opt-in Plaintiffs are dismissed without prejudice.

SO ORDERED.

Dated:     March 23, 2014
           Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                            Chief Judge
                                     United States District Court